**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| NATIONAL FIRE & MARINE INSURANCE COMPANY, a Nebraska corporation, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) | No.: |
| | ) | |
| WINDY CITY ANESTHESIA, P.C., MICHAEL TURNER, and MICHAEL KEATING JR., as Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Plaintiff, NATIONAL FIRE & MARINE INSURANCE COMPANY, by and through its attorneys, for its Complaint for Declaratory Judgment against Defendants WINDY CITY ANESTHESIA, P.C., MICHAEL TURNER and MICHAEL KEATING JR., as Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, and states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. §1332 and 28 U.S.C.A. §2201 based on diversity of citizenship between the Plaintiff and Defendants.

2.      The matter in controversy in this cause exceeds $75,000. The insurance policies at issue in this matter have limits of liability of $1 million per occurrence. The underlying claimants seek damages against the insured in excess of $50,000, and the costs to defend against such matter will exceed $25,000. Therefore, the amount in controversy exceeds $75,000.

4825-5510-0697.1

1

3.      Venue is proper in this district pursuant to 28 U.S.C.A. §1391 because certain events giving rise to this matter occurred in this judicial district and the Defendants are subject to the personal jurisdiction of this Court.

## PARTIES

4.      Plaintiff, National Fire & Marine Insurance Company ("National Fire") is an insurance company organized under the laws of the state of Nebraska with a principal place of business in Omaha, Nebraska.  Therefore, National Fire is a citizen and resident of the state of Nebraska.

5.      Windy City Anesthesia is an Illinois professional corporation located in Frankfort, Illinois, and is therefore a citizen and resident of the state of Illinois.

6.      Michael Turner is a citizen and resident of the state of Illinois.

7.      Michael Keating Jr. is a citizen and resident of that the State of Illinois.  Mr. Keating is joined in this suit as a necessary party defendant.

## FACTUAL ALLEGATIONS

### *National Fire Policies*

8.      National Fire issued claims made and reported Policy no. ES013814 to Windy City Anesthesia P.C. for the policy period of April 21, 2020 to April 21, 2021 ("National Fire 2020 Policy") The Policy has limits of liability of $1 million per event and $3 million in the aggregate, subject to a $10,000 Per Event Deductible. A true and accurate copy of the National Fire 2020 Policy is attached hereto as **Exhibit A.**

9.     National Fire also issued claims made and reported Policy no. ES013814 to Windy City Anesthesia P.C. for the policy period of April 21, 2023 to April 21, 2024 ("National Fire 2023 Policy") The Policy has limits of liability of $1 million per event and $3 million in the aggregate, subject to a $10,000 Per Event Deductible. A true and accurate copy of the National Fire 2023 Policy is attached hereto as **Exhibit B.**

### *Underlying Lawsuit*

10.     On February 18, 2020,  Michael Keating Jr., as Administrator of the Estate of Crystal Loraine Walker Keating ("Keating"), filed civil action no. 2020L002002 in the Circuit Court of Cook County, Illinois against Ayoub Sayeg, M.D., Surgical Assistant Luis, Certified Surgical Technologist Lisa, Certified Registered Nurse Anesthetist Mike, 63rd Medical & Surgical Center L.L.C., 63rd Laser & Skin Clinic, L.L.C., Anti-Aging & Cosmetic Institute of Chicago, Ltd., Fernando Orellana M.D., Angell Jones, M.D., Theresa Mazur, R.N., Carmen Cavner R.N., Nurse Nassar, R.N.,  and Holy Cross Hospital ("Keating Lawsuit").

11.     On May 26, 2020, Michael Turner, by his counsel, entered an Appearance in the Keating Lawsuit.  A true and accurate copy of Turner's Appearance is attached hereto as **Exhibit C.**

12.     On June 9, 2020, Keating filed a First Amended Complaint.  A true and accurate copy of the First Amended Complaint filed in the Keating Lawsuit is attached hereto as **Exhibit D.**

13.     In the First Amended Complaint, Keating alleges that on November 1, 2018, Dr. Ayoub Sayeg performed multiple surgical procedures upon Crystal Loraine Walker Keating ("Walker"), at a facility located at 3918 W. 63rd Street, Chicago, Illinois.   Keating alleges that Dr. Sayeg was assisted

by the defendants, including Michael Turner, who was at all relevant times a Certified Registered Nurse Anesthetist.

14.     Keating alleges that after the surgery was completed, Ms. Walker experienced symptoms of blood loss, and was transported to Holy Cross Hospital.   He alleges that later that night, Ms. Walker died, due to the alleged negligence of the defendants.

15.     Keating asserts two causes of action against Michael Turner:   Wrongful Death (Count V); and Survival Action (Count VI).  Keating alleges that Turner violated his duty to care by failing to recognize and/or disregarding the signs of extensive blood loss and tachycardia during and following the procedures, failing to timely call emergency responders, and failing to monitor Walker and follow up after the completion of the procedures.

16.     Upon information and belief, Turner is being afforded a defense against the Keating Lawsuit by the insurer of the defendant facility.

17.     On or before May 22, 2020, Windy City Aesthetics first became aware of the Keating Lawsuit.   Windy City did not notify National Fire of the lawsuit.

18.     On January 10, 2024, Michael Turner first provided National Fire with notice of the Keating Lawsuit.

19.     National Fire contends it has no obligation to defend or indemnify Michael Turner against the Keating Lawsuit.  Michael Turner contends that National Fire has an obligation to defend and indemnify him against the Lawsuit.  As a result, a present justiciable controversy exists regarding National Fire's rights and obligations, if any, with regard to these claims.

## COUNT I

### (INSURING AGREEMENT – 2020 POLICY)

20.     National Fire adopts and incorporates by reference paragraphs 1- 19 as though set forth herein as this paragraph 20.

21.     The National Fire 2020 Policy contains the follow Notice:

**NOTICE:**

**This Insuring Agreement contains claims-made and reported coverage.  Claims expenses are included within the Limit of Liability and the Limit of Liability available to pay damages shall be reduced and may be completely exhausted by the payment of claim expenses. Please read this policy carefully.**

22.     The Insuring Agreement of the National Fire Policy states, in pertinent part, as follows:

I.      *INSURING AGREEMENT – LOSS*

A.      The **Company** will pay on behalf of **covered providers** and **agents** all **loss** and **claims expense** arising from a **health care event** that took place on or after the **retroactive date**. However, the **loss** and **claims expense** must also result from:

1.      a **claim** that was **first made** against the **covered provider** or **agent,** during the **policy period.**  In addition, the **claim** must have been reported to the **Company**, in writing, during the **policy period** to be covered under this policy.

*             *             *

23.     **Claim** is defined in *SECTION III- DEFINITIONS* (G) as an express, written demand upon an **Insured** for money or services as compensation for civil damages.

24.     *SECTION II. WHO IS INSURED* states:

For the purposes of this Insuring Agreement, an **Insured** is:

A.      a **contract staffing organization;**
B.      A **new facility**;
C.      an **agent;** or,
D.      a **covered provider**;
As defined below.

25.     The term **Agent** is defined in the Policy, in pertinent part, as:

1.      **Agent** means a person who was acting within the scope of their duties as:

a.      an **employee, administrator, committee member,** or **student** of the **contract staffing organization** at the time of the **health care event** or **wrongful credentialing services event;**

\*       \*       \*

4.      As used to define an **agent,** above:

a.      **employee** means any person employed by, or under contract with, the **contracting staffing organization** at the time of a **health care event.** It includes an authorized volunteer worker. However, it does not include any:

(1)      Physician or dentist, including residents;

(2)      Certified registered nurse anesthetist, nurse midwife, nurse practitioner, physical's assistant, podiatry, **covered provider,** or **surgical assistant.**

26.     The term **covered provider** is defined in *SECTION III- DEFINITIONS* (L) to include:

1.      any formerly employed or formerly contracted health care provider, but only while providing **professional services** as defined by contract between the **contract staffing organization** and a third party, and while acting on behalf of the **contracting staffing organization** at the time of the **health care event.** However, a formerly employed or formerly contracted health care provider is not a **covered provider** if any other insurance is available to cover any **claims** made against the formerly employed or contracted health care provider; or

2.      any **W-2 provider or non W-2 provider** providing professional services as defined by contract between the **contract staffing organization** and a third party, and while acting within the scope of their duties on behalf of the **contract staffing organization** at the time of the **health care event.**

\*       \*       \*

A **covered provider** shares the coverage provided to the **contract staffing organization,** including its limits of liability and any applicable restrictions.

4825-5510-0697.1

27. **First made** is defined in *SECTION III- DEFINITIONS* (R) as:

  R. **First made** means the date on which the **authorized insured** first received a **claim.** All **claims** arising from **loss** suffered by the same claimant(s) shall be considered as having been **first made** when the first such **claim** is received by the **Insured.**

28. **Authorized insured** is defined in *SECTION III. DEFINITIONS* (C) as:

  C. **Authorized insured** means any **Insured** authorized by the **first named insured** to give or receive notice of a **claim** or **potential claim.**

29. The General Conditions of the National Fire 2020 Policy also contain the following Reporting Requirement:

  1. The **Company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon the **authorized insured's** forwarding, as soon as practicable and within the requirements of the applicable Insuring Agreement, notice of every **claim,** demand, summons or legal paper the **authorized insured** receives.

30. At the time of the alleged injury to Ms. Walker, Michael Turner was a certified nurse anesthetist contracted by the named insured contract staffing agency, Windy City Anesthesia, P.C., to provide services to Anti-Aging Surgical Center.

31. Upon information and belief, Turner is no longer a contracted provider of Windy City.

32. On or before May 22, 2020, Michael Turner was first served with the Keating Lawsuit.

33. On or before May 22, 2020, Dan Borvan, President of Windy City Anesthesia, P.C., was notified of the lawsuit.

34. On January 10, 2024, Michael Turner first notified National Fire of the Keating Lawsuit. Prior to January 10, 2024, neither Windy City nor Michael Turner notified National Fire of the occurrence or lawsuit.

35.     The Keating Lawsuit is outside the scope of the Insuring Agreement of the National Fire 2020 Policy, because the claim was not both first made and reported during the policy period, as required to invoke coverage.   National Fire can therefore have no obligation to defend or indemnify any Insured against the Keating Lawsuit.

WHEREFORE, National Fire prays that this Honorable Court declare that National Fire has no obligation to defend or indemnify Michael Turner or any Insured against the Keating Lawsuit, and grant such other and further relief as this Court deems just and proper, including fees and costs.

## COUNT II

### (INSURING AGREEMENT – 2023 POLICY)

36.     National Fire adopts and incorporates by reference paragraphs 1- 35 as though set forth herein as this paragraph 36.

37.     The National Fire 2023 Policy contains the follow Notice:

**NOTICE:**

**This Insuring Agreement contains claims-made and reported coverage.  Claims expenses are included within the Limit of Liability and the Limit of Liability available to pay damages shall be reduced and may be completely exhausted by the payment of claim expenses.**
**Please read this policy carefully.**

38.     The Insuring Agreement of the National 2023 Fire Policy states, in pertinent part, as follows:

I.      *INSURING AGREEMENT – LOSS*

A.      The **Company** will pay on behalf of **covered providers** and **agents** all **loss** and **claims expense** arising from a **health care event** that took place on or after the **retroactive date**. However, the **loss** and **claims expense** must also result from:

1.      a **claim** that was **first made** against the **covered provider** or **agent,** during the **policy period.** In addition, the **claim** must have been reported to the **Company**, in writing, during the **policy period** to be covered under this policy.

\*        \*        \*

39.      **Claim** is defined in *SECTION III- DEFINITIONS* (G) as an express, written demand upon an **Insured** for money or services as compensation for civil damages.

40.      *SECTION II. WHO IS INSURED* states:

For the purposes of this Insuring Agreement, an **Insured** is:

A.      a **contract staffing organization;**
B.      A **new facility**;
C.      an **agent;** or,
D.      a **covered provider**;
As defined below.

41.      The term **Agent** is defined in the Policy, in pertinent part, as:

1.      **Agent** means a person who was acting within the scope of their duties as:

a.      an **employee, administrator, committee member,** or **student** of the **contract staffing organization** at the time of the **health care event** or **wrongful credentialing services event;**

\*        \*        \*

4.      As used to define an **agent,** above:

a.      **employee** means any person employed by, or under contract with, the **contracting staffing organization** at the time of a **health care event**. It includes an authorized volunteer worker. However, it does not include any:

(1)      Physician or dentist, including residents;

(2)      Certified registered nurse anesthetist, nurse midwife, nurse practitioner, physical's assistant, podiatry, **covered provider,** or

**surgical assistant.**

42.     The term **covered provider** is defined in *SECTION II- DEFINITIONS* (L) to include:

1.      any formerly employed or formerly contracted health care provider, but only while providing **professional services** as defined by contract between the **contract staffing organization** and a third party, and while acting on behalf of the **contracting staffing organization** at the time of the **health care event.** However, a formerly employed or formerly contracted health care provider is not a **covered provider** if any other insurance is available to cover any **claims** made against the formerly employed or contracted health care provider; or

2.      any **W-2 provider or non W-2 provider** providing professional services as defined by contract between the **contract staffing organization** and a third party, and while acting within the scope of their duties on behalf of the **contract staffing organization** at the time of the **health care event.**

                    *       *       *

A **covered provider** shares the coverage provided to the **contract staffing organization,** including its limits of liability and any applicable restrictions.

43.     **First made** is defined in *SECTION III- DEFINITIONS* (R) as:

R.      **First made** means the date on which the **authorized insured** first received a **claim.** All **claims** arising from **loss** suffered by the same claimant(s) shall be considered as having been **first made** when the first such **claim** is received by the **Insured.**

44.     **Authorized insured** is defined in *SECTION III. DEFINITIONS* (C) as:

C.      **Authorized insured** means any **Insured** authorized by the **first named insured** to give or receive notice of a **claim** or **potential claim.**

45.     At the time of the alleged injury to Ms. Walker, Michael Turner was a certified nurse anesthetist contracted by the named insured contract staffing agency, Windy City Anesthesia, P.C., to provide services to Anti-Aging Surgical Center.

46.     Upon information and belief, Turner is no longer a contracted provider of Windy City.

47.     On or before May 22, 2020, Michael Turner was first served with the Keating Lawsuit.

4825-5510-0697.1

48.     The Keating Lawsuit is outside the scope of the Insuring Agreement because the claim was first made prior to inception of the Policy.  National Fire can therefore have no obligation to defend or indemnify any Insured against the Keating Lawsuit.

WHEREFORE, National Fire prays that this Honorable Court declare that National Fire has no obligation to defend or indemnify Michael Turner or any Insured against the Keating Lawsuit, and grant such other and further relief as this Court deems just and proper, including fees and costs.


Dated: February 19, 2024

                                             Respectfully submitted,

                                             NATIONAL FIRE & MARINE INSURANCE
                                             COMPANY


                                             By: /s/  Michelle M. Bracke_____
                                                    Attorney for Plaintiff



Michelle M. Bracke – ARDC No. 6224533
LEAHY EISENBERG & FRAENKEL, LTD.
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
Tel.: (312) 368-4554
Fax: (312) 368-4562
Email: mmb@lefltd.com

# EXHIBIT A



Medical Protective
Princeton Insurance Company
PLICO
MedPro RRG

05/04/2020

WINDY CITY ANESTHESIA, PC
21120 WASHINGTON PKWY
FRANKFORT, IL  60423-3112

**Re:   Policy Number ES013814**

Thank you for trusting us to protect your assets and reputation. Enclosed please find your policy underwritten by National Fire & Marine Insurance Company.

MedPro Group, a Berkshire Hathaway company, offers our insureds:

- Peace of Mind: Unsurpassed financial strength ratings of A++ (Superior) from A.M. Best and AA+ from Standard and Poor's combined with the strongest defense of claims

- Expertise: Innovative patient safety and risk solutions

- Choice: Customized insurance solutions across the healthcare continuum – nationwide

We encourage you to visit our website and Prevention & Education Center (www.medpro.com) to access information regarding the latest risk concerns and recommended strategies to help promote patient safety and satisfaction.

Please direct notice of claims in accordance with the reporting requirements of this policy as follows:

Via Email:      reportaclaim@medpro.com

Via Mail:      Medical Protective
              Attn: First Claim Reports
              5814 Reed Road
              Fort Wayne, IN 46835

Our claim experts are prepared to work with you to resolve any claim-related issues. Please feel free to contact 800-4MedPro (800-463-3776) to be connected to your claims representative who will be able to address questions or concerns about a claim involving this policy.

Sincerely,

Tim Kenesey
President and CEO

A.M. Best rating as of 05/27/2015. S&P rating as of 08/06/2015. MedPro Group is the marketing name used to refer to the insurance operations of The Medical Protective Company, Princeton Insurance Company, PLICO, Inc. and MedPro RRG Risk Retention Group. All insurance products are administered by MedPro Group and underwritten by these and other Berkshire Hathaway affiliates, including National Fire & Marine Insurance Company, all of which have earned financial strength ratings of A++ from A.M. Best. Visit www.medpro.com/affiliates for more information. © 2016 MedPro Group Inc. All Rights Reserved.

# Illinois Surplus Lines Warning Statement

### *Notice to Policyholder*

**This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.**

Compliance with Illinois Bulletin 2011-06
and
The Religious Freedom Protection and Civil Union Act

National Fire & Marine Insurance Company recognizes the rights afforded to individuals under The Religious Freedom Protection and Civil Union Act which states:

"The parties to a civil union are entitled to the same legal obligations, responsibilities, protections and benefits that are afforded or recognized by the laws of Illinois to spouses. The law further provides that a party to a civil union shall be included in any definition or use of the terms "spouse," "family," "immediate family," "dependent," "next of kin," and other terms descriptive of spousal relationships as those terms are used throughout Illinois law. This includes the terms "marriage" or "married." or variations thereon. If policies of insurance provide coverage for children, the children of civil unions must also be provided coverage. The Act also requires recognition of civil unions or same sex civil unions or marriages legally entered into in other jurisdictions."

# National Fire & Marine Insurance Company
Omaha, Nebraska

### *DECLARATIONS*
**NOTICE**: **This policy may contain claims-made coverage.  Please read this policy carefully.**

Policy Number:  ES013814

| ITEM 1 | **FIRST NAMED INSURED**:   Windy City Anesthesia, PC<br>**ADDRESS**:   21120 Washington Pkwy<br>Frankfort, IL 60423-3112 |
|---|---|

| ITEM 2 | **POLICY PERIOD**:   From   04/21/2020    to    04/21/2021<br>Both days at 12:01 a.m. at the address of the First Named Insured as stated herein. |
|---|---|

**ITEM 3**

**COVERAGES SELECTED**:
(Please refer to the applicable Schedule of Insureds for limits, deductibles, retentions, etc.)

|  | Occurrence | Claims-Made |
|---|---|---|
| CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY |  | X |

**ITEM 4**

**COVERAGES NOT SELECTED**:
HEALTH CARE ENTITIES PROFESSIONAL LIABILITY
PHYSICIANS PROFESSIONAL LIABILITY
HEALTH CARE PROVIDERS PROFESSIONAL LIABILITY

**ITEM 5**

| **DEPOSIT PREMIUM:** | $ 76,922 |
|---|---|
| **ANNUAL MINIMUM PREMIUM:** | N/A |
| **TOTAL ANNUAL PREMIUM**: | $ 76,922 |

(May reflect deposit premium, which is subject to audit.  The premium does not include any surplus lines tax, which must be collected by the producer.  Terrorism premium is not reflected in the total premium amount.)

| ITEM 6 | **PRODUCER**:   Brown & Riding Insurance Services Inc<br>3405 Piedmont Road Ste 470<br>Atlanta, GA 30305 |
|---|---|

IN WITNESS WHEREOF, National Fire & Marine Insurance Company has caused this policy to be signed by its President (and countersigned by its duly Authorized Representative, where necessary).

*Smith F. White*

President

Countersigned By: _____     Date: _____

# National Fire & Marine Insurance Company

Omaha, Nebraska

*POLICY GUIDE*

This Policy Guide has been developed to describe how your policy is formatted. This guide does not change any of the terms and conditions contained in the policy.

Your policy consists of the following items:

<u>The Declarations</u>: This page designates the first named insured, the policy number, the policy period, the coverages selected, the total premium, and the producer.

<u>Schedules of Insureds</u>: These schedules define your coverage by designating who will be insured under a particular Insuring Agreement and what limits of liability will apply. If an Insuring Agreement is attached to your policy without a corresponding Schedule of Insureds, there is no coverage under that Insuring Agreement.

<u>Insuring Agreements</u>: These documents define the scope of the particular coverage that is being provided and any unique provisions (Additional Definitions, Additional Conditions, etc.) that will apply to it. For example, they indicate the types of claims that are covered and who is eligible to request indemnity under the policy. However, as mentioned above, these Insuring Agreements only provide coverage when attached to a corresponding Schedule of Insureds.

<u>Modified Coverages</u>: These forms describe any special restrictions that may apply to certain classifications of insureds. These modifications are identified by a corresponding code in the Modified Coverage column on the applicable Schedule of Insureds. Additional code descriptions may be included in endorsements attached to your policy.

<u>Defense and Supplemental Payments</u>: If a claim or potential claim is covered under one of the Insuring Agreements, our company will have a duty to both defend and, if necessary, pay damages on the insured's behalf. This form defines the scope of our duty to defend an insured in the event of a claim.

<u>General Definitions</u>: This form contains the definitions that apply to every Insuring Agreement under your policy, unless otherwise noted. Additional or alternative definitions can be found within the definitions section of the relevant Insuring Agreement. Each word or phrase listed in **bold print** has been specifically defined within the policy. If a word has not been bolded, then its commonly understood meaning will apply.

<u>General Exclusions</u>: This form contains the exclusions that apply to every Insuring Agreement under your policy, unless otherwise noted. Additional exclusions can be found within the *ADDITIONAL EXCLUSIONS* section of the relevant Insuring Agreement.

<u>General Conditions</u>: This form defines the general duties our Company and the Insureds owe to each other under the terms of this policy contract, such as the requirements for reporting claims, the effect of other applicable insurance, the duties of the first named insured, etc.

<u>Endorsements</u>: Endorsements modify the terms and conditions of all or part of the policy and become a part of your policy. If an endorsement modifies one or more parts of the policy, but less than the entire policy, the endorsement will specify which parts of the policy are modified. It is important to understand that this is also the only method by which the terms and conditions of your policy can be altered.

If you have any questions regarding a particular provision or the coverage that is being provided to you, please contact your producer. We appreciate your patronage.

# National Fire & Marine Insurance Company

Omaha, Nebraska

*SCHEDULE OF CONTRACT STAFFING INSUREDS*
*CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT*
*(CLAIMS-MADE)*

| DECLARATIONS | |
| --- | --- |
| Policy Number:  ES013814 | First Named Insured:  Windy City Anesthesia, PC |

**DEDUCTIBLE – LOSS & CLAIMS EXPENSE**          **MODIFIED COVERAGE**

Per Event Deductible:          $ 10,000                              FNI

| SCHEDULE OF INSUREDS |
| --- |

In consideration of the payment of the premium due, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree the following persons and entities are designated as **contract staffing organizations** and **contract providers**.

| CONTRACT STAFFING ORGANIZATION | ID NUMBER | RETROACTIVE DATE | TERMINATION DATE | MODIFIED COVERAGE | PER EVENT/ AGGREGATE LIMIT OF LIABILITY | PREMIUM |
| --- | --- | --- | --- | --- | --- | --- |
| Windy City Anesthesia, PC | 1170265 | 02/11/2003 | | | $ 1,000,000 / $ 3,000,000 | $ 76,922 |

# National Fire & Marine Insurance Company

Omaha, Nebraska

### *CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT*
### *DEFENSE WITHIN THE LIMITS*
### *(CLAIMS-MADE)*

---

**NOTICE:**
**This Insuring Agreement contains claims-made and reported coverage. Claims expenses are included within the Limit of Liability and the Limit of Liability available to pay damages shall be reduced and may be completely exhausted by the payment of claims expenses.**
**Please read this policy carefully.**

In consideration of the payment of the premium due, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree as follows, subject to the terms and conditions of this policy, including the applicable limits of liability:

*I.  INSURING AGREEMENT - LOSS*

    A.  The **Company** will pay on behalf of **covered providers** and **agents** all **loss** and **claims expense** arising from a **health care event** that took place on or after the **retroactive date**. However, the **loss** and **claims expense** must also result from:

        1.  a **claim** that was **first made** against the **covered provider** or **agent**, during the **policy period**. In addition, the **claim** must have been reported to the **Company**, in writing, during the **policy period**, or 30 days thereafter, to be covered under this policy; or,

        2.  a **potential claim** that was **first discovered** by the **contract staffing organization**, or its **covered provider** or **agent**, during the **policy period**. In addition, the **potential claim** must have been reported to the **Company**, in writing, during the **policy period** to be covered under this policy.

    B.  The **Company** will pay on behalf of a **contract staffing organization** all **loss** and **claims expense** arising from a either a **health care event** or a **wrongful credentialing services event** rendered or which should have been rendered on or after the **retroactive date**. However, the **loss** and **claims expense** must also result from:

        1.  a **claim** that was **first made** against the **contract staffing organization** during the **policy period**. In addition, the **claim** must have been reported to the **Company**, in writing, during the **policy period**, or 30 days thereafter, to be covered under this policy; or,

        2.  a **potential claim** that was **first discovered** by the **contract staffing organization** during the **policy period**. In addition, the **potential claim** must have been reported to the **Company**, in writing, during the **policy period** to be covered under this policy.

    C.  All **claims** arising out of the same **health care event** or the same **wrongful credentialing services event** will be deemed to have been made at the time the first such **claim** is made against any **Insured**. Only the policy in effect when the first such **claim** is made and reported to the **Company** in writing will apply to all related **claims**, no matter when those related **claims** are made or reported. If the first such **claim** is made prior to the effective date of this policy, this policy will not apply to that **claim**, nor to any related **claim** made during this **policy period** or any **extended reporting period**.

*II.  WHO IS INSURED*

    For the purposes of this Insuring Agreement, an **Insured** is:

    A.  a **contract staffing organization**;

    B.  a **new facility**;

    C.  an **agent**; or,

    D.  a **covered provider**;

    as defined below.

---

## III. DEFINITIONS

The following definitions apply to this Insuring Agreement:

A. **Additional Insured** means any person or entity listed on a Schedule of Additional Insureds.

B. **Agent**
1. **Agent** means a person who was acting within the scope of his or her duties as:
   a. an **employee**, **administrator**, **committee member**, or **student** of the **contract staffing organization** at the time of the **health care event** or **wrongful credentialing services event**; or,
   b. a trustee, assign, or legal representative of the **contract staffing organization**, or of a person described in B.1.a., above in the event of bankruptcy, incapacity, or death.
2. An **agent** shares the coverage provided to the **contract staffing organization**, including its limits of liability and any applicable restrictions.
3. An **agent** is not, however, an **Insured**, when the **agent** has other valid and collectible insurance to cover the **claim**.
4. As used to define an **agent**, above:
   a. **employee** means any person employed by, or under contract with, the **contract staffing organization** at the time of a **health care event**. It includes any authorized volunteer worker. However, it does not include any:
      (1) physician or dentist, including residents;
      (2) certified registered nurse anesthetist, nurse midwife, nurse practitioner, physician's assistant, podiatrist, **covered provider**, or **surgical assistant**; or,
      (3) **administrator**, **committee member**, or **student**.
   b. **administrator** means an owner, partner, stockholder, director, trustee, executive officer, medical director, department head, or faculty member of the **contract staffing organization**.
   c. **committee member** means a person serving as a member of a committee or board formed or controlled by the **contract staffing organization**. It also includes any person executing the directives of such a committee or board.
   d. **student** means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by the **contract staffing organization** relative to the delivery of **professional services**.

C. **Authorized insured** means any **Insured** authorized by the **first named insured** to give or receive notice of a **claim** or **potential claim**.

D. **Bodily injury** means any damage to the human body, including sickness or disease and any mental injury, emotional distress, or death arising therefrom. In addition, it includes damages claimed for the cost of any care, loss of services, or loss of consortium arising therefrom.

E. **Business practices claim** means any **claim** or **potential claim** arising from an **Insured's**:
1. billing practices; or,
2. advertising activities.

F. **Case management** means identifying patients with specific health care needs and developing a plan to ensure an efficient use of resources to achieve the best outcome.

G. **Claim** means an express, written demand upon an **Insured** for money or services as compensation for civil damages.

H. **Claims expense** means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any **claim**. Such costs and expenses shall only include:
1. attorney fees paid to the law firm selected by the **Company** to defend an **Insured**;
2. court costs;
3. expert fees;
4. reporter fees;
5. the cost of any alternative dispute resolution ordered by a court, otherwise required by law, or pre-approved by the **Company**;

Reprinted with permission of The Medical Protective Company. All rights reserved.
Edition Date: 12/2016

6. post-judgment interest on that portion of the judgment that does not exceed the applicable limit of liability available under the policy; and,
7. such other costs and expenses that the **Company** determines to be reasonably related to the defense of a **claim**.

However, **claims expense** does not include:
1. **loss**;
2. attorney fees awarded to a claimant;
3. the salary of any **employee** of an **Insured**; or,
4. the forgiveness of any amounts owed for the cost of care or services rendered by an **Insured**.

I.   **Company** means the insurance company listed in the Declarations.

J.   **Contract staffing organization** means any organization listed as a **contract staffing organization** on the Schedule of Contract Staffing Insureds.

K.   **Counseling** means formal therapy rendered to a patient by a licensed professional approved and credentialed by the **Insured** to provide such therapy.

L.   **Covered provider** means:
1. any formerly employed or formerly contracted health care provider, but only while providing **professional services** as defined by contract between the **contract staffing organization** and a third party, and while acting on behalf of the **contract staffing organization** at the time of the **health care event**. However, a formerly employed or formerly contracted health care provider is not a **covered provider** if any other insurance is available to cover any **claims** made against the formerly employed or contracted health care provider; or,
2. any **W-2 provider** or **non W-2 provider** providing **professional services** as defined by contract between the **contract staffing organization** and a third party, and while acting within the scope of their duties on behalf of the **contract staffing organization** at the time of a **health care event**.

However, any health care provider under contract with, or employed by (or formerly contracted with or formerly employed by), the **contract staffing organization** and who is scheduled by name on any Schedule, other than the Schedule of Contract Staffing Insureds, attached to this or any prior policy issued by the **Company** is not a **covered provider**.

A **covered provider** shares the coverage provided to the **contract staffing organization**, including its limits of liability and any applicable restrictions.

M.   **Credentialing services** means **medical credentialing**, evaluating, selecting, hiring, and contracting with health care professionals to provide **professional services** for health care organizations when performed by the **contract staffing organization**; however, **credentialing services** shall not include **managed care services**.

N.   **Employment practices claim** means any **claim** or **potential claim** brought by an **employee**, or applicant for employment, which alleges the **Insured**:
1. breached an actual or implied contract of employment;
2. violated an anti-discrimination statute;
3. engaged in any form of harassment;
4. engaged in libel or slander related to an employment relation;
5. retaliated for the exercise of a public right or duty;
6. engaged in intentional or negligent infliction of emotional distress arising out of an employment relationship;
7. wrongfully failed to hire, promote, or grant tenure;
8. wrongfully demoted; or,
9. wrongfully terminated employment.

---

O. **Event** means an accident. All injuries arising from:
1. the same or related acts, errors, or omissions; or,
2. the continuous or repeated exposure to substantially the same harmful conditions,
will be considered one **event**. For the purposes of this definition, all injuries to a mother and fetus (or fetuses) from conception through delivery shall constitute one **event**.

P. **Extended reporting period** means the period of time after the cancellation or nonrenewal of claims-made coverage during which the **Insured** may report a **claim** or **potential claim**.

Q. **First discovered** means the date on which the **authorized insured** first knew, or reasonably should have known, of the **claim** or **potential claim**.

R. **First made** means the date on which the **authorized insured** first received a **claim**. All **claims** arising from **loss** suffered by the same claimant(s) shall be considered as having been **first made** when the first such **claim** is received by the **Insured**.

S. **First named insured** (or **FNI**) means the entity or person listed as the First Named Insured on the Declarations.

T. **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury. All injuries arising from the same or related acts, errors, or omissions in furnishing **professional services** shall be considered one **health care event**.

U. **Health care plan** means medical benefits plan administered by a health maintenance organization (HMO), preferred provider organization (PPO), or other similar managed care organization or self-insured program.

V. **Insured** means any person or entity entitled to coverage as specified under the *WHO IS INSURED* section of the applicable Insuring Agreement.

W. **Locum premium base** is computed by multiplying the applicable Locum Tenens Rate as listed in the Schedule of the Contract Staffing and Locum Tenens Rates by the number of days that a **contract provider** rendered contract services to the **contract staffing organization** during the **policy period**. For purposes of this definition, one (1) day equals eight (8) hours for all specialties with the exception of Emergency Medicine, Hospitalist, and Neonatology. For those three (3) specialties, one (1) day equals twelve (12) hours. Premiums are calculated using **locum premium base** only for any policy which has a Schedule of the Contract Staffing and Locum Tenens Rates attached.

X. **Loss**
1. **Loss** means civil damages, including prejudgment interest, which an **Insured** becomes legally obligated to pay through adjudication or settlement.
2. **Loss** does not include:
   a. any damages that are greater than the **Insured's** limit of liability;
   b. any injunctive or other equitable relief;
   c. **claims expense**;
   d. attorney fees awarded to a claimant as a fine, penalty, or sanction based upon the **Insured's** misconduct. However, attorney fees awarded as a part of the claimant's damages in a covered **claim** for any other purpose will be included as **loss**;
   e. the salary of any **employee** of an **Insured**; or,
   f. the forgiveness of any amounts owed for the cost of care or services rendered by an **Insured**.

Y. **Managed care event** means any **event** in the rendering of, or failure to render, **managed care services** that results in injury. All injuries arising from the same or related acts, errors, or omissions in the furnishing of **managed care services** shall be considered one **managed care event**.

Reprinted with permission of The Medical Protective Company. All rights reserved.

Z.  **Managed care services** means services provided to manage and/or administer a **health care plan**. These services can include any of the following acts provided on behalf of the **health care plan**:
1.  the creation, sale, and marketing of a **health care plan**;
2.  the selection, credentialing, and contracting of health care providers;
3.  the evaluation of the cost, quality and proper utilization of **treatment** options available or being provided to participants;
4.  the adjustment, investigation, and processing of claims for benefits; or,
5.  **case management**.
However, **managed care services** do not include **treatment** rendered, or which should have been rendered, to a patient.

AA.  **Medical credentialing** means the process of assessing the quality of licensed medical professionals through the verification of license, training, competency, and medical malpractice history in order to determine his or her ability to perform certain services and medical procedures on behalf of a **contract staffing organization**. **Medical credentialing** does not include the process of assessing the quality of licensed medical professionals as a service to third party clients for a fee.

BB.  **New facility** means an entity formed or acquired by the **contract staffing organization** during the **policy period**, over which the **contract staffing organization** maintains at least majority ownership.
1.  A **new facility** is not covered:
    a.  after 90 days have elapsed from the date the entity was formed or acquired by the **contract staffing organization**; or,
    b.  for **loss**, **claims expense**, **wrongful credentialing services event**, or a **health care event** that occurred before the entity was formed or acquired by the **contract staffing organization** or after the **policy period**.
2.  A **new facility** shares the coverage provided to the **contract staffing organization**, including its limits of liability.

CC.  **Non-standard policy** means a policy issued by a market of last resort, where coverage is typically limited or restricted due to prior claims or other specific risk issues identified as part of a risk profile.

DD.  **Non W-2 provider** means any health care provider who is not on the regular payroll of the **contract staffing organization** and who does not have federal income taxes withheld from his or her compensation by the **contract staffing organization**.

EE.  **Policy period** means the period of time listed on the Declarations as the Policy Period. However, if the policy is terminated before the later of the dates listed on the Declarations, **policy period** means the period between the first date indicated on the Declarations and the date the policy was terminated.

FF.  **Potential claim** means an **event** the **Insured** knows or reasonably should know is likely to result in a **claim**.

GG.  **Product liability claim** means any **claim** or **potential claim** arising from a defective good or product invented, designed, manufactured, or sold by an **Insured**. However, it does not include any **claim** or **potential claim** arising from a good or product, which was specifically used by the **Insured**, to provide **treatment** to the **Insured's** own patient.

HH.  **Professional services** means **treatment**.

II.  **Provider premium** is calculated by multiplying the premium rate shown in the Contract Staffing Rates provision of the Schedule of Locums and Contract Staffing Rates by the applicable number of **provider premium elements** rendered on behalf of the **contract services organization** during the **policy period**.

JJ.  **Provider premium element** means the factor(s) listed in the Contract Staffing Rates provision of the Schedule of Locums and Contract Staffing Rates.

Reprinted with permission of The Medical Protective Company.   All rights reserved.

KK. **Retroactive date** means the date prior to which an **Insured** has no coverage under the applicable Insuring Agreement. The **retroactive date** is listed on the applicable Schedule of Insureds for each **Insured** to which a **retroactive date** applies.

LL. **Scheduled insured** means any person or entity listed on a Schedule of Insureds.

MM. **Social services** means programs provided by an **Insured** to help maintain or improve the quality of life for the patient, including family counseling and educational programs. These programs do not include therapy for the direct benefit of anyone other than the patient.

NN. **Surgical assistant** means a person directly assisting as a non-physician first assistant in surgical procedures, including a person acting as a nurse surgical assistant or a physician surgical assistant.

OO. **Total locum premium base** is calculated by adding together all **locum premium bases** derived for all Classifications and Descriptions as accrued to the end of the **policy period** using the applicable Locum Tenens Rate found in the Schedule of Contract Staffing and Locum Tenens Rates. Premiums are calculated using **total locum premium base** only for any policy which has a Schedule of the Contract Staffing and Locum Tenens Rates attached.

PP. **Totally disabled** means the **Insured** is:
1. permanently, wholly, and continuously disabled and thereby prevented from performing any and all duties pertaining to the practice of medicine, surgery, dentistry or nursing; and,
2. under the regular care and attendance of a legally qualified physician, other than the **Insured**.

QQ. **Treatment** means:
1. the rendering of medical, surgical, dental, nursing services, **counseling** or **social services** to a patient. This shall include first aid rendered at the scene of an accident without expectation of monetary compensation;
2. the provision of medical examinations, opinions, or consultations regarding a person's medical condition within the **Insured's** practice as a licensed health care provider; or,
3. the furnishing of any of the following, but only as it relates to the rendering of medical, surgical, dental, nursing services, **counseling** or **social services** to a patient:
   a. food and beverages; or,
   b. medical, surgical, or dental supplies, appliances, or drugs.

RR. **W-2 provider** means any health care provider who is on the regular payroll of the **contract staffing organization** and who has federal income taxes withheld from his or her compensation by the **contract staffing organization**.

SS. **Wrongful credentialing services event** means any **event** in the performance of **credentialing services** by the **contract staffing organization** resulting in a **health care event** sustained by a patient and committed by any **covered provider**.

## IV. *GENERAL EXCLUSIONS*
This Insuring Agreement does not apply to:

A. any **potential claim** that was **first discovered** by any **authorized insured** prior to the **policy period**;

B. any **claim** arising from, or in connection with, an **Insured's** ownership, supervision, or management of any organization, partnership, joint venture, or other business enterprise that is not an **contract staffing organization**;

C. any **claim** arising from, or in connection with, the rendering or failure to render **treatment** by an **administrator** or **committee member**, unless it was provided in an emergency without an expectation of compensation;

D. any **business practices claim**;

E. any **employment practices claim**;

F. any **product liability claim**;

G. any **claim** arising from, or in connection with, the rendering or failure to render **managed care services**; or,

H. any liability for the acts of another assumed by the **Insured** under any contract or agreement, whether written or oral, which shall include any hold harmless or indemnification agreement entered into by the **Insured**, provided that this exclusion shall not serve to exclude coverage to any third party for any liability imposed upon such third party solely as the result of the **Insured's** rendering of, or failure to render, **professional services**.

I. Any **loss** arising from, or in connection with, any act listed in the subparagraphs below:
   1. any malicious act or intentional tort;
   2. any actual or threatened sexual act, behavior or conduct, including, but not limited to, assault, exploitation, harassment or molestation, by any person of another person while in the care, custody, or control of any **Insured**, whether under the guise of **treatment** or not;
   3. any personal, romantic, sexual, or other non-professional relationship with a current, former, or prospective patient, whether under the guise of **treatment** or not;
   4. any willful violation of any law, statute, or regulation; or,
   5. any dishonest or fraudulent act.

   Under this exclusion, the **Company** will defend and pay **claims expense** for any **claim** or **potential claim** arising from, or in connection with, an **event**, **health care event**, or **managed care event**. However, the **Company's** duty to defend any **Insured** for such a **claim** or **potential claim** will cease if it is established by trial or arbitration verdict, court ruling, regulatory ruling or legal admission, that an **Insured** engaged in any act listed in the above subparagraphs.

J. Any **claim** or **potential claim** arising from, or in connection with, any **treatment** rendered by any individual who was not authorized to provide such services due to the suspension, revocation, surrender, or restriction of, or failure to obtain, the proper professional license.

K. Any **claim**, **potential claim**, suit or other matter seeking:
   1. injunctive relief;
   2. any relief other than **loss**; or,
   3. the award of fines, penalties, or sanctions.

L. Any damages over and above actual compensatory damages. This includes punitive, exemplary, and multiple damages.

M. Any **bodily injury** to an employee that arose out of, and in the course of, employment with an **Insured**. This exclusion includes any injury to the spouse, child, parent, relative or heir of the employee that derives therefrom. It also applies regardless of whether an **Insured** may be liable as an employer or in any other capacity. In addition, the exclusion applies to any duty to share **loss** or **claims expense** with or repay a third party for **loss** or **claims expense** as a result of the **bodily injury**.

N. Any **claim** or **potential claim** arising from, or in connection with, any obligation or damages arising under any law related to:
   1. workers' compensation;
   2. occupational disease;
   3. unemployment compensation;
   4. disability benefits; or,
   5. other similar law that provides for scheduled benefits as a result of an injury or disease.

O. Any **claim** or **potential claim** arising from, or in connection with, any **loss** or **claims expense** covered under an **Insured's** directors' and officers' policy.

P. Any **claim** or **potential claim** arising from, or in connection with, any **loss** or **claims expense** which is initiated, alleged, or caused to be brought about, by any **Insured** covered by this policy against any other **Insured** covered by this policy. This exclusion does not apply if the **claim** arises out of an **Insured** providing **professional services** to another **Insured**.

Q. Any **claim** or **potential claim**:
  1. arising from, or in connection with, any rendering of, or failure to render, **professional services** for which the **Insured** has, or is eligible for, complete immunity as a volunteer or as an employee or contractor of a federal, state, or local government; or,
  2. involving an **Insured** who has, or is eligible for, insurance, indemnity, or any other protection pursuant to any federal, state, or local laws, including but not limited to the Federal Tort Claims Act.

R. Any default judgment or other **claim** or **potential claim** that the **Company** was unable to timely investigate or defend due to the acts or omissions of the **Insured**.

S. Any damages:
  1. for which an **Insured** has coverage under a nuclear energy liability policy issued by the:
      a. Nuclear Energy Liability Insurance Association;
      b. Mutual Atomic Energy Liability Underwriters;
      c. Nuclear Insurance Association of Canada; or,
      d. any successor or assign of the entities set forth in the subparagraphs above.
  This policy also does not apply if such coverage did exist, but was terminated by the exhaustion of the **Insured's** limit of liability.
  2. resulting from the hazardous properties of nuclear material for which the **Insured**:
      a. was required to maintain financial protection under the Atomic Energy Act of 1954 or any amendment or regulation that applies thereto; or,
      b. was entitled to indemnity by the United States government or any agency thereof or would have been entitled to had this policy not been issued.

T. Any **claim** or **potential claim** arising from, or in connection with, an **Insured's** duty to comply with the Americans with Disabilities Act of 1990 (ADA). This also includes any amendment or regulation that applies thereto or any comparable federal, state, or local law.

U. Any **claim** or **potential claim** arising from, or in connection with, an **Insured's** duty as a sponsor of an employee benefit plan under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto. However, this exclusion is limited to:
  1. an **Insured's** failure or inability to fund the plan in accordance with the plan document or any applicable law or regulation; and,
  2. liability for the payment of benefits owed to a participant or beneficiary of the plan that have been paid or may lawfully be paid from the plan's funds or those of other employee programs.

V. Any **claim** or **potential claim** arising from, or in connection with, an **Insured's** violation of the Racketeer Influenced Corrupt Organizations Act (RICO), or any comparable federal, state or local laws or any amendment or regulation that applies thereto.

W. Any **claim** or **potential claim** arising from, or in connection with, an **Insured's** violation of any federal, state, or local securities law or regulation.

Reprinted with permission of The Medical Protective Company. All rights reserved.

X. Any **claim** or **potential claim** arising from, or in connection with, the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate **electronic data**. As used in this exclusion, **electronic data** means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices, or any other media that are used with electronically controlled equipment.

Y. Any **claim** or **potential claim** arising from, or in connection with, any **loss** or **claims expense** covered under an **Insured's** cyber or privacy insurance coverage, including but not limited to, any coverage for network security and privacy, regulatory fines and penalties, patient notification and credit monitoring, or data recovery cost.

Z. Any **claim** or **potential claim** arising from, or in connection with, any unlawful discrimination by any **Insured**, including any civil rights violation alleged pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.*) and amendments thereto.

AA. Any **claim** or **potential claim** arising from or in connection with any **covered provider** or **contracting staffing organization's** rendering of, or failure to render, **professional services** or **credentialing services** during any period of time when such **covered provider** or **contracting staffing organization** is enrolled in the patient compensation fund (or however otherwise titled by the applicable enabling statute) of Kansas or Wisconsin.

BB. Any **claim** or **potential claim** otherwise covered under this policy where providing coverage would be in violation of any U.S. economic trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control. Under this exclusion, such coverage shall be null and void. Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any **claim** or **potential claim** that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

## V. OTHER EXCLUSIONS - MULTI-POLICY AND ANTI-STACKING

If more than one Insuring Agreement or policy applies, the following multi-policy and anti-stacking exclusions apply:

A. If more than one policy issued by the **Company** applies to the liability of an **Insured**, the **Company's** duty to pay for a **loss** or **claims expense** will be confined to the policy containing the largest applicable limit.

B. If more than one Insuring Agreement under this policy applies to the liability of an **Insured**, the **Company's** duty to pay **loss** or **claims expense** will be confined to the Insuring Agreement containing the largest applicable limit.

## VI. LIMITS OF LIABILITY

### PER EVENT LIMIT

The **Company's** duty to pay **loss** or **claims expense** on behalf of a **contract staffing organization** for any **health care event** or **wrongful credentialing services event** covered under this Insuring Agreement shall not exceed the Per Event Limit of Liability shown for the **contract staffing organization** on the Schedule of Contract Staffing Insureds. This limit shall apply regardless of the number of:

1. persons who sustain injury;
2. claimants;
3. **claims** or **potential claims**;
4. policies issued by the **Company**;
5. the number of **Insureds** involved or alleged to be involved in the same **health care event** or **wrongful credentialing services event**; or,
6. **Insureds** who share the Per Event limit.

### AGGREGATE LIMIT

The **Company's** duty to pay **loss** or **claims expense** on behalf of a **contract staffing organization** for all **health care events** and **wrongful credentialing services events** covered under this Insuring Agreement shall not exceed the Aggregate Limit of Liability shown for the **contract staffing organization** on the Schedule of Contract Staffing

Insureds. This limit shall apply regardless of the number of:

1. **health care events** and **wrongful credentialing services events**;
2. persons who sustain injury;
3. claimants;
4. **claims** or **potential claims**;
5. policies issued by the **Company**;
6. the number of **Insureds** involved or alleged to be involved in the same **health care event** or **wrongful credentialing services event**; or,
7. **Insureds** who share the Aggregate limit.

Notwithstanding any provision in the policy to the contrary, any payment of **loss** and **claims expense** by the **Company** will reduce and may exhaust both the Per Event and Aggregate Limits of Liability provided hereunder.

## VII. ADDITIONAL CONDITIONS

In addition to the conditions contained in the General Conditions, the following conditions apply to this Insuring Agreement:

A. *Settlement.*

Consent of the **first named insured** only is necessary and sufficient for the **Company** to settle any **claim**, **potential claim** or other matter brought against an **contract staffing organization** or its **covered providers**, **agents** or any other **Insured**, unless prohibited by statute, regulation, rule or order. However, if the **first named insured** withholds consent to any settlement recommended by the **Company** then the **Company's** liability for **loss** and **claims expense** shall not exceed the amount for which the **claim**, **potential claim**, or other matter could have been settled.

B. *Material Change in Risk.*

In the event the **Company** is made aware of a material change in risk in the **Insured's** practice, in addition to the rights reserved in the *GENERAL CONDITIONS,* the **Company** reserves the right to cancel the policy pursuant to the Cancellation provisions in the policy.

C. *Statement of Premium and Premium Audit Rights.*

Only with respect to a policy which has a Schedule of Contract Staffing and Locum Tenens Rates attached, the **Company** shall have the right, during the **policy period** or within one (1) year thereafter, to require the **contract staffing organization** to provide within ten (10) days after request, a sworn statement for any specified portion of the **policy period** setting forth, as applicable, either the contract staffing premium derived from the Contract Staffing Rates, or the **locum premium base** by provider classification as derived from the Locum Tenens Rates. Additionally, during the **policy period** or within three (3) years thereafter, the **Company** shall be permitted, at its own discretion and for its own benefit, to audit the business records of the **contract staffing organization** in order to verify the **locum premium base** statement. The rendering of any estimate or statement or the making of any previous settlement shall not bar the **Company** from conducting additional audits as needed, nor prevent the **Company** from receiving additional premium.

D. *Extended Reporting Period Option.*

Purchase of an **extended reporting period**:

1. If the coverage afforded to a **locum tenens insured** on a separate limit basis is terminated, the **Company** shall, upon written request of the **first named insured**, mail an offer for an **extended reporting period** for the terminated coverage, to the **first named insured** at the last address on record with the **Company**.
   a. Any such written request by the **first named insured** must be received by the **Company** within 30 days of the termination of coverage for a **contract staffing organization**.
   b. Upon receipt of such request, the **Company** shall only be required to offer an **extended reporting period** to the **first named insured**.
2. If the coverage afforded to an **contract staffing organization** on a shared limit basis, as designated by the **FNI** in the Modified Coverage column on the Schedule of Contract Staffing Insureds, is terminated, the **Company** shall offer an **extended reporting period** only when all coverage available under a specific shared limit is

terminated. The **Company** shall, upon written request of the **first named insured**, mail an offer for an **extended reporting period** for the terminated coverage to the **first named insured** at the last address on record with the **Company**.

    a.  Any such written request by the **first named insured** must be received by the **Company** within 30 days of the termination of coverage.

    b.  Upon receipt of such request, the **Company** shall only be required to offer an **extended reporting period** to the **first named insured**.

3. If the entire policy is canceled or nonrenewed:

    a.  the **Company** shall only be required to offer an **extended reporting period**, if requested, to the **first named insured** for all **Insureds** covered under the policy. If the **first named insured** accepts the offer of an **extended reporting period**, all **Insureds** that were afforded coverage by this policy shall be included in the **extended reporting period**.

    b.  the **Company** shall have no duty to offer a separate **extended reporting period** to any **contract staffing organization** or its **covered provider** or **agent** or any other **Insured**.

    c.  the **Company** shall have no duty to inform any **contract staffing organization** or its **covered provider** or **agent** or any other **Insured** whether the **first named insured** accepts the offer of an **extended reporting period**.

4. The **first named insured** may accept the **Company's** offer of an **extended reporting period** by paying the premium on or before the due date indicated in the offer. Failure to pay the full premium by such date will be deemed a rejection of the offer.

5. If purchased, any **claim** or **potential claim** against a **contract staffing organization**, which is otherwise covered by the policy, may be reported for an unlimited duration. However, the **extended reporting period** shall not:

    a.  extend the **policy period**;

    b.  apply to any **claim** or **potential claim** arising from a **health care event** that took place after the **policy period**; or,

    c.  otherwise expand the coverage provided under this policy.

# National Fire & Marine Insurance Company

Omaha, Nebraska

*GENERAL CONDITIONS*

---

Each condition contained in this form, or in any attached form, is a separate and distinct condition precedent to coverage. Please read and review each condition carefully.

These General Conditions apply to all Insuring Agreements selected under this policy.

A. *Representations and Change Provision.*
1. By acceptance of this policy, each **Insured** agrees, represents, and warrants that the statements and particulars made in all applications, including any statements and particulars made in any and all documents, supplemental pages or other attachments ("Attachments") for the purposes of any application, are true and correct. It is further understood and agreed that any application, and any Attachments, are incorporated into, and shall form a part of, this policy. Therefore, this policy and any endorsements, and all applications and Attachments, embody all agreements between the **Insured** and the **Company**, or any of its authorized representatives, relating to this insurance.
2. In the event any application was executed or endorsed by the **Insured's** agent, the **Insured** acknowledges that the agent has acted under the **Insured's** express authority and that the **Insured** has thoroughly reviewed the information contained on any application. Therefore, it is understood and agreed that, to the extent permitted by law, the **Company** reserves the right to rescind this policy, or deny any coverage provided for a **claim**, based upon any material misrepresentation made by the **Insured**.
   The representations made by the **Insured** in the applications, and Attachments, are the basis for the coverage provided, as well as the **Company's** calculation of the applicable premium. As a result, the **Insured** agrees to inform the **Company** of any material change in practice.
3. In the event the **Company** is made aware of a material change in the **Insured's** practice, it reserves the right to recalculate the applicable premium, exclude the new practice characteristics from coverage, and/or deny any coverage provided for a **claim** arising from, or in connection with, the material change.
4. Notwithstanding the above, the **Company** will not rescind this policy, or deny any coverage provided for a **claim** or **potential claim**, based upon an unintentional error or omission in disclosing information to the **Company** which is not a material misrepresentation.

B. *Reporting Requirements.*
1. The **Company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon the **authorized insured's** forwarding, as soon as practicable and within the requirements of the applicable Insuring Agreement, notice of every **claim**, demand, summons, or legal paper the **authorized insured** receives.
2. Any such notice to the **Company** shall be in writing and contain all of the following information:
   a. the identity of all **Insureds** implicated;
   b. all reasonably obtainable information with respect to the time, place and circumstances of the **event**;
   c. the nature and extent of the injury;
   d. the names and addresses of any injured persons;
   e. the names and addresses of available witnesses; and
   f. the basis for the **authorized insured's** belief that a **claim** is reasonably likely to be made, as well as the date the **authorized insured** first came to this belief.
3. All such reports and documents shall be directed to the **Company** using the contact information listed on the contact sheet attached to this policy.
4. An **event** reported to the **Company** as part of risk management or loss control services shall not be considered the report of a **claim** or **potential claim**.

C. *Assistance and Cooperation.*
1. After any **claim** or **potential claim**, the **Insured** shall not contract any expense, voluntarily assume any liability in any

Reprinted with permission of The Medical Protective Company. All rights reserved.
Edition Date: 12/2016

situation; nor make or contract any settlement of the **claim** or **potential claim**, except at the **Insured's** own cost and responsibility, without the written authorization of the **Company**.

2. The **Company's** duty to defend and pay **loss** for any **claim** otherwise covered under this policy is strictly conditioned upon the **Insured's** cooperation with the **Company** in the investigation, defense, and/or settlement of any matter to which this policy applies. Such cooperation shall include, but is not limited to:

   a. attendance at any deposition, hearing, or trial, as requested by the **Company**;

   b. assistance in securing and giving evidence;

   c. obtaining the attendance of witnesses; and,

   d. doing nothing to prejudice the **Company's** ability to investigate, defend, and/or manage any matter to which this policy applies;

   e. submitting to recorded and/or sworn statements and to examinations under oath as requested by the **Company**; and,

   f. promptly producing, at the **Company's** request, any records, documents and other information in the **Insured's** possession, custody or control.

3. If a **claim** or **potential claim** is, or might be, covered under any other policy of insurance, the **authorized insured** shall promptly give notice to such other insurers, but only to the extent that the **authorized insured** is aware of such other insurance. The **Insured** shall also provide the **Company** with copies of the applicable policies, but only to the extent the applicable policies are in the custody and control of the **authorized insured**. The **Insured** shall further act in good faith to enforce any rights held under such policies, including the right to a defense.

D. *Premiums.*

1. The **Company's** obligation to perform any duty under the policy is strictly conditioned upon the payment of the premium when due. Similarly, the **Company's** obligation to perform any duty pursuant to a renewal of coverage provided under the policy shall be strictly conditioned upon the payment of the renewal premium when due. Therefore, this policy shall not be deemed to have been issued, delivered, or renewed and shall not be applicable to any matter which would otherwise be covered herein, until:

   a. the premium has been paid in full; or,

   b. if the **Company** has agreed to finance the policy, the first installment has been paid in full.

   If payment is made by check, electronic transfer or money order, it shall not be considered "paid in full" until honored by the payor's bank.

2. Premiums for this policy shall be computed in accordance with the **Company's** rules, rates, and rating plans.

3. Any premium designated as Deposit Premium on the Declarations is merely a deposit on the actual amount owed. At the close of the **policy period**, the **Company** will compute the earned premium for that period. The Deposit Premium will then be credited to that amount. If the Deposit Premium exceeds the earned premium, the **Company** will refund the difference to the **first named insured**, subject to the Annual Minimum Premium set forth in the Declarations. If the earned premium exceeds the Deposit Premium, the **Company** will bill the **first named insured** for the difference. The **Company's** computation of earned premium under this provision is expressly made subject to any minimum earned premium endorsement attached to the policy.

4. The **first named insured** shall maintain records of the information necessary for premium computation. The **first named insured** shall send copies of these records to the **Company** at the end of the **policy period** as directed by the **Company**. Such information shall be subject to audit and verification by the **Company**.

E. *Inspection and Audit.*

The **Company** shall be permitted, at its own discretion and for its own benefit, to audit an **Insured's** property, operations, and any business records. The **Company** shall also have the right to obtain a copy of any current or prior insurance records. Any findings or recommendations made by the **Company** as a result of an audit shall inure solely to the **Company's** benefit. As a result, they may not be used as evidence of the **Insured's** compliance with any safety regulations or other industry standards.

F. *Other Insurance.*

Unless otherwise noted in an Insuring Agreement:

1. If any other valid and collectible insurance is available to any **Insured** with respect to any liability arising from a **potential claim**, **claim** or suit which is covered by this policy, and such other insurance is afforded under a policy or

**extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **Company**:

    a.  if the **Insured** has secured coverage from the **Company** or any of its affiliates on a **non-standard policy**, then the **Company's** duty to pay **loss** will be confined to the **non-standard policy**;

    b.  if subsection (a) does not apply, and an **Insured** is named as a specific named insured under any other valid and collectible insurance available to that **Insured**, then any duty to pay **loss** is confined to the policy where the **Insured** is specifically named;

    c.  if neither subsection (a) nor (b) above apply, any duty to pay **loss** will be confined to the policy containing the largest applicable limit.

2.  If any other valid and collectible insurance is available to any **Insured** with respect to any liability arising from a **potential claim**, **claim** or suit which is covered by this policy, and such other insurance is not afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **Company**, then this insurance will be excess over such other insurance even if such other insurance is stated to be primary, excess, contingent or otherwise. The **Company** will pay only the **Company's** share of the **loss**, if any, that exceeds the sum of:

    a.  the total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and,

    b.  the total of all deductible and self-insured amounts under all such other insurance.

3.  If the **Insured** has such other insurance that applies on the same basis, whether excess or primary, the **Company's** liability for **loss** and **claims expense** shall not exceed:

    a.  the amount that would be payable if each insurer contributed by equal shares until the lowest limit contained in any applicable policy was exhausted or the entire **loss** was paid, whichever occurred first. If any **loss** remains, the **Company** will continue to contribute by equal shares until any of the following occurs:

        (1)  the applicable limits from this policy are exhausted,

        (2)  the limits of all applicable policies have been exhausted, or

        (3)  the entire amount is paid.

        This method shall only apply if all other such insurance provides for contribution by equal shares; or,

    b.  the ratio between the limit of liability available to the **Insured** under this policy and the total limit of liability under all applicable policies until the applicable limits from this policy are exhausted or the entire **loss** is paid. This method shall only apply if any applicable policy does not provide for contribution by equal shares.

4.  The **Company** will have no duty to defend the **Insured** against any suit if any other insurer has a duty to defend the **Insured** against that suit. If no other insurer defends, the **Company** will undertake to do so, but the **Company** will be entitled to all of the **Insured's** subrogation rights against all those other insurers to the extent of any payments made, or as allowed by law.

5.  This condition shall not apply if such other valid insurance is written to be specifically excess of this policy.

G.  *Subrogation.*

    The **Company** shall be subrogated to the rights of any **Insured** to the extent of any payments made, or as allowed by law. The **Insured** shall do nothing to prejudice those rights. At the **Company's** request, the **Insured** shall bring suit or transfer those rights to the **Company**. The **Insured** shall also help the **Company** enforce its rights.

H.  *First Named Insured.*

1.  The **first named insured** shall act as the agent of all **Insureds** with respect to this policy, with full authority to bind all **Insureds**. This shall include, but is not limited to:

    a.  receipt of notices of cancellation or nonrenewal;

    b.  requesting or receiving endorsements issued to form a part of this policy;

    c.  payment of premiums due;

    d.  receiving return premium; and,

    e.  receiving and/or responding to an offer for an **extended reporting period** for any **Insured**.

2.  The **first named insured** shall notify in writing the **Company** and all **Insureds** of any changes that might affect the insurance provided under this policy, including cancellation and nonrenewal.

I.  *Policy Territory.*

    Unless otherwise noted in an Insuring Agreement, this policy shall only apply to a **claim** filed within the United States, including its territories and possessions. However, unless otherwise noted, a **claim** may be based upon **professional**

**services** provided anywhere in the world, so long as the **Insured** had prior approval to provide such services from the appropriate governmental authorities and the **Company**.

J. *Cancellation, Nonrenewal and/or Termination of Coverage.*
   1. This policy may be canceled by the **first named insured**. The **first named insured** shall mail written notice to the **Company** requesting cancellation. The cancellation shall be effective on the date requested by the **first named insured** or the date the notice is received by the **Company**, whichever is later.
   2. Any coverage contained within this policy may be terminated by the **first named insured**. The **first named insured** shall mail written notice to the **Company** requesting the coverage termination. The termination shall be effective on the date requested by the **first named insured** or the date the notice is received by the **Company**, whichever is later.
   3. This policy, or any coverage contained therein, may also be canceled, terminated or nonrenewed by the **Company**. The **Company** will send notice to the **first named insured** at the last address on record with the **Company**.
   4. If the **Company** cancels or nonrenews an **Insured's** policy for any reason other than non-payment of premium, the **Company** shall provide written notice to the **first named insured** not less than thirty (30) days prior to the effective date of such cancellation or nonrenewal. If the **Company** cancels an **Insured's** policy for nonpayment of premium, the **Company** shall provide written notice to the **first named insured** not less than ten (10) days prior to the effective date of such cancellation or nonrenewal.
   5. If the **Company** cancels or nonrenews an **Insured's** policy, the **Insured's** coverage under that policy shall terminate on the earlier of:
      a. the date stated on the cancellation or nonrenewal notice; or,
      b. the date the **Insured** procures replacement coverage.

K. *Modifications.*
   Except as provided herein, this policy may not be modified except by written endorsement attached to and made a part of this policy by the **Company**. The **Company's** decision not to insist on the **Insured's** compliance with any provision of this policy shall not operate to waive, modify, or void the provision.

L. *Bankruptcy or Insolvency.*
   The bankruptcy or insolvency of an **Insured**, or an **Insured's** estate, shall not act to modify any duty owed by the **Insured** or the **Company** under the policy. Under no circumstances will such bankruptcy or insolvency require the **Company** to assume or in any way replace any **Insured's** deductible or otherwise assume any obligation owed by any **Insured** under this policy.

M. *Non-assignability.*
   No interest of an **Insured** under this policy shall be assignable without the prior written consent of the **Company**. However, if the **Insured** is a person and dies, the coverage afforded by this policy shall inure to the benefit of that **Insured's** estate.

N. *Separation of Insureds.*
   Except for the applicable limits of liability and any duties specifically assigned to the **first named insured**, this policy applies:
   1. separately to each **Insured** against whom a **claim** or **potential claim** is made; and,
   2. as if each **Insured** were the only **Insured** under this policy.

O. *Action Against the Company.*
   1. No action shall lie against the **Company** unless each **Insured** is in full compliance with all of the terms of this policy.
   2. No person shall have the right to join the **Company** as a party to a **claim** to determine the **Insured's** liability under this policy. Further, an **Insured** shall not interplead the **Company** into a **claim**.
   3. No action shall lie against the **Company** until the amount of **loss** has been finally determined by entry of judgment or written agreement between the **Insured**, the claimant, and the **Company**. Once the amount of **loss** has been finally determined, the claimant shall be entitled to recover under the terms of this policy.

Reprinted with permission of The Medical Protective Company. All rights reserved.

P.   _Arbitration._

The **Company** and the **Insured** agree that any dispute, **claim** or controversy arising out of, relating to, or in connection with this policy, whether brought by or on behalf of the **Insured**, **Company**, or any other party, that the **Company** may elect to submit any such dispute, **claim** or controversy to binding arbitration, in accordance with Title 9 USC Sec. 1 et seq (the Federal Arbitration Act) and shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

The arbitration shall be presided over by three arbitrators chosen from the Commercial Insurance Panel of the American Arbitration Association. The arbitrators shall be governed by the law of the state of the address of the **first named insured**, as set forth on the Declarations. The arbitration shall take place in the county that the capital of that state is located.

The arbitrators shall have the discretion to order pre-arbitration discovery, including an exchange of documents and deposition of potential witnesses. Each party shall bear its own arbitration costs and expenses including attorneys' fees, unless otherwise provided by law.

Any arbitration award shall be in writing and shall specify the factual and legal bases of the award. Judgment on the award rendered by the arbitrator shall be final and may be entered in any court having jurisdiction thereof. Furthermore, this arbitration provision shall be a complete defense to any suit, action or proceeding in any federal, state or local court or before any administrative tribunal with respect to any dispute, **claim** or controversy arising out of, relating to or in connection with this policy.

Q.   _Terms Conform to Statute or Regulation._

If any term of this policy, or any duty arising therefrom, would cause the **Company** to violate any federal, state or local law or regulation, the policy is amended to bring the **Company** into compliance with such statute or regulation.

R.   _Fraud Warning._

Any person who knowingly and with intent to injure, deceive, or defraud any insurance company or other person files an application for insurance containing any materially false information or fails to provide complete information or conceals, for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and may be prosecuted under state law and may be guilty of a felony and subject to criminal an civil penalties, fines, denial of insurance or confinement in prison.

# National Fire & Marine Insurance Company

## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 1 | ES013814 | Windy City Anesthesia, PC |
| **Effective Date of Endorsement** | | |
| 04/21/2020 | | |

### *UNIVERSAL AGGREGATE ENDORSEMENT*

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the policy as follows:

---

### ENDORSEMENT DECLARATIONS

Universal Aggregate Limit of Liability:        $ 3,000,000

---

### MODIFIED COVERAGES

The following provision is added to the *LIMITS OF LIABILITY* section of the Insuring Agreements shown below:

Contract Staffing & Locum Tenens Professional Liability Insuring Agreement

*Universal Aggregate.*
It is hereby agreed and understood that the Universal Aggregate Limit of Liability is the most the **Company** will pay for all duties and obligations owed, including but not limited to, **loss**, damages or **claims expense** under the Insuring Agreements shown above. However, **claims expense** does not erode the Universal Aggregate Limits of Liability if the policy includes an endorsement amending coverage such that **claims expense** is outside of, and does not erode, the Limits of Liability under the policy.

It is further agreed and understood that, once the Universal Aggregate Limits of Liability has been exhausted through the **Company's** payment of:
a.   **claims expense** (but only if **claims expense** is within and erode the Limits of Liability under the policy);
b.   **loss**; or,
c.   damages,
the **Company** shall have no further duties to defend or pay **loss**, damages or **claims expense** on behalf of any **Insured** under the Insuring Agreements shown above.

All other terms and conditions of the policy remain unchanged.

---

# National Fire & Marine Insurance Company

## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 2 | ES013814 | Windy City Anesthesia, PC |

| Effective Date of Endorsement | |
|---|---|
| 04/21/2020 | |

### *NON-SCHEDULED ADDITIONAL INSURED (PRIMARY AND NON-CONTRIBUTORY) ENDORSEMENT*
### *HEALTH CARE FACILITIES PROFESSIONAL LIABILITY INSURING AGREEMENT*

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend agree to amend the policy as follows:

---
### MODIFIED COVERAGES
---

The definition of **additional insured** is deleted from the General Definitions and replaced with the following:

> **Additional insured** means:
> 1. any person or entity listed on a Schedule of Additional Insureds; or,
> 2. only with respect to any **loss** or damages payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **Insured** otherwise covered under the Health Care Facilities Professional Liability Insuring Agreement, any person or entity with which the **insured facility** has entered into a written contract or agreement agreeing:
>    a. to add the person or entity as an **additional insured**; or,
>    b. to hold harmless or indemnify such person or organization.
>
> This definition does not apply:
> i. unless the written contract or agreement has been executed prior to the **loss**. The contract or agreement will be considered executed when the **Insured's** performance begins, or when the contract is signed, whichever occurs first; or,
> ii. to **losses** arising from or in connection any of the **additional insured's** own acts or omissions.

The following provision is added to the *LIMITS OF LIABILITY* of the Health Care Facilities Professional Liability Insuring Agreement*:*

> All **additional insureds** meeting the definition provided herein share the Limits of Liability applicable to any **claim** or **suit** with any **Insured** for which the **additional insured** is alleged to be vicariously liable with respect to that same **claim** or **suit**.

Solely with respect to any **additional insured(s)** meeting the description provided by subsection 2 of the definition of **additional insured** set forth in this endorsement, the following Additional Condition is added to the *ADDITIONAL CONDITIONS* of the Health Care Facilities Professional Liability Insuring Agreement:

> Only if required by written contract or agreement with the **insured facility**, coverage for any **additional insured(s)** provided by this endorsement shall be primary and non-contributory as respects any other insurance

policy issued to such **additional insured**.  Otherwise, the _Other Insurance_ provision of the General Conditions applies as written.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company

### Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 3 | ES013814 | Windy City Anesthesia, PC |
| **Effective Date of Endorsement** | | |
| 04/21/2020 | | |

### *STATE RESTRICTION ENDORSEMENT*
### *CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT*

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement as follows:

## GENERAL EXCLUSIONS

The following exclusion is added to *GENERAL EXCLUSIONS:*

> any **claim** or **potential claim** arising from **professional services** or **wrongful credentialing services** rendered or which should have been rendered in the state(s) of Kansas or Wisconsin for any person or entity that is fund-qualified and is enrolled in the patient compensation fund.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company

## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 4 | ES013814 | Windy City Anesthesia, PC |
| Effective Date of Endorsement | | |
| 04/21/2020 | | |

### EXTENDED REPORTING PERIOD PREMIUM ENDORSEMENT
### CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement as follows:

---

**MODIFIED COVERAGES**

---

The following condition is added to the *Extended Reporting Period Option* of *ADDITIONAL CONDITIONS*:

Additional premium to be charged for the purchase of an **extended reporting period** is as follows:

| | |
|---|---|
| For a 12 month **extended reporting period**: | 150% |
| For a 24 month **extended reporting period**: | 175% |
| For a 36 month **extended reporting period**: | 200% |
| For a 60 month **extended reporting period**: | N/A |
| For an unlimited **extended reporting period**: | N/A |

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company

## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 5 | ES013814 | Windy City Anesthesia, PC |
| **Effective Date of Endorsement** | | |
| 04/21/2020 | | |

### *DEDUCTIBLE ENDORSEMENT*
### *CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT*
### *(LOSS AND CLAIMS EXPENSE)*

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement as follows:

---

**MODIFIED COVERAGES**

---

The following condition is added to the *ADDITIONAL CONDITIONS* of the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement:

*Deductibles.*

If a **deductible** is shown on the Schedule of Contract Staffing Insureds and designated as "Loss and Claims Expense" it is agreed and understood that the **Company's** duty to pay **loss** and **claims expense** for any **claim** or **potential claim** thereunder will be limited in the following manner:

1. The **Company** shall only have a duty to pay **loss** and **claims expense** in excess of the **deductible**. The **deductible** shall be applied to **claims expense** first, then to **loss**.
2. The **first named insured** shall have a duty to pay all **loss** and **claims expense** up to the amount of the applicable **deductible**, payment of which shall not be unreasonably withheld.
3. Unless otherwise required by law, the **Company** has complete discretion to pay the entire **loss** and **claims expense** and seek reimbursement from the **first named insured** for the **deductible**. If this occurs, the **first named insured** shall reimburse the **Company** within 30 days of the **Company's** payment of the **deductible** amount.
4. The applicable limits of liability shall be reduced by the amount of the **deductible** payable as **loss** for such **claims** and **potential claims**.
5. If a **per event deductible** is shown, the **per event deductible** shall apply to all **loss** and **claims expense** arising from a single **health care event** or **wrongful credentialing services event**, regardless of the number of **Insureds** found liable for the **loss**.
6. If a **per event deductible** is shown and an **aggregate deductible** is also shown, the **first named insured's** duty to pay **loss** and **claims expense** shall not exceed the **aggregate deductible**.

The following definitions are added to *DEFINITIONS*:

**Deductible** includes any **per event deductible**. However, if an **aggregate deductible** applies and the amount listed as the Per Event Deductible exceeds the remaining **aggregate deductible**, then **deductible** means the remaining **aggregate deductible**.

**Per event deductible** means the amount shown as the Per Event Deductible on the Schedule of Contract Staffing Insureds.

---

Reprinted with permission of The Medical Protective Company. All rights reserved.

**Aggregate deductible** means the amount shown as the Aggregate Deductible on the Schedule of Contract Staffing Insureds.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company
### Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 6 | ES013814 | Windy City Anesthesia, PC |

| Effective Date of Endorsement | |
|---|---|
| 04/21/2020 | |

### SCHEDULE OF LIMITS OF LIABILITY FOR SPECIFIED STATES
### CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Schedule of Contract Staffing Insureds as follows:

| **MODIFIED COVERAGES** |
|---|

Notwithstanding the Limits of Liability set forth in the Schedule of Contract Staffing Insureds, the following Limits of Liability apply as follows:

I.   *LIMITS OF LIABILITY*

    A.   Shared Limits of Liability apply for:

        1.   all **covered providers** and **contract staffing organizations** in all states except as noted in I.B through I.G. below; and

        2.   all non-fund **covered providers** and **contract staffing organizations** (those **covered providers** and **contract staffing organizations** not enrolled in a patient compensation fund):

        Per Event Limit:     $1,000,000
        Aggregate Limit:    $3,000,000

    B.   Shared Limits of Liability for All Virginia **Insureds**:

        1.   Per Event Limit     N/A

        However, with respect to any **claim** brought against any Virginia **Insured**, the Per Event Limit of Liability shall be the limitation on the amount of recovery for an action for malpractice where the act or acts of alleged malpractice occurred as set forth in Virginia Statutes Section 8.01-581.15.  With respect to any **claim** involving an act or acts of alleged malpractice occurring on or before July 31, 1999, the Per Event Limit of Liability will be the amount shown above.

        2.   Aggregate Limit

        With respect to all **claims** brought against all Virginia **Insureds**, the Aggregate Limit of Liability shall be three times the amount of the Per Event Limit of Liability established in section I.B.1. above.

    C.   Limits of Liability for All New York **Insureds**:

        1.   Where allowed by law, shared limits of:

        Per Event Limit:     $1,300,000
        Aggregate Limit:    $3,900,000

CONTRACT STAFFING PROFESSIONAL LIABILITY
Reprinted with permission of The Medical Protective Company.   All rights reserved.
Edition Date: 7/2017

2.  Notwithstanding any other provision to the contrary, where required by law, separate limits of:

Per Event Limit:        $1,300,000
Aggregate Limit:        $3,900,000

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage is provided the Limits of Liability set forth in this section C.2. To the extent that any **covered provider** or **contract staffing organization** is allowed by law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this section C.2.

3.  Notwithstanding any other provision to the contrary, where required by law, higher separate limits of:

Per Event Limit:        N/A
Aggregate Limit:        N/A

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage is provided the Limits of Liability set forth in this section C.3. To the extent that any **covered provider** or **contract staffing organization** is allowed by law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this section C.3.

D.  Notwithstanding any other provision to the contrary, Limits of Liability for each **Insured** enrolled in the Pennsylvania Mcare Fund are:

Per Event Limit:        $500,000
Aggregate Limit:        $1,500,000

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage due to enrollment in Pennsylvania's patient compensation fund established pursuant to Mcare is provided the Limits of Liability set forth in this subsection D. To the extent that any **covered provider** or **contract staffing organization** is allowed by Pennsylvania law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this subsection D.

Notwithstanding any provision in the policy to the contrary, the payment of **claims expense** by the **Company** will not reduce or exhaust either the Per Event or Aggregate Limits of Liability provided hereunder.

If a **deductible** is shown on the Schedule of Contract Staffing Insureds and designated "Loss and Claims Expense" it is agreed and understood that the **Insured's** duty to pay any deductible does not include the duty to pay **claims expense** within that deductible, notwithstanding any provision in the policy or any applicable deductible endorsement to the contrary.

E.  Notwithstanding any other provision to the contrary, where required by law, Limits of Liability for each **Insured** enrolled in the Indiana Patients Compensation Fund:

For any **insured** participating in the Indiana Patient's Compensation Fund, and with respect to **claims** or **potential claims** arising from a **health care event** otherwise covered under this Coverage Part occurring prior to July 1, 1999, the Limits of Liability shown on the Declarations

are replaced with the following Limits of Liability:

| | | |
|---|---|---|
| Individual health care providers: | Per Event: | $100,000 |
| | Aggregate: | $300,000 |

For any **insured** participating in the Indiana Patient's Compensation Fund, and with respect to **claims** or **potential claims** arising from a **health care event** otherwise covered under this Coverage Part occurring on or after July 1, 1999 and before July 1, 2017, the Limits of Liability shown on the Declarations are replaced with the following Limits of Liability:

| | | |
|---|---|---|
| Individual health care providers: | Per Event: | $250,000 |
| | Aggregate: | $750,000 |

For any **insured** participating in the Indiana Patient's Compensation Fund, and with respect to **claims** or **potential claims** arising from a **health care event** otherwise covered under this Coverage Part occurring on or after July 1, 2017 and before July 1, 2019, the Limits of Liability shown on the Declarations are replaced with the following Limits of Liability:

| | | |
|---|---|---|
| Individual health care providers: | Per Event: | $400,000 |
| | Aggregate: | $1,200,000 |

For any **insured** participating in the Indiana Patient's Compensation Fund, and with respect to **claims** or **potential claims** arising from a **health care event** otherwise covered under this Coverage Part occurring on or after July 1, 2019, the Limits of Liability shown on the Declarations are replaced with the following Limits of Liability:

| | | |
|---|---|---|
| Individual health care providers: | Per Event: | $500,000 |
| | Aggregate: | $1,500,000 |

As used in this Schedule, the reference to the Indiana Patient's Compensation Fund shall have the same meaning as set forth in the Indiana Medical Malpractice Act (IC 34-18-1, et seq.).

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage due to enrollment in the Indiana Patient Compensation Fund established pursuant to Indiana law is provided the Limits of Liability set forth in this subsection E. To the extent that any **covered provider** or **contract staffing organization** is allowed by Indiana law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this subsection E.

Notwithstanding any provision in the policy to the contrary, the payment of **claims expense** by the **Company** will not reduce or exhaust either the Per Event or Aggregate Limits of Liability provided hereunder.

If a **deductible** is shown on the Schedule of Contract Staffing Insureds and designated "Loss and Claims Expense" it is agreed and understood that the **Insured's** duty to pay any deductible does not include the duty to pay **claims expense** within that deductible, notwithstanding any provision in the policy or any applicable deductible endorsement to the contrary.

For purposes of application of the Limits of Liability under this subsection:
1. the definition of **agents** includes only those **employees** who are also **W-2 providers**, and does not include any health care provider who meets the definition of a "Health Care Provider" as defined by Ind. Code § 34-18-2-14;
2. **new facilities** are removed from the *WHO IS INSURED* section of the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement; and,

3.   the **Company** may settle any **claim** against an **Insured** without consent who qualifies as a "Health Care Provider" as defined by Ind. Code § 34-18-2-14, if the unanimous opinion of the medical review panel under Ind. Code § 34-18-10-22(b)(1) is that the evidence supports the conclusion that the relevant **Insured** failed to comply with the appropriate standard of care as charged in the complaint.

F.   Notwithstanding any other provision to the contrary, where required by law, Limits of Liability for each **Insured** enrolled in the Louisiana Patient Compensation Fund:

Per Event Limit:      $100,000
Aggregate Limit:      $300,000

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**.   Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage due to enrollment in the Louisiana Patient Compensation Fund established pursuant to Louisiana law is provided the Limits of Liability set forth in this subsection F.   To the extent that any **covered provider** or **contract staffing organization** is allowed by Louisiana law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this subsection F.

Notwithstanding any provision in the policy to the contrary, the payment of **claims expense** by the **Company** will not reduce or exhaust either the Per Event or Aggregate Limit of Liability provided hereunder.

If a **deductible** is shown on the Schedule of Contract Staffing Insureds and designated "Loss and Claims Expense" it is agreed and understood that the **Insured's** duty to pay any deductible does not include the duty to pay **claims expense** within that deductible, notwithstanding any provision in the policy or any applicable deductible endorsement to the contrary.

G.   Notwithstanding any other provision to the contrary, where required by law, Separate Limits of Liability required for **Insureds** who provide **professional services** or **credentialing services** in Connecticut:
Per Event Limit:      $500,000
Aggregate Limit:      $1,500,000

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**.   Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage due to Conn. Gen. Stat. Ann. § 20-11b is provided the Limits of Liability set forth in this subsection G.   To the extent that any **covered provider** or **contract staffing organization** is allowed by Connecticut law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this subsection G.   All other **Insureds** share the limits provided under subsection I.A above.

H.   Notwithstanding any provision in the policy to the contrary, when an **Insured** provides **professional services** or **credentialing services** in Florida and the policy's Per Event Limit of Liability is no greater than $250,000 and the Aggregate Limit of Liability is no greater than $750,000, then the payment of **claims expense** by the **Company** will not reduce or exhaust either the Per Event or Aggregate Limit of Liability provided hereunder.

All other terms and conditions of the policy remain unchanged.

---

Reprinted with permission of The Medical Protective Company.   All rights reserved.

# National Fire & Marine Insurance Company

### Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 7 | ES013814 | Windy City Anesthesia, PC |
| Effective Date of Endorsement | | |
| 04/21/2020 | | |

### CALCULATION OF PREMIUM ENDORSEMENT
### CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the General Conditions as follows:

## GENERAL CONDITIONS

The following provisions are added to General Conditions:
  *Calculation of Premium – Cancellation Prior to Expiration.*
  1. If a policy has an attached Schedule of Contract Staffing and Locum Tenens Rates, the following provisions regarding the calculation of premium at time of cancellation apply:
     a. If the **first named insured** or the **Company** cancels any coverage provided under the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement, but not the entire policy, earned premium for the coverage provided will be, as applicable:
        (1) the **total locum premium base**, accrued up to the date of cancellation, as determined by the Locum Tenens Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates; or,
        (2) the **provider premium** accrued up to the date of cancellation as determined by Contract Staffing Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates.
     b. If the **first named insured** or the **Company** cancels any coverage provided under any Insuring Agreement other than the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement, but not the entire policy, earned premium for the coverage canceled will be computed pro rata.
     c. If the **first named insured** cancels the entire policy, earned premium shall be the greater of:
        (1) The short rate amount of the Total Annual Premium computed in accordance with the standard short rate tables and procedure; or,
        (2) the sum of:
           a) the **total locum premium base**, if any;
           b) the **provider premium** up to the date of cancellation as determined by Contract Staffing Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates, if any; and,
           c) any other premium accrued up to the date of cancellation, such premium computed pro rata, for coverage provided under Insuring Agreements other than the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement.
     d. If the **Company** cancels the entire policy, earned premium shall be the greater of:
        (1) The pro rata amount of the Total Annual Premium;
        (2) the sum of:
           a) the **total locum premium base**, if any;

b) the **provider premium** up to the date of cancellation as determined by Contract Staffing Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates, if any; and,

c) any other premium accrued up to the date of cancellation, such premium computed pro rata, for coverage provided under Insuring Agreements other than the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement

(3) a minimum earned premium of 0% of the Total Annual Premium set forth in the Declarations, but only when the **first named insured** (not the **Company**) cancels the entire policy.

2. If a policy does not have an attached Schedule of Contract Staffing and Locum Tenens Rates, the following cancellation provisions apply:

a. If the **first named insured** cancels this policy, or terminates any coverage contained therein, earned premium shall be the greater of:

(1) the premium computed in accordance with the standard short rate tables and procedure;

(2) the Annual Minimum Premium as set forth in the Declarations; or,

(3) a minimum earned premium of 0% of the Total Annual Premium set forth in the Declarations.

b. If the **Company** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed pro rata.

3. Premium adjustments shall be made within a reasonable period of time after cancellation. However, payment or tender of unearned premium shall not be a condition of cancellation.

4. Any premium calculations made in accordance with the above provisions with respect to a policy which has an attached Schedule of Contract Staffing and Locum Tenens Rates remain subject to audit pursuant to any audit provision set forth in the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement.

### *Calculation of Premium – Expiration at the End of the Policy Term.*

1. If a policy has an attached Schedule of Contract Staffing and Locum Tenens Rates, the following provisions apply regarding the calculation of premium at the expiration of the policy at the end of the full term of the policy as originally specified in the Declarations:

a. *Locum Tenens Rates* - If the premium is calculated based upon Locum Tenens Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates:

(1) Upon expiration of this policy, the **contract staffing organization** shall furnish to the **Company** a statement of the **contract staffing organization's** actual **locum premium base** for the **policy period** for each Provider Classification and Description set forth in the Schedule of Contract Staffing and Locum Tenens Rates, as well as a **total locum premium base**;

(2) If the Deposit Premium set forth in the Declarations is less than the **total locum premium base** by 10% or more, the **contract staffing organization** shall pay the difference to the **Company**. Alternatively, if the **total locum premium base** is less than the Deposit Premium, the **Company** shall refund the difference to the **contract staffing organization**, except to the extent that the **Company** is entitled to the Annual Minimum Premium as set forth in the Declarations;

b. *Contract Staffing Rates* - If the premium is calculated based upon Contract Staffing Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates:

(1) Upon expiration of this policy, the **contract staffing organization** shall furnish to the **Company** a statement, for the **policy period**, of the **contract staffing organization's** actual number of **provider premium elements** listed in the Contract Staffing Rates provision of the Schedule for Contract Staffing and Locum Tenens Rates;

(2) The Deposit Premium set forth in the Declarations is less than the **provider premium** charged by 10% or more, the **contract staffing organization** shall pay the difference to the **Company**. Alternatively, if the **provider premium** charged is less than the Deposit Premium, the **Company** shall refund the difference to the **contract staffing organization**, except to the extent that the **Company** is entitled to the Annual Minimum Premium as set forth in the Declarations

2. If a policy does not have an attached Schedule of Contract Staffing and Locum Tenens Rates, the Total Annual Premium set forth in the Declarations applies.

3. Any premium calculations made in accordance with the above provisions with respect to a policy which has an attached Schedule of Contract Staffing and Locum Tenens Rates remain subject to audit pursuant to any audit provision set forth in the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company

Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 8 | ES013814 | Windy City Anesthesia, PC |

| Effective Date of Endorsement | |
|---|---|
| 04/21/2020 | |

## THIS ENDORSEMENT CHANGES THE POLICY - PLEASE READ IT CAREFULLY

### SERVICE OF SUIT CLAUSE ENDORSEMENT

Service of process in any lawsuit, or mandated alternative dispute resolution (ADR) proceeding instituted against the **Company** shall be made upon:

**General Counsel**
**National Fire & Marine Insurance Company**
**1314 Douglas Street**
**Omaha, Nebraska 68102-1944**

The General Counsel is authorized and directed to accept service of process on behalf of the **Company** in any suit or ADR proceeding and, upon the request of the **Insured**, agrees to give a written acknowledgement to the **Insured** that the **Company** will retain counsel to enter an appearance upon the **Company's** behalf should a lawsuit or ADR proceeding be instituted.

Further, pursuant to any law of any state, the District of Columbia, territory, or protectorate of the United States which makes provision therefore, the **Company** hereby designates the Superintendent, Commissioner, Director of Insurance, deputy, or department employee specified as attorney or agent for receipt of lawful service of process or ADR proceeding, in the law, instituted by or on behalf of the **Insured** or any beneficiary within this contract, the General Counsel is hereby authorized as the **Company's** designee upon whom the service of process may be served.

Nothing contained herein shall limit or abridge the right to serve any process, notice or demand upon the **Company** in any other manner permitted or required by law.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

All other terms and conditions of this policy remain unchanged.

# EXHIBIT B



Medical Protective
Princeton Insurance Company
PLICO
MedPro RRG

04/26/2023

WINDY CITY ANESTHESIA, PC
21120 WASHINGTON PKWY
FRANKFORT, IL  60423-3112

**Re:   Policy Number ES013814**

Thank you for trusting us to protect your assets and reputation. Enclosed please find your policy underwritten by National Fire & Marine Insurance Company.

MedPro Group, a Berkshire Hathaway company, offers our insureds:

- Peace of Mind: Unsurpassed financial strength ratings of A++ (Superior) from A.M. Best and AA+ from Standard and Poor's combined with the strongest defense of claims

- Expertise: Innovative patient safety and risk solutions

- Choice: Customized insurance solutions across the healthcare continuum – nationwide

We encourage you to visit our website and Prevention & Education Center (www.medpro.com) to access information regarding the latest risk concerns and recommended strategies to help promote patient safety and satisfaction.

Please direct notice of claims in accordance with the reporting requirements of this policy as follows:

Via Email:        reportaclaim@medpro.com

Via Mail:         Medical Protective
                  Attn: First Claim Reports
                  5814 Reed Road
                  Fort Wayne, IN 46835

Our claim experts are prepared to work with you to resolve any claim-related issues. Please feel free to contact 800-4MedPro (800-463-3776) to be connected to your claims representative who will be able to address questions or concerns about a claim involving this policy.

Sincerely,

Tim Kenesey
President and CEO

A.M. Best rating as of 05/27/2015. S&P rating as of 08/06/2015. MedPro Group is the marketing name used to refer to the insurance operations of The Medical Protective Company, Princeton Insurance Company, PLICO, Inc. and MedPro RRG Risk Retention Group. All insurance products are administered by MedPro Group and underwritten by these and other Berkshire Hathaway affiliates, including National Fire & Marine Insurance Company, all of which have earned financial strength ratings of A++ from A.M. Best. Visit www.medpro.com/affiliates for more information. © 2016 MedPro Group Inc. All Rights Reserved.

# Illinois Surplus Lines Warning Statement

***Notice to Policyholder***

**This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.**

Compliance with Illinois Bulletin 2011-06
and
The Religious Freedom Protection and Civil Union Act

National Fire & Marine Insurance Company recognizes the rights afforded to individuals under The Religious Freedom Protection and Civil Union Act which states:

"The parties to a civil union are entitled to the same legal obligations, responsibilities, protections and benefits that are afforded or recognized by the laws of Illinois to spouses. The law further provides that a party to a civil union shall be included in any definition or use of the terms "spouse," "family," "immediate family," "dependent," "next of kin," and other terms descriptive of spousal relationships as those terms are used throughout Illinois law. This includes the terms "marriage" or "married." or variations thereon. If policies of insurance provide coverage for children, the children of civil unions must also be provided coverage. The Act also requires recognition of civil unions or same sex civil unions or marriages legally entered into in other jurisdictions."

# National Fire & Marine Insurance Company

Omaha, Nebraska

***DECLARATIONS***
**NOTICE**: This policy may contain claims-made coverage.  Please read this policy carefully.

Policy Number:  ES013814

| ITEM 1 | **FIRST NAMED INSURED**: **ADDRESS**: | Windy City Anesthesia, PC 21120 Washington Pkwy Frankfort, IL 60423-3112 | |
|---|---|---|---|

**ITEM 2** — **POLICY PERIOD**:   From    04/21/2023    to    04/21/2024
Both days at 12:01 a.m. at the address of the First Named Insured as stated herein.

**ITEM 3** — **COVERAGES SELECTED**:
(Please refer to the applicable Schedule of Insureds for limits, deductibles, retentions, etc.)

| | Occurrence | Claims-Made |
|---|---|---|
| CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY | | X |

**ITEM 4** — **COVERAGES NOT SELECTED**:
HEALTH CARE ENTITIES PROFESSIONAL LIABILITY
PHYSICIANS PROFESSIONAL LIABILITY
HEALTH CARE PROVIDERS PROFESSIONAL LIABILITY

**ITEM 5**

| | |
|---|---|
| **DEPOSIT PREMIUM**: | $ 98,117 |
| **ANNUAL MINIMUM PREMIUM**: | $0 |
| **TOTAL ANNUAL PREMIUM**: | $ 98,117 |

(May reflect deposit premium, which is subject to audit.  The premium does not include any surplus lines tax, which must be collected by the producer.  Terrorism premium is not reflected in the total premium amount.)

**ITEM 6** — **PRODUCER**:   Brown & Riding Insurance Services Inc
777 S Figueroa St Ste 2550
Los Angeles, CA 90017

IN WITNESS WHEREOF, National Fire & Marine Insurance Company has caused this policy to be signed by its President (and countersigned by its duly Authorized Representative, where necessary).

*[signature]*
President

Countersigned By: _____    Date: _____

# National Fire & Marine Insurance Company

Omaha, Nebraska

## *POLICY GUIDE*

This Policy Guide has been developed to describe how your policy is formatted. This guide does not change any of the terms and conditions contained in the policy.

Your policy consists of the following items:

The Declarations: This page designates the first named insured, the policy number, the policy period, the coverages selected, the total premium, and the producer.

Schedules of Insureds: These schedules define your coverage by designating who will be insured under a particular Insuring Agreement and what limits of liability will apply. If an Insuring Agreement is attached to your policy without a corresponding Schedule of Insureds, there is no coverage under that Insuring Agreement.

Insuring Agreements: These documents define the scope of the particular coverage that is being provided and any unique provisions (Additional Definitions, Additional Conditions, etc.) that will apply to it. For example, they indicate the types of claims that are covered and who is eligible to request indemnity under the policy. However, as mentioned above, these Insuring Agreements only provide coverage when attached to a corresponding Schedule of Insureds.

Modified Coverages: These forms describe any special restrictions that may apply to certain classifications of insureds. These modifications are identified by a corresponding code in the Modified Coverage column on the applicable Schedule of Insureds. Additional code descriptions may be included in endorsements attached to your policy.

Defense and Supplemental Payments: If a claim or potential claim is covered under one of the Insuring Agreements, our company will have a duty to both defend and, if necessary, pay damages on the insured's behalf. This form defines the scope of our duty to defend an insured in the event of a claim.

General Definitions: This form contains the definitions that apply to every Insuring Agreement under your policy, unless otherwise noted. Additional or alternative definitions can be found within the definitions section of the relevant Insuring Agreement. Each word or phrase listed in **bold print** has been specifically defined within the policy. If a word has not been bolded, then its commonly understood meaning will apply.

General Exclusions: This form contains the exclusions that apply to every Insuring Agreement under your policy, unless otherwise noted. Additional exclusions can be found within the *ADDITIONAL EXCLUSIONS* section of the relevant Insuring Agreement.

General Conditions: This form defines the general duties our Company and the Insureds owe to each other under the terms of this policy contract, such as the requirements for reporting claims, the effect of other applicable insurance, the duties of the first named insured, etc.

Endorsements: Endorsements modify the terms and conditions of all or part of the policy and become a part of your policy. If an endorsement modifies one or more parts of the policy, but less than the entire policy, the endorsement will specify which parts of the policy are modified. It is important to understand that this is also the only method by which the terms and conditions of your policy can be altered.

If you have any questions regarding a particular provision or the coverage that is being provided to you, please contact your producer. We appreciate your patronage.

# National Fire & Marine Insurance Company

Omaha, Nebraska

*SCHEDULE OF CONTRACT STAFFING INSUREDS*
*CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT*
*(CLAIMS-MADE)*

| DECLARATIONS | |
|---|---|
| Policy Number:  ES013814 | First Named Insured:  Windy City Anesthesia, PC |

**DEDUCTIBLE – LOSS & CLAIMS EXPENSE**                    **MODIFIED COVERAGE**

Per Event Deductible:            $ 10,000                                               FNI

| SCHEDULE OF INSUREDS |
|---|

In consideration of the payment of the premium due, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree the following persons and entities are designated as **contract staffing organizations** and **contract providers**.

| CONTRACT STAFFING ORGANIZATION | ID NUMBER | RETROACTIVE DATE | TERMINATION DATE | MODIFIED COVERAGE | PER EVENT/ AGGREGATE LIMIT OF LIABILITY | PREMIUM |
|---|---|---|---|---|---|---|
| Windy City Anesthesia, PC | 1170265 | 02/11/2003 | | | $ 1,000,000 / $ 3,000,000 | $ 98,117 |

CONTRACT STAFFING PROFESSIONAL LIABILITY
Reprinted with permission of The Medical Protective Company.   All rights reserved.
Edition Date: 7/2018

# National Fire & Marine Insurance Company

Omaha, Nebraska

***CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT***
***DEFENSE WITHIN THE LIMITS***
*(CLAIMS-MADE)*

---

### NOTICE:

**This Insuring Agreement contains claims-made and reported coverage. Claims expenses are included within the Limit of Liability and the Limit of Liability available to pay damages shall be reduced and may be completely exhausted by the payment of claims expenses.**
**Please read this policy carefully.**

In consideration of the payment of the premium due, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree as follows, subject to the terms and conditions of this policy, including the applicable limits of liability:

*I. INSURING AGREEMENT - LOSS*

A. The **Company** will pay on behalf of **covered providers** and **agents** all **loss** and **claims expense** arising from a **health care event** that took place on or after the **retroactive date**. However, the **loss** and **claims expense** must also result from:

   1. a **claim** that was **first made** against the **covered provider** or **agent**, during the **policy period**. In addition, the **claim** must have been reported to the **Company**, in writing, during the **policy period**, or 30 days thereafter, to be covered under this policy; or,

   2. a **potential claim** that was **first discovered** by the **contract staffing organization**, or its **covered provider** or **agent**, during the **policy period**. In addition, the **potential claim** must have been reported to the **Company**, in writing, during the **policy period** to be covered under this policy.

B. The **Company** will pay on behalf of a **contract staffing organization** all **loss** and **claims expense** arising from a either a **health care event** or a **wrongful credentialing services event** rendered or which should have been rendered on or after the **retroactive date**. However, the **loss** and **claims expense** must also result from:

   1. a **claim** that was **first made** against the **contract staffing organization** during the **policy period**. In addition, the **claim** must have been reported to the **Company**, in writing, during the **policy period**, or 30 days thereafter, to be covered under this policy; or,

   2. a **potential claim** that was **first discovered** by the **contract staffing organization** during the **policy period**. In addition, the **potential claim** must have been reported to the **Company**, in writing, during the **policy period** to be covered under this policy.

C. All **claims** arising out of the same **health care event** or the same **wrongful credentialing services event** will be deemed to have been made at the time the first such **claim** is made against any **Insured**. Only the policy in effect when the first such **claim** is made and reported to the **Company** in writing will apply to all related **claims**, no matter when those related **claims** are made or reported. If the first such **claim** is made prior to the effective date of this policy, this policy will not apply to that **claim**, nor to any related **claim** made during this **policy period** or any **extended reporting period**.

*II. WHO IS INSURED*

For the purposes of this Insuring Agreement, an **Insured** is:

A. a **contract staffing organization**;

B. a **new facility**;

C. an **agent**; or,

D. a **covered provider**;

as defined below.

---

*III. DEFINITIONS*

The following definitions apply to this Insuring Agreement:

A. **Additional Insured** means any person or entity listed on a Schedule of Additional Insureds.

B. **Agent**
1. **Agent** means a person who was acting within the scope of their duties as:
   a. an **employee**, **administrator**, **committee member**, or **student** of the **contract staffing organization** at the time of the **health care event** or **wrongful credentialing services event**; or,
   b. a trustee, assign, or legal representative of the **contract staffing organization**, or of a person described in B.1.a., above in the event of bankruptcy, incapacity, or death.
2. An **agent** shares the coverage provided to the **contract staffing organization**, including its limits of liability and any applicable restrictions.
3. An **agent** is not, however, an **Insured**, when the **agent** has other valid and collectible insurance to cover the **claim**.
4. As used to define an **agent**, above:
   a. **employee** means any person employed by, or under contract with, the **contract staffing organization** at the time of a **health care event**. It includes any authorized volunteer worker. However, it does not include any:
      (1) physician or dentist, including residents;
      (2) certified registered nurse anesthetist, nurse midwife, nurse practitioner, physician's assistant, podiatrist, **covered provider**, or **surgical assistant**; or,
      (3) **administrator**, **committee member**, or **student**.
   b. **administrator** means an owner, partner, stockholder, director, trustee, executive officer, medical director, department head, or faculty member of the **contract staffing organization**.
   c. **committee member** means a person serving as a member of a committee or board formed or controlled by the **contract staffing organization**. It also includes any person executing the directives of such a committee or board.
   d. **student** means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by the **contract staffing organization** relative to the delivery of **professional services**.

C. **Authorized insured** means any **Insured** authorized by the **first named insured** to give or receive notice of a **claim** or **potential claim**.

D. **Bodily injury** means any damage to the human body, including sickness or disease and any mental injury, emotional distress, or death arising therefrom. In addition, it includes damages claimed for the cost of any care, loss of services, or loss of consortium arising therefrom.

E. **Business practices claim** means any **claim** or **potential claim** arising from an **Insured's**:
1. billing practices; or,
2. advertising activities.

F. **Case management** means identifying patients with specific health care needs and developing a plan to ensure an efficient use of resources to achieve the best outcome.

G. **Claim** means an express, written demand upon an **Insured** for money or services as compensation for civil damages.

H. **Claims expense** means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any **claim**. Such costs and expenses shall only include:
1. attorney fees paid to the law firm selected by the **Company** to defend an **Insured**;
2. court costs;
3. expert fees;
4. reporter fees;
5. the cost of any alternative dispute resolution ordered by a court, otherwise required by law, or pre-approved by the **Company**;

Reprinted with permission of The Medical Protective Company. All rights reserved.
Edition Date: 04/2021

6. post-judgment interest on that portion of the judgment that does not exceed the applicable limit of liability available under the policy; and,

7. such other costs and expenses that the **Company** determines to be reasonably related to the defense of a **claim**.

However, **claims expense** does not include:
1. **loss**;
2. attorney fees awarded to a claimant;
3. the salary of any **employee** of an **Insured**; or,
4. the forgiveness of any amounts owed for the cost of care or services rendered by an **Insured**.

I. **Company** means the insurance company listed in the Declarations.

J. **Contract staffing organization** means any organization listed as a **contract staffing organization** on the Schedule of Contract Staffing Insureds.

K. **Counseling** means formal therapy rendered to a patient by a licensed professional approved and credentialed by the **Insured** to provide such therapy.

L. **Covered provider** means:
1. any formerly employed or formerly contracted health care provider, but only while providing **professional services** as defined by contract between the **contract staffing organization** and a third party, and while acting on behalf of the **contract staffing organization** at the time of the **health care event**. However, a formerly employed or formerly contracted health care provider is not a **covered provider** if any other insurance is available to cover any **claims** made against the formerly employed or contracted health care provider; or,
2. any **W-2 provider** or **non W-2 provider** providing **professional services** as defined by contract between the **contract staffing organization** and a third party, and while acting within the scope of their duties on behalf of the **contract staffing organization** at the time of a **health care event**.

However, any health care provider under contract with, or employed by (or formerly contracted with or formerly employed by), the **contract staffing organization** and who is scheduled by name on any Schedule, other than the Schedule of Contract Staffing Insureds, attached to this or any prior policy issued by the **Company** is not a **covered provider**.

A **covered provider** shares the coverage provided to the **contract staffing organization**, including its limits of liability and any applicable restrictions.

M. **Credentialing services** means **medical credentialing**, evaluating, selecting, hiring, and contracting with health care professionals to provide **professional services** for health care organizations when performed by the **contract staffing organization**; however, **credentialing services** shall not include **managed care services**.

N. **Employment practices claim** means any **claim** or **potential claim** brought by an **employee**, or applicant for employment, which alleges the **Insured**:
1. breached an actual or implied contract of employment;
2. violated an anti-discrimination statute;
3. engaged in any form of harassment;
4. engaged in libel or slander related to an employment relation;
5. retaliated for the exercise of a public right or duty;
6. engaged in intentional or negligent infliction of emotional distress arising out of an employment relationship;
7. wrongfully failed to hire, promote, or grant tenure;
8. wrongfully demoted; or,
9. wrongfully terminated employment.

O. **Event** means an accident. All injuries arising from:
1. the same or related acts, errors, or omissions; or,
2. the continuous or repeated exposure to substantially the same harmful conditions,
will be considered one **event**. For the purposes of this definition, all injuries to a mother and fetus (or fetuses) from conception through delivery shall constitute one **event**.

P. **Extended reporting period** means the period of time after the cancellation or nonrenewal of claims-made coverage during which the **Insured** may report a **claim** or **potential claim**.

Q. **First discovered** means the date on which the **authorized insured** first knew, or reasonably should have known, of the **claim** or **potential claim**.

R. **First made** means the date on which the **authorized insured** first received a **claim**. All **claims** arising from **loss** suffered by the same claimant(s) shall be considered as having been **first made** when the first such **claim** is received by the **Insured**.

S. **First named insured** (or **FNI**) means the entity or person listed as the First Named Insured on the Declarations.

T. **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury. All injuries arising from the same or related acts, errors, or omissions in furnishing **professional services** shall be considered one **health care event**.

U. **Health care plan** means medical benefits plan administered by a health maintenance organization (HMO), preferred provider organization (PPO), or other similar managed care organization or self-insured program.

V. **Insured** means any person or entity entitled to coverage as specified under the *WHO IS INSURED* section of the applicable Insuring Agreement.

W. **Locum premium base** is computed by multiplying the applicable Locum Tenens Rate as listed in the Schedule of the Contract Staffing and Locum Tenens Rates by the number of days that a **contract provider** rendered contract services to the **contract staffing organization** during the **policy period**. For purposes of this definition, one (1) day equals ten (10) hours for all specialties with the exception of Allied specialties. For Allied specialties, one (1) day equals eight (8) hours. Premiums are calculated using **locum premium base** only for any policy which has a Schedule of the Contract Staffing and Locum Tenens Rates attached.

X. **Loss**
1. **Loss** means civil damages, including prejudgment interest, which an **Insured** becomes legally obligated to pay through adjudication or settlement.
2. **Loss** does not include:
   a. any damages that are greater than the **Insured's** limit of liability;
   b. any injunctive or other equitable relief;
   c. **claims expense**;
   d. attorney fees awarded to a claimant as a fine, penalty, or sanction based upon the **Insured's** misconduct. However, attorney fees awarded as a part of the claimant's damages in a covered **claim** for any other purpose will be included as **loss**;
   e. the salary of any **employee** of an **Insured**; or,
   f. the forgiveness of any amounts owed for the cost of care or services rendered by an **Insured**.

Y. **Managed care event** means any **event** in the rendering of, or failure to render, **managed care services** that results in injury. All injuries arising from the same or related acts, errors, or omissions in the furnishing of **managed care services** shall be considered one **managed care event**.

Reprinted with permission of The Medical Protective Company. All rights reserved.
Edition Date: 04/2021

Z.  **Managed care services** means services provided to manage and/or administer a **health care plan**.  These services can include any of the following acts provided on behalf of the **health care plan**:
   1. the creation, sale, and marketing of a **health care plan**;
   2. the selection, credentialing, and contracting of health care providers;
   3. the evaluation of the cost, quality and proper utilization of **treatment** options available or being provided to participants;
   4. the adjustment, investigation, and processing of claims for benefits; or,
   5. **case management**.
   However, **managed care services** do not include **treatment** rendered, or which should have been rendered, to a patient.

AA.  **Medical credentialing** means the process of assessing the quality of licensed medical professionals through the verification of license, training, competency, and medical malpractice history in order to determine their ability to perform certain services and medical procedures on behalf of a **contract staffing organization**. **Medical credentialing** does not include the process of assessing the quality of licensed medical professionals as a service to third party clients for a fee.

BB.  **New facility** means an entity formed or acquired by the **contract staffing organization** during the **policy period**, over which the **contract staffing organization** maintains at least majority ownership.
   1. A **new facility** is not covered:
      a. after 90 days have elapsed from the date the entity was formed or acquired by the **contract staffing organization**; or,
      b. for **loss**, **claims expense**, **wrongful credentialing services event**, or a **health care event** that occurred before the entity was formed or acquired by the **contract staffing organization** or after the **policy period**.
   2. A **new facility** shares the coverage provided to the **contract staffing organization**, including its limits of liability.

CC.  **Non-standard policy** means a policy issued by a market of last resort, where coverage is typically limited or restricted due to prior claims or other specific risk issues identified as part of a risk profile.

DD.  **Non W-2 provider** means any health care provider who is not on the regular payroll of the **contract staffing organization** and who does not have federal income taxes withheld from their compensation by the **contract staffing organization**.

EE.  **Policy period** means the period of time listed on the Declarations as the Policy Period. However, if the policy is terminated before the later of the dates listed on the Declarations, **policy period** means the period between the first date indicated on the Declarations and the date the policy was terminated.

FF.  **Potential claim** means an **event** the **Insured** knows or reasonably should know is likely to result in a **claim**.

GG.  **Product liability claim** means any **claim** or **potential claim** arising from a defective good or product invented, designed, manufactured, or sold by an **Insured**.  However, it does not include any **claim** or **potential claim** arising from a good or product, which was specifically used by the **Insured**, to provide **treatment** to the **Insured's** own patient.

HH.  **Professional services** means **treatment**.

II.  **Provider premium** is calculated by multiplying the premium rate shown in the Contract Staffing Rates provision of the Schedule of Locums and Contract Staffing Rates by the applicable number of **provider premium elements** rendered on behalf of the **contract services organization** during the **policy period**.

JJ.  **Provider premium element** means the factor(s) listed in the Contract Staffing Rates provision of the Schedule of Locums and Contract Staffing Rates.

KK.  **Retroactive date** means the date prior to which an **Insured** has no coverage under the applicable Insuring Agreement.  The **retroactive date** is listed on the applicable Schedule of Insureds for each **Insured** to which a **retroactive date** applies.

LL.  **Scheduled insured** means any person or entity listed on a Schedule of Insureds.

MM. **Social services** means programs provided by an **Insured** to help maintain or improve the quality of life for the patient, including family counseling and educational programs.  These programs do not include therapy for the direct benefit of anyone other than the patient.

NN.  **Surgical assistant** means a person directly assisting as a non-physician first assistant in surgical procedures, including a person acting as a nurse surgical assistant or a physician surgical assistant.

OO.  **Total locum premium base** is calculated by adding together all **locum premium bases** derived for all Provider Groups and Descriptions as accrued to the end of the **policy period** using the applicable Locum Tenens Rate found in the Schedule of Contract Staffing and Locum Tenens Rates.  Premiums are calculated using **total locum premium base** only for any policy which has a Schedule of the Contract Staffing and Locum Tenens Rates attached.

PP.  **Totally disabled** means the **Insured** is:
1.  permanently, wholly, and continually disabled and thereby prevented from performing any and all duties pertaining to the practice of medicine, surgery, dentistry or nursing; and,
2.  under the regular care and attendance of a legally qualified physician, other than the **Insured**.

QQ. **Treatment** means:
1.  the rendering of medical, surgical, dental, nursing services, **counseling** or **social services** to a patient.  This shall include first aid rendered at the scene of an accident without expectation of monetary compensation;
2.  the provision of medical examinations, opinions, or consultations regarding a person's medical condition within the **Insured's** practice as a licensed health care provider; or,
3.  the furnishing of any of the following, but only as it relates to the rendering of medical, surgical, dental, nursing services, **counseling** or **social services** to a patient:
    a.  food and beverages; or,
    b.  medical, surgical, or dental supplies, appliances, or drugs.

RR.  **W-2 provider** means any health care provider who is on the regular payroll of the **contract staffing organization** and who has federal income taxes withheld from their compensation by the **contract staffing organization**.

SS.  **Wrongful credentialing services event** means any **event** in the performance of **credentialing services** by the **contract staffing organization** resulting in a **health care event** sustained by a patient and committed by any **covered provider**.

## IV.  *GENERAL EXCLUSIONS*
This Insuring Agreement does not apply to:
A.  any **potential claim** that was **first discovered** by any **authorized insured** prior to the **policy period**;

B.  any **claim** arising from, or in connection with, an **Insured's** ownership, supervision, or management of any organization, partnership, joint venture, or other business enterprise that is not an **contract staffing organization**;

C.  any **claim** arising from, or in connection with, the rendering or failure to render **treatment** by an **administrator** or **committee member**, unless it was provided in an emergency without an expectation of compensation;

D.  any **business practices claim**;

E.  any **employment practices claim**;

F.  any **product liability claim**;

G.  any **claim** arising from, or in connection with, the rendering or failure to render **managed care services**; or,

H.  any liability for the acts of another assumed by the **Insured** under any contract or agreement, whether written or oral, which shall include any hold harmless or indemnification agreement entered into by the **Insured**, provided that this exclusion shall not serve to exclude coverage to any third party for any liability imposed upon such third party solely as the result of the **Insured's** rendering of, or failure to render, **professional services**.

I.  Any **loss** arising from, or in connection with, any act listed in the subparagraphs below:
    1.  any malicious act or intentional tort;
    2.  any actual or threatened sexual act, behavior or conduct, including, but not limited to, assault, exploitation, harassment or molestation, by any person of another person while in the care, custody, or control of any **Insured**, whether under the guise of **treatment** or not;
    3.  any personal, romantic, sexual, or other non-professional relationship with a current, former, or prospective patient, whether under the guise of **treatment** or not;
    4.  any willful violation of any law, statute, or regulation; or,
    5.  any dishonest or fraudulent act.

    Under this exclusion, the **Company** will defend and pay **claims expense** for any **claim** or **potential claim** arising from, or in connection with, an **event**, **health care event**, or **managed care event**. However, the **Company's** duty to defend any **Insured** for such a **claim** or **potential claim** will cease if it is established by trial or arbitration verdict, court ruling, regulatory ruling or legal admission, that an **Insured** engaged in any act listed in the above subparagraphs.

J.  Any **claim** or **potential claim** arising from, or in connection with, any **treatment** rendered by any individual who was not authorized to provide such services due to the suspension, revocation, surrender, or restriction of, or failure to obtain, the proper professional license.

K.  Any **claim**, **potential claim**, suit or other matter seeking:
    1.  injunctive relief;
    2.  any relief other than **loss**; or,
    3.  the award of fines, penalties, or sanctions.

L.  Any damages over and above actual compensatory damages. This includes punitive, exemplary, and multiple damages.

M.  Any **bodily injury** to an employee that arose out of, and in the course of, employment with an **Insured**. This exclusion includes any injury to the spouse, child, parent, relative or heir of the employee that derives therefrom. It also applies regardless of whether an **Insured** may be liable as an employer or in any other capacity. In addition, the exclusion applies to any duty to share **loss** or **claims expense** with or repay a third party for **loss** or **claims expense** as a result of the **bodily injury**.

N.  Any **claim** or **potential claim** arising from, or in connection with, any obligation or damages arising under any law related to:
    1.  workers' compensation;
    2.  occupational disease;
    3.  unemployment compensation;

    4.   disability benefits; or,

    5.   other similar law that provides for scheduled benefits as a result of an injury or disease.

O.  Any **claim** or **potential claim** arising from, or in connection with, any **loss** or **claims expense** covered under an **Insured's** directors' and officers' policy.

P.  Any **claim** or **potential claim** arising from, or in connection with, any **loss** or **claims expense** which is initiated, alleged, or caused to be brought about, by any **Insured** covered by this policy against any other **Insured** covered by this policy. This exclusion does not apply if the **claim** arises out of an **Insured** providing **professional services** to another **Insured**.

Q.  Any **claim** or **potential claim**:

    1.   arising from, or in connection with, any rendering of, or failure to render, **professional services** for which the **Insured** has, or is eligible for, complete immunity as a volunteer or as an employee or contractor of a federal, state, or local government; or,

    2.   involving an **Insured** who has, or is eligible for, insurance, indemnity, or any other protection pursuant to any federal, state, or local laws, including but not limited to the Federal Tort Claims Act.

R.  Any default judgment or other **claim** or **potential claim** that the **Company** was unable to timely investigate or defend due to the acts or omissions of the **Insured**.

S.  Any damages:

    1.   for which an **Insured** has coverage under a nuclear energy liability policy issued by the:

        a.   Nuclear Energy Liability Insurance Association;

        b.   Mutual Atomic Energy Liability Underwriters;

        c.   Nuclear Insurance Association of Canada; or,

        d.   any successor or assign of the entities set forth in the subparagraphs above.

This policy also does not apply if such coverage did exist, but was terminated by the exhaustion of the **Insured's** limit of liability.

    2.   resulting from the hazardous properties of nuclear material for which the **Insured**:

        a.   was required to maintain financial protection under the Atomic Energy Act of 1954 or any amendment or regulation that applies thereto; or,

        b.   was entitled to indemnity by the United States government or any agency thereof or would have been entitled to had this policy not been issued.

T.  Any **claim** or **potential claim** arising from, or in connection with, an **Insured's** duty to comply with the Americans with Disabilities Act of 1990 (ADA).  This also includes any amendment or regulation that applies thereto or any comparable federal, state, or local law.

U.  Any **claim** or **potential claim** arising from, or in connection with, an **Insured's** duty as a sponsor of an employee benefit plan under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto.  However, this exclusion is limited to:

    1.   an **Insured's** failure or inability to fund the plan in accordance with the plan document or any applicable law or regulation; and,

    2.   liability for the payment of benefits owed to a participant or beneficiary of the plan that have been paid or may lawfully be paid from the plan's funds or those of other employee programs.

V.  Any **claim** or **potential claim** arising from, or in connection with, an **Insured's** violation of the Racketeer Influenced Corrupt Organizations Act (RICO), or any comparable federal, state or local laws or any amendment or regulation that applies thereto.

W. Any **claim** or **potential claim** arising from, or in connection with, an **Insured's** violation of any federal, state, or local securities law or regulation.

X. Any **claim** or **potential claim** arising from, or in connection with, the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate **electronic data**. As used in this exclusion, **electronic data** means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices, or any other media that are used with electronically controlled equipment.

Y. Any **claim** or **potential claim** arising from, or in connection with, any **loss** or **claims expense** covered under an **Insured's** cyber or privacy insurance coverage, including but not limited to, any coverage for network security and privacy, regulatory fines and penalties, patient notification and credit monitoring, or data recovery cost.

Z. Any **claim** or **potential claim** arising from, or in connection with, any unlawful discrimination by any **Insured**, including any civil rights violation alleged pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.*) and amendments thereto.

AA. Any **claim** or **potential claim** arising from or in connection with any **covered provider** or **contracting staffing organization's** rendering of, or failure to render, **professional services** or **credentialing services** during any period of time when such **covered provider** or **contracting staffing organization** is enrolled in the patient compensation fund (or however otherwise titled by the applicable enabling statute) of Kansas or Wisconsin.

BB. Any **claim** or **potential claim** otherwise covered under this policy where providing coverage would be in violation of any U.S. economic trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control. Under this exclusion, such coverage shall be null and void. Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any **claim** or **potential claim** that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

## V. *OTHER EXCLUSIONS - MULTI-POLICY AND ANTI-STACKING*

If more than one Insuring Agreement or policy applies, the following multi-policy and anti-stacking exclusions apply:

A. If more than one policy issued by the **Company** applies to the liability of an **Insured**, the **Company's** duty to pay for a **loss** or **claims expense** will be confined to the policy containing the largest applicable limit.

B. If more than one Insuring Agreement under this policy applies to the liability of an **Insured**, the **Company's** duty to pay **loss** or **claims expense** will be confined to the Insuring Agreement containing the largest applicable limit.

## VI. *LIMITS OF LIABILITY*
### *PER EVENT LIMIT*

The **Company's** duty to pay **loss** or **claims expense** on behalf of a **contract staffing organization** for any **health care event** or **wrongful credentialing services event** covered under this Insuring Agreement shall not exceed the Per Event Limit of Liability shown for the **contract staffing organization** on the Schedule of Contract Staffing Insureds. This limit shall apply regardless of the number of:

1. persons who sustain injury;
2. claimants;
3. **claims** or **potential claims**;
4. policies issued by the **Company**;
5. the number of **Insureds** involved or alleged to be involved in the same **health care event** or **wrongful credentialing services event**; or,
6. **Insureds** who share the Per Event limit.

*AGGREGATE LIMIT*

The **Company's** duty to pay **loss** or **claims expense** on behalf of a **contract staffing organization** for all **health care events** and **wrongful credentialing services events** covered under this Insuring Agreement shall not exceed the Aggregate Limit of Liability shown for the **contract staffing organization** on the Schedule of Contract Staffing Insureds. This limit shall apply regardless of the number of:

1. **health care events** and **wrongful credentialing services events**;
2. persons who sustain injury;
3. claimants;
4. **claims** or **potential claims**;
5. policies issued by the **Company**;
6. the number of **Insureds** involved or alleged to be involved in the same **health care event** or **wrongful credentialing services event**; or,
7. **Insureds** who share the Aggregate limit.

Notwithstanding any provision in the policy to the contrary, any payment of **loss** and **claims expense** by the **Company** will reduce and may exhaust both the Per Event and Aggregate Limits of Liability provided hereunder.

## VII. ADDITIONAL CONDITIONS

In addition to the conditions contained in the General Conditions, the following conditions apply to this Insuring Agreement:

A. *Settlement.*

Consent of the **first named insured** only is necessary and sufficient for the **Company** to settle any **claim**, **potential claim** or other matter brought against an **contract staffing organization** or its **covered providers**, **agents** or any other **Insured**, unless prohibited by statute, regulation, rule or order. However, if the **first named insured** withholds consent to any settlement recommended by the **Company** then the **Company's** liability for **loss** and **claims expense** shall not exceed the amount for which the **claim**, **potential claim**, or other matter could have been settled.

B. *Material Change in Risk.*

In the event the **Company** is made aware of a material change in risk in the **Insured's** practice, in addition to the rights reserved in the *GENERAL CONDITIONS,* the **Company** reserves the right to cancel the policy pursuant to the Cancellation provisions in the policy.

C. *Statement of Premium and Premium Audit Rights.*

Only with respect to a policy which has a Schedule of Contract Staffing and Locum Tenens Rates attached, the **Company** shall have the right, during the **policy period** or within one (1) year thereafter, to require the **contract staffing organization** to provide within ten (10) days after request, a sworn statement for any specified portion of the **policy period** setting forth, as applicable, either the contract staffing premium derived from the Contract Staffing Rates, or the **locum premium base** by Provider Group as derived from the Locum Tenens Rates. Additionally, during the **policy period** or within three (3) years thereafter, the **Company** shall be permitted, at its own discretion and for its own benefit, to audit the business records of the **contract staffing organization** in order to verify the **locum premium base** statement. The rendering of any estimate or statement or the making of any previous settlement shall not bar the **Company** from conducting additional audits as needed, nor prevent the **Company** from receiving additional premium.

D. *Extended Reporting Period Option.*

Purchase of an **extended reporting period**:

1. If the coverage afforded to a **locum tenens insured** on a separate limit basis is terminated, the **Company** shall, upon written request of the **first named insured**, mail an offer for an **extended reporting period** for the terminated coverage, to the **first named insured** at the last address on record with the **Company**.

   a. Any such written request by the **first named insured** must be received by the **Company** within 30 days of the termination of coverage for a **contract staffing organization**.

    b.  Upon receipt of such request, the **Company** shall only be required to offer an **extended reporting period** to the **first named insured**.

2. If the coverage afforded to an **contract staffing organization** on a shared limit basis, as designated by the **FNI** in the Modified Coverage column on the Schedule of Contract Staffing Insureds, is terminated, the **Company** shall offer an **extended reporting period** only when all coverage available under a specific shared limit is terminated. The **Company** shall, upon written request of the **first named insured**, mail an offer for an **extended reporting period** for the terminated coverage to the **first named insured** at the last address on record with the **Company**.

    a.  Any such written request by the **first named insured** must be received by the **Company** within 30 days of the termination of coverage.

    b.  Upon receipt of such request, the **Company** shall only be required to offer an **extended reporting period** to the **first named insured**.

3. If the entire policy is canceled or nonrenewed:

    a.  the **Company** shall only be required to offer an **extended reporting period**, if requested, to the **first named insured** for all **Insureds** covered under the policy.  If the **first named insured** accepts the offer of an **extended reporting period**, all **Insureds** that were afforded coverage by this policy shall be included in the **extended reporting period**.

    b.  the **Company** shall have no duty to offer a separate **extended reporting period** to any **contract staffing organization** or its **covered provider** or **agent** or any other **Insured**.

    c.  the **Company** shall have no duty to inform any **contract staffing organization** or its **covered provider** or **agent** or any other **Insured** whether the **first named insured** accepts the offer of an **extended reporting period**.

4. The **first named insured** may accept the **Company's** offer of an **extended reporting period** by paying the premium on or before the due date indicated in the offer.  Failure to pay the full premium by such date will be deemed a rejection of the offer.

5. If purchased, any **claim** or **potential claim** against a **contract staffing organization**, which is otherwise covered by the policy, may be reported for an unlimited duration.  However, the **extended reporting period** shall not:

    a.  extend the **policy period**;

    b.  apply to any **claim** or **potential claim** arising from a **health care event** that took place after the **policy period**; or,

    c.  otherwise expand the coverage provided under this policy.

---

# National Fire & Marine Insurance Company

Omaha, Nebraska

### *GENERAL CONDITIONS*

---

Each condition contained in this form, or in any attached form, is a separate and distinct condition precedent to coverage. Please read and review each condition carefully.

These General Conditions apply to all Insuring Agreements selected under this policy.

A. *Representations and Change Provision.*
    1.  By acceptance of this policy, each **Insured** agrees, represents, and warrants that the statements and particulars made in all applications, including any statements and particulars made in any and all documents, supplemental pages or other attachments ("Attachments") for the purposes of any application, are true and correct. It is further understood and agreed that any application, and any Attachments, are incorporated into, and shall form a part of, this policy. Therefore, this policy and any endorsements, and all applications and Attachments, embody all agreements between the **Insured** and the **Company**, or any of its authorized representatives, relating to this insurance.
    2.  In the event any application was executed or endorsed by the **Insured's** agent, the **Insured** acknowledges that the agent has acted under the **Insured's** express authority and that the **Insured** has thoroughly reviewed the information contained on any application. Therefore, it is understood and agreed that, to the extent permitted by law, the **Company** reserves the right to rescind this policy, or deny any coverage provided for a **claim**, based upon any material misrepresentation made by the **Insured**.
        The representations made by the **Insured** in the applications, and Attachments, are the basis for the coverage provided, as well as the **Company's** calculation of the applicable premium. As a result, the **Insured** agrees to inform the **Company** of any material change in practice.
    3.  In the event the **Company** is made aware of a material change in the **Insured's** practice, it reserves the right to recalculate the applicable premium, exclude the new practice characteristics from coverage, and/or deny any coverage provided for a **claim** arising from, or in connection with, the material change.
    4.  Notwithstanding the above, the **Company** will not rescind this policy, or deny any coverage provided for a **claim** or **potential claim**, based upon an unintentional error or omission in disclosing information to the **Company** which is not a material misrepresentation.

B. *Reporting Requirements.*
    1.  The **Company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon the **authorized insured's** forwarding, as soon as practicable and within the requirements of the applicable Insuring Agreement, notice of every **claim**, demand, summons, or legal paper the **authorized insured** receives.
    2.  Any such notice to the **Company** shall be in writing and contain all of the following information:
        a.  the identity of all **Insureds** implicated;
        b.  all reasonably obtainable information with respect to the time, place and circumstances of the **event**;
        c.  the nature and extent of the injury;
        d.  the names and addresses of any injured persons;
        e.  the names and addresses of available witnesses; and
        f.  the basis for the **authorized insured's** belief that a **claim** is reasonably likely to be made, as well as the date the **authorized insured** first came to this belief.
    3.  All such reports and documents shall be directed to the **Company** using the contact information listed on the contact sheet attached to this policy.
    4.  An **event** reported to the **Company** as part of risk management or loss control services shall not be considered the report of a **claim** or **potential claim**.

C. *Assistance and Cooperation.*
    1.  After any **claim** or **potential claim**, the **Insured** shall not contract any expense, voluntarily assume any liability in any

Reprinted with permission of The Medical Protective Company. All rights reserved.

situation; nor make or contract any settlement of the **claim** or **potential claim**, except at the **Insured's** own cost and responsibility, without the written authorization of the **Company**.

2. The **Company's** duty to defend and pay **loss** for any **claim** otherwise covered under this policy is strictly conditioned upon the **Insured's** cooperation with the **Company** in the investigation, defense, and/or settlement of any matter to which this policy applies. Such cooperation shall include, but is not limited to:

   a. attendance at any deposition, hearing, or trial, as requested by the **Company**;

   b. assistance in securing and giving evidence;

   c. obtaining the attendance of witnesses; and,

   d. doing nothing to prejudice the **Company's** ability to investigate, defend, and/or manage any matter to which this policy applies;

   e. submitting to recorded and/or sworn statements and to examinations under oath as requested by the **Company**; and,

   f. promptly producing, at the **Company's** request, any records, documents and other information in the **Insured's** possession, custody or control.

3. If a **claim** or **potential claim** is, or might be, covered under any other policy of insurance, the **authorized insured** shall promptly give notice to such other insurers, but only to the extent that the **authorized insured** is aware of such other insurance. The **Insured** shall also provide the **Company** with copies of the applicable policies, but only to the extent the applicable policies are in the custody and control of the **authorized insured**. The **Insured** shall further act in good faith to enforce any rights held under such policies, including the right to a defense.

D. _Premiums._

1. The **Company's** obligation to perform any duty under the policy is strictly conditioned upon the payment of the premium when due. Similarly, the **Company's** obligation to perform any duty pursuant to a renewal of coverage provided under the policy shall be strictly conditioned upon the payment of the renewal premium when due. Therefore, this policy shall not be deemed to have been issued, delivered, or renewed and shall not be applicable to any matter which would otherwise be covered herein, until:

   a. the premium has been paid in full; or,

   b. if the **Company** has agreed to finance the policy, the first installment has been paid in full.

   If payment is made by check, electronic transfer or money order, it shall not be considered "paid in full" until honored by the payor's bank.

2. Premiums for this policy shall be computed in accordance with the **Company's** rules, rates, and rating plans.

3. Any premium designated as Deposit Premium on the Declarations is merely a deposit on the actual amount owed. At the close of the **policy period**, the **Company** will compute the earned premium for that period. The Deposit Premium will then be credited to that amount. If the Deposit Premium exceeds the earned premium, the **Company** will refund the difference to the **first named insured**, subject to the Annual Minimum Premium set forth in the Declarations. If the earned premium exceeds the Deposit Premium, the **Company** will bill the **first named insured** for the difference. The **Company's** computation of earned premium under this provision is expressly made subject to any minimum earned premium endorsement attached to the policy.

4. The **first named insured** shall maintain records of the information necessary for premium computation. The **first named insured** shall send copies of these records to the **Company** at the end of the **policy period** as directed by the **Company**. Such information shall be subject to audit and verification by the **Company**.

E. _Inspection and Audit._

The **Company** shall be permitted, at its own discretion and for its own benefit, to audit an **Insured's** property, operations, and any business records. The **Company** shall also have the right to obtain a copy of any current or prior insurance records. Any findings or recommendations made by the **Company** as a result of an audit shall inure solely to the **Company's** benefit. As a result, they may not be used as evidence of the **Insured's** compliance with any safety regulations or other industry standards.

F. _Other Insurance._

Unless otherwise noted in an Insuring Agreement:

1. If any other valid and collectible insurance is available to any **Insured** with respect to any liability arising from a **potential claim**, **claim** or suit which is covered by this policy, and such other insurance is afforded under a policy or

**extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **Company**:

    a.    if the **Insured** has secured coverage from the **Company** or any of its affiliates on a **non-standard policy**, then the **Company's** duty to pay **loss** will be confined to the **non-standard policy**;

    b.    if subsection (a) does not apply, and an **Insured** is named as a specific named insured under any other valid and collectible insurance available to that **Insured**, then any duty to pay **loss** is confined to the policy where the **Insured** is specifically named;

    c.    if neither subsection (a) nor (b) above apply, any duty to pay **loss** will be confined to the policy containing the largest applicable limit.

2.    If any other valid and collectible insurance is available to any **Insured** with respect to any liability arising from a **potential claim**, **claim** or suit which is covered by this policy, and such other insurance is not afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **Company**, then this insurance will be excess over such other insurance even if such other insurance is stated to be primary, excess, contingent or otherwise. The **Company** will pay only the **Company's** share of the **loss**, if any, that exceeds the sum of:

    a.    the total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and,

    b.    the total of all deductible and self-insured amounts under all such other insurance.

3.    If the **Insured** has such other insurance that applies on the same basis, whether excess or primary, the **Company's** liability for **loss** and **claims expense** shall not exceed:

    a.    the amount that would be payable if each insurer contributed by equal shares until the lowest limit contained in any applicable policy was exhausted or the entire **loss** was paid, whichever occurred first. If any **loss** remains, the **Company** will continue to contribute by equal shares until any of the following occurs:

        (1)    the applicable limits from this policy are exhausted,

        (2)    the limits of all applicable policies have been exhausted, or

        (3)    the entire amount is paid.

        This method shall only apply if all other such insurance provides for contribution by equal shares; or,

    b.    the ratio between the limit of liability available to the **Insured** under this policy and the total limit of liability under all applicable policies until the applicable limits from this policy are exhausted or the entire **loss** is paid. This method shall only apply if any applicable policy does not provide for contribution by equal shares.

4.    The **Company** will have no duty to defend the **Insured** against any suit if any other insurer has a duty to defend the **Insured** against that suit. If no other insurer defends, the **Company** will undertake to do so, but the **Company** will be entitled to all of the **Insured's** subrogation rights against all those other insurers to the extent of any payments made, or as allowed by law.

5.    This condition shall not apply if such other valid insurance is written to be specifically excess of this policy.

G.    *Subrogation.*

    The **Company** shall be subrogated to the rights of any **Insured** to the extent of any payments made, or as allowed by law. The **Insured** shall do nothing to prejudice those rights. At the **Company's** request, the **Insured** shall bring suit or transfer those rights to the **Company**. The **Insured** shall also help the **Company** enforce its rights.

H.    *First Named Insured.*

1.    The **first named insured** shall act as the agent of all **Insureds** with respect to this policy, with full authority to bind all **Insureds**. This shall include, but is not limited to:

    a.    receipt of notices of cancellation or nonrenewal;

    b.    requesting or receiving endorsements issued to form a part of this policy;

    c.    payment of premiums due;

    d.    receiving return premium; and,

    e.    receiving and/or responding to an offer for an **extended reporting period** for any **Insured**.

2.    The **first named insured** shall notify in writing the **Company** and all **Insureds** of any changes that might affect the insurance provided under this policy, including cancellation and nonrenewal.

I.    *Policy Territory.*

    Unless otherwise noted in an Insuring Agreement, this policy shall only apply to a **claim** filed within the United States, including its territories and possessions. However, unless otherwise noted, a **claim** may be based upon **professional**

---

**services** provided anywhere in the world, so long as the **Insured** had prior approval to provide such services from the appropriate governmental authorities and the **Company**.

J. *Cancellation, Nonrenewal and/or Termination of Coverage.*
   1. This policy may be canceled by the **first named insured**. The **first named insured** shall mail written notice to the **Company** requesting cancellation. The cancellation shall be effective on the date requested by the **first named insured** or the date the notice is received by the **Company**, whichever is later.
   2. Any coverage contained within this policy may be terminated by the **first named insured**. The **first named insured** shall mail written notice to the **Company** requesting the coverage termination. The termination shall be effective on the date requested by the **first named insured** or the date the notice is received by the **Company**, whichever is later.
   3. This policy, or any coverage contained therein, may also be canceled, terminated or nonrenewed by the **Company**. The **Company** will send notice to the **first named insured** at the last address on record with the **Company**.
   4. If the **Company** cancels or nonrenews an **Insured's** policy for any reason other than non-payment of premium, the **Company** shall provide written notice to the **first named insured** not less than thirty (30) days prior to the effective date of such cancellation or nonrenewal. If the **Company** cancels an **Insured's** policy for nonpayment of premium, the **Company** shall provide written notice to the **first named insured** not less than ten (10) days prior to the effective date of such cancellation or nonrenewal.
   5. If the **Company** cancels or nonrenews an **Insured's** policy, the **Insured's** coverage under that policy shall terminate on the earlier of:
      a. the date stated on the cancellation or nonrenewal notice; or,
      b. the date the **Insured** procures replacement coverage.

K. *Modifications.*
   Except as provided herein, this policy may not be modified except by written endorsement attached to and made a part of this policy by the **Company**. The **Company's** decision not to insist on the **Insured's** compliance with any provision of this policy shall not operate to waive, modify, or void the provision.

L. *Bankruptcy or Insolvency.*
   The bankruptcy or insolvency of an **Insured**, or an **Insured's** estate, shall not act to modify any duty owed by the **Insured** or the **Company** under the policy. Under no circumstances will such bankruptcy or insolvency require the **Company** to assume or in any way replace any **Insured's** deductible or otherwise assume any obligation owed by any **Insured** under this policy.

M. *Non-assignability.*
   No interest of an **Insured** under this policy shall be assignable without the prior written consent of the **Company**. However, if the **Insured** is a person and dies, the coverage afforded by this policy shall inure to the benefit of that **Insured's** estate.

N. *Separation of Insureds.*
   Except for the applicable limits of liability and any duties specifically assigned to the **first named insured**, this policy applies:
   1. separately to each **Insured** against whom a **claim** or **potential claim** is made; and,
   2. as if each **Insured** were the only **Insured** under this policy.

O. *Action Against the Company.*
   1. No action shall lie against the **Company** unless each **Insured** is in full compliance with all of the terms of this policy.
   2. No person shall have the right to join the **Company** as a party to a **claim** to determine the **Insured's** liability under this policy. Further, an **Insured** shall not interplead the **Company** into a **claim**.
   3. No action shall lie against the **Company** until the amount of **loss** has been finally determined by entry of judgment or written agreement between the **Insured**, the claimant, and the **Company**. Once the amount of **loss** has been finally determined, the claimant shall be entitled to recover under the terms of this policy.

P.  *Arbitration.*

The **Company** and the **Insured** agree that any dispute, **claim** or controversy arising out of, relating to, or in connection with this policy, whether brought by or on behalf of the **Insured**, **Company**, or any other party, that the **Company** may elect to submit any such dispute, **claim** or controversy to binding arbitration, in accordance with Title 9 USC Sec. 1 et seq (the Federal Arbitration Act) and shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

The arbitration shall be presided over by three arbitrators chosen from the Commercial Insurance Panel of the American Arbitration Association. The arbitrators shall be governed by the law of the state of the address of the **first named insured**, as set forth on the Declarations. The arbitration shall take place in the county that the capital of that state is located.

The arbitrators shall have the discretion to order pre-arbitration discovery, including an exchange of documents and deposition of potential witnesses. Each party shall bear its own arbitration costs and expenses including attorneys' fees, unless otherwise provided by law.

Any arbitration award shall be in writing and shall specify the factual and legal bases of the award. Judgment on the award rendered by the arbitrator shall be final and may be entered in any court having jurisdiction thereof. Furthermore, this arbitration provision shall be a complete defense to any suit, action or proceeding in any federal, state or local court or before any administrative tribunal with respect to any dispute, **claim** or controversy arising out of, relating to or in connection with this policy.

Q.  *Terms Conform to Statute or Regulation.*

If any term of this policy, or any duty arising therefrom, would cause the **Company** to violate any federal, state or local law or regulation, the policy is amended to bring the **Company** into compliance with such statute or regulation.

R.  *Fraud Warning.*

Any person who knowingly and with intent to injure, deceive, or defraud any insurance company or other person files an application for insurance containing any materially false information or fails to provide complete information or conceals, for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and may be prosecuted under state law and may be guilty of a felony and subject to criminal an civil penalties, fines, denial of insurance or confinement in prison.

---

# National Fire & Marine Insurance Company

## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 1 | ES013814 | Windy City Anesthesia, PC |
| **Effective Date of Endorsement** 04/21/2023 | | |

### *UNIVERSAL AGGREGATE ENDORSEMENT*

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the policy as follows:

## ENDORSEMENT DECLARATIONS

Universal Aggregate Limit of Liability: $ 3,000,000

## MODIFIED COVERAGES

The following provision is added to the *LIMITS OF LIABILITY* section of the Insuring Agreements shown below:

Contract Staffing & Locum Tenens Professional Liability Insuring Agreement

*Universal Aggregate.*

It is hereby agreed and understood that the Universal Aggregate Limit of Liability is the most the **Company** will pay for all duties and obligations owed, including but not limited to, **loss**, damages or **claims expense** under the Insuring Agreements shown above. However, **claims expense** does not erode the Universal Aggregate Limits of Liability if the policy includes an endorsement amending coverage such that **claims expense** is outside of, and does not erode, the Limits of Liability under the policy.

It is further agreed and understood that, once the Universal Aggregate Limits of Liability has been exhausted through the **Company's** payment of:

a. **claims expense** (but only if **claims expense** is within and erode the Limits of Liability under the policy);
b. **loss**; or,
c. damages,

the **Company** shall have no further duties to defend or pay **loss**, damages or **claims expense** on behalf of any **Insured** under the Insuring Agreements shown above.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company

## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 2 | ES013814 | Windy City Anesthesia, PC |

| Effective Date of Endorsement | |
|---|---|
| 04/21/2023 | |

### NON-SCHEDULED ADDITIONAL INSURED (PRIMARY AND NON-CONTRIBUTORY) ENDORSEMENT
### HEALTH CARE FACILITIES PROFESSIONAL LIABILITY INSURING AGREEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend agree to amend the policy as follows:

---

### MODIFIED COVERAGES

The definition of **additional insured** is deleted from the General Definitions and replaced with the following:

> **Additional insured** means:
> 1. any person or entity listed on a Schedule of Additional Insureds; or,
> 2. only with respect to any **loss** or damages payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **Insured** otherwise covered under the Health Care Facilities Professional Liability Insuring Agreement, any person or entity with which the **insured facility** has entered into a written contract or agreement agreeing:
>    a. to add the person or entity as an **additional insured**; or,
>    b. to hold harmless or indemnify such person or organization.
>
> This definition does not apply:
> i. unless the written contract or agreement has been executed prior to the **loss**. The contract or agreement will be considered executed when the **Insured's** performance begins, or when the contract is signed, whichever occurs first; or,
> ii. to **losses** arising from or in connection any of the **additional insured's** own acts or omissions.

The following provision is added to the *LIMITS OF LIABILITY* of the Health Care Facilities Professional Liability Insuring Agreement:

> All **additional insureds** meeting the definition provided herein share the Limits of Liability applicable to any **claim** or **suit** with any **Insured** for which the **additional insured** is alleged to be vicariously liable with respect to that same **claim** or **suit**.

Solely with respect to any **additional insured(s)** meeting the description provided by subsection 2 of the definition of **additional insured** set forth in this endorsement, the following Additional Condition is added to the *ADDITIONAL CONDITIONS* of the Health Care Facilities Professional Liability Insuring Agreement:

> Only if required by written contract or agreement with the **insured facility**, coverage for any **additional insured(s)** provided by this endorsement shall be primary and non-contributory as respects any other insurance

policy issued to such **additional insured**.  Otherwise, the _Other Insurance_ provision of the General Conditions applies as written.


All other terms and conditions of the policy remain unchanged.

---

# National Fire & Marine Insurance Company

## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 3 | ES013814 | Windy City Anesthesia, PC |
| **Effective Date of Endorsement** | | |
| 04/21/2023 | | |

### STATE RESTRICTION ENDORSEMENT
### CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement as follows:

---

### GENERAL EXCLUSIONS

---

The following exclusion is added to *GENERAL EXCLUSIONS:*

> any **claim** or **potential claim** arising from **professional services** or **wrongful credentialing services** rendered or which should have been rendered in the state(s) of Kansas or Wisconsin for any person or entity that is fund-qualified and is enrolled in the patient compensation fund.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company
## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 4 | ES013814 | Windy City Anesthesia, PC |
| **Effective Date of Endorsement** | | |
| 04/21/2023 | | |

### EXTENDED REPORTING PERIOD PREMIUM ENDORSEMENT
### CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement as follows:

---

### MODIFIED COVERAGES

---

The following condition is added to the *Extended Reporting Period Option* of *ADDITIONAL CONDITIONS*:

Additional premium to be charged for the purchase of an **extended reporting period** is as follows:

| | |
|---|---|
| For a 12 month **extended reporting period**: | 150% |
| For a 24 month **extended reporting period**: | 175% |
| For a 36 month **extended reporting period**: | 200% |
| For a 60 month **extended reporting period**: | N/A |
| For an unlimited **extended reporting period**: | N/A |

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company

## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 5 | ES013814 | Windy City Anesthesia, PC |
| Effective Date of Endorsement | | |
| 04/21/2023 | | |

### *DEADUCTIBLE ENDORSEMENT*
### *CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT*
### *(LOSS AND CLAIMS EXPENSE)*

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement as follows:

---

**MODIFIED COVERAGES**

---

The following condition is added to the *ADDITIONAL CONDITIONS* of the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement:

*Deductibles.*

If a **deductible** is shown on the Schedule of Contract Staffing Insureds and designated as "Loss and Claims Expense" it is agreed and understood that the **Company's** duty to pay **loss** and **claims expense** for any **claim** or **potential claim** thereunder will be limited in the following manner:

1. The **Company** shall only have a duty to pay **loss** and **claims expense** in excess of the **deductible**. The **deductible** shall be applied to **claims expense** first, then to **loss**.
2. The **first named insured** shall have a duty to pay all **loss** and **claims expense** up to the amount of the applicable **deductible**, payment of which shall not be unreasonably withheld.
3. Unless otherwise required by law, the **Company** has complete discretion to pay the entire **loss** and **claims expense** and seek reimbursement from the **first named insured** for the **deductible**. If this occurs, the **first named insured** shall reimburse the **Company** within 30 days of the **Company's** payment of the **deductible** amount.
4. The applicable limits of liability shall be reduced by the amount of the **deductible** payable as **loss** for such **claims** and **potential claims**.
5. If a **per event deductible** is shown, the **per event deductible** shall apply to all **loss** and **claims expense** arising from a single **health care event** or **wrongful credentialing services event**, regardless of the number of **Insureds** found liable for the **loss**.
6. If a **per event deductible** is shown and an **aggregate deductible** is also shown, the **first named insured's** duty to pay **loss** and **claims expense** shall not exceed the **aggregate deductible**.

The following definitions are added to *DEFINITIONS*:

**Deductible** includes any **per event deductible**. However, if an **aggregate deductible** applies and the amount listed as the Per Event Deductible exceeds the remaining **aggregate deductible**, then **deductible** means the remaining **aggregate deductible**.

**Per event deductible** means the amount shown as the Per Event Deductible on the Schedule of Contract Staffing Insureds.

---

**Aggregate deductible** means the amount shown as the Aggregate Deductible on the Schedule of Contract Staffing Insureds.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company

### Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 6 | ES013814 | Windy City Anesthesia, PC |

| Effective Date of Endorsement | |
|---|---|
| 04/21/2023 | |

### SCHEDULE OF LIMITS OF LIABILITY FOR SPECIFIED STATES
### CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Schedule of Contract Staffing Insureds as follows:

---

### MODIFIED COVERAGES

---

Notwithstanding the Limits of Liability set forth in the Schedule of Contract Staffing Insureds, the following Limits of Liability apply as follows:

I.  *LIMITS OF LIABILITY*

    A.  Shared Limits of Liability apply for:

        1.  all **covered providers** and **contract staffing organizations** in all states except as noted in I.B through I.G. below; and

        2.  all non-fund **covered providers** and **contract staffing organizations** (those **covered providers** and **contract staffing organizations** not enrolled in a patient compensation fund):

        Per Event Limit:     $1,000,000
        Aggregate Limit:     $3,000,000

    B.  Shared Limits of Liability for All Virginia **Insureds**:

        1.  Per Event Limit     N/A

        However, with respect to any **claim** brought against any Virginia **Insured**, the Per Event Limit of Liability shall be the limitation on the amount of recovery for an action for malpractice where the act or acts of alleged malpractice occurred as set forth in Virginia Statutes Section 8.01-581.15. With respect to any **claim** involving an act or acts of alleged malpractice occurring on or before July 31, 1999, the Per Event Limit of Liability will be the amount shown above.

        2.  Aggregate Limit    N/A

        With respect to all **claims** brought against all Virginia **Insureds**, the Aggregate Limit of Liability shall be three times the amount of the Per Event Limit of Liability established in section I.B.1. above.

    C.  Limits of Liability for All New York **Insureds**:

        1.  Where allowed by law, shared limits of:

        Per Event Limit:     $1,300,000
        Aggregate Limit:     $3,900,000

2. Notwithstanding any other provision to the contrary, where required by law, separate limits of:

Per Event Limit:      $1,300,000
Aggregate Limit:      $3,900,000

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage is provided the Limits of Liability set forth in this section C.2. To the extent that any **covered provider** or **contract staffing organization** is allowed by law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this section C.2.

3. Notwithstanding any other provision to the contrary, where required by law, higher separate limits of:

Per Event Limit:      N/A
Aggregate Limit:      N/A

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage is provided the Limits of Liability set forth in this section C.3. To the extent that any **covered provider** or **contract staffing organization** is allowed by law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this section C.3.

D. Notwithstanding any other provision to the contrary, Limits of Liability for each **Insured** enrolled in the Pennsylvania Mcare Fund are:

Per Event Limit:      $500,000
Aggregate Limit:      $1,500,000

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage due to enrollment in Pennsylvania's patient compensation fund established pursuant to Mcare is provided the Limits of Liability set forth in this subsection D. To the extent that any **covered provider** or **contract staffing organization** is allowed by Pennsylvania law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this subsection D.

Notwithstanding any provision in the policy to the contrary, the payment of **claims expense** by the **Company** will not reduce or exhaust either the Per Event or Aggregate Limits of Liability provided hereunder.

If a **deductible** is shown on the Schedule of Contract Staffing Insureds and designated "Loss and Claims Expense" it is agreed and understood that the **Insured's** duty to pay any deductible does not include the duty to pay **claims expense** within that deductible, notwithstanding any provision in the policy or any applicable deductible endorsement to the contrary.

E. Notwithstanding any other provision to the contrary, where required by law, Limits of Liability for each **Insured** enrolled in the Indiana Patients Compensation Fund:

For any **insured** participating in the Indiana Patient's Compensation Fund, and with respect to **claims** or **potential claims** arising from a **health care event** otherwise covered under this Coverage Part occurring prior to July 1, 1999, the Limits of Liability shown on the Declarations

are replaced with the following Limits of Liability:

| | | |
|---|---|---|
| Individual health care providers: | Per Event: | $100,000 |
| | Aggregate: | $300,000 |

For any **insured** participating in the Indiana Patient's Compensation Fund, and with respect to **claims** or **potential claims** arising from a **health care event** otherwise covered under this Coverage Part occurring on or after July 1, 1999 and before July 1, 2017, the Limits of Liability shown on the Declarations are replaced with the following Limits of Liability:

| | | |
|---|---|---|
| Individual health care providers: | Per Event: | $250,000 |
| | Aggregate: | $750,000 |

For any **insured** participating in the Indiana Patient's Compensation Fund, and with respect to **claims** or **potential claims** arising from a **health care event** otherwise covered under this Coverage Part occurring on or after July 1, 2017 and before July 1, 2019, the Limits of Liability shown on the Declarations are replaced with the following Limits of Liability:

| | | |
|---|---|---|
| Individual health care providers: | Per Event: | $400,000 |
| | Aggregate: | $1,200,000 |

For any **insured** participating in the Indiana Patient's Compensation Fund, and with respect to **claims** or **potential claims** arising from a **health care event** otherwise covered under this Coverage Part occurring on or after July 1, 2019, the Limits of Liability shown on the Declarations are replaced with the following Limits of Liability:

| | | |
|---|---|---|
| Individual health care providers: | Per Event: | $500,000 |
| | Aggregate: | $1,500,000 |

As used in this Schedule, the reference to the Indiana Patient's Compensation Fund shall have the same meaning as set forth in the Indiana Medical Malpractice Act (IC 34-18-1, et seq.).

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage due to enrollment in the Indiana Patient Compensation Fund established pursuant to Indiana law is provided the Limits of Liability set forth in this subsection E. To the extent that any **covered provider** or **contract staffing organization** is allowed by Indiana law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this subsection E.

Notwithstanding any provision in the policy to the contrary, the payment of **claims expense** by the **Company** will not reduce or exhaust either the Per Event or Aggregate Limits of Liability provided hereunder.

If a **deductible** is shown on the Schedule of Contract Staffing Insureds and designated "Loss and Claims Expense" it is agreed and understood that the **Insured's** duty to pay any deductible does not include the duty to pay **claims expense** within that deductible, notwithstanding any provision in the policy or any applicable deductible endorsement to the contrary.

For purposes of application of the Limits of Liability under this subsection:
1. the definition of **agents** includes only those **employees** who are also **W-2 providers**, and does not include any health care provider who meets the definition of a "Health Care Provider" as defined by Ind. Code § 34-18-2-14;
2. **new facilities** are removed from the *WHO IS INSURED* section of the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement; and,

3. the **Company** may settle any **claim** against an **Insured** without consent who qualifies as a "Health Care Provider" as defined by Ind. Code § 34-18-2-14, if the unanimous opinion of the medical review panel under Ind. Code § 34-18-10-22(b)(1) is that the evidence supports the conclusion that the relevant **Insured** failed to comply with the appropriate standard of care as charged in the complaint.

F. Notwithstanding any other provision to the contrary, where required by law, Limits of Liability for each **Insured** enrolled in the Louisiana Patient Compensation Fund:

Per Event Limit:        $100,000
Aggregate Limit:        $300,000

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage due to enrollment in the Louisiana Patient Compensation Fund established pursuant to Louisiana law is provided the Limits of Liability set forth in this subsection F. To the extent that any **covered provider** or **contract staffing organization** is allowed by Louisiana law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this subsection F.

Notwithstanding any provision in the policy to the contrary, the payment of **claims expense** by the **Company** will not reduce or exhaust either the Per Event or Aggregate Limit of Liability provided hereunder.

If a **deductible** is shown on the Schedule of Contract Staffing Insureds and designated "Loss and Claims Expense" it is agreed and understood that the **Insured's** duty to pay any deductible does not include the duty to pay **claims expense** within that deductible, notwithstanding any provision in the policy or any applicable deductible endorsement to the contrary.

G. Notwithstanding any other provision to the contrary, where required by law, Separate Limits of Liability required for **Insureds** who provide **professional services** or **credentialing services** in Connecticut:
Per Event Limit:        $500,000
Aggregate Limit:        $1,500,000

A separate limit **Insured** does not share the Per Event and Aggregate Limits of Liability set forth in this subsection with any other separate limit **Insured**. Any **covered provider** or **contract staffing organization** that is required to maintain a separate limit of liability of coverage due to Conn. Gen. Stat. Ann. § 20-11b is provided the Limits of Liability set forth in this subsection G. To the extent that any **covered provider** or **contract staffing organization** is allowed by Connecticut law to share limits with **agents**, such **agents** share the Limits of Liability of the **covered provider** or **contract staffing organization** set forth in this subsection G. All other **Insureds** share the limits provided under subsection I.A above.

H. Notwithstanding any provision in the policy to the contrary, when an **Insured** provides **professional services** or **credentialing services** in Florida and the policy's Per Event Limit of Liability is no greater than $250,000 and the Aggregate Limit of Liability is no greater than $750,000, then the payment of **claims expense** by the **Company** will not reduce or exhaust either the Per Event or Aggregate Limit of Liability provided hereunder.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company

### Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 7 | ES013814 | Windy City Anesthesia, PC |
| **Effective Date of Endorsement** | | |
| 04/21/2023 | | |

### CALCULATION OF PREMIUM ENDORSEMENT
### CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the General Conditions as follows:

## GENERAL CONDITIONS

The following provisions are added to General Conditions:

*Calculation of Premium – Cancellation Prior to Expiration.*

1. If a policy has an attached Schedule of Contract Staffing and Locum Tenens Rates, the following provisions regarding the calculation of premium at time of cancellation apply:
   a. If the **first named insured** or the **Company** cancels any coverage provided under the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement, but not the entire policy, earned premium for the coverage provided will be, as applicable:
      (1) the **total locum premium base**, accrued up to the date of cancellation, as determined by the Locum Tenens Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates; or,
      (2) the **provider premium** accrued up to the date of cancellation as determined by Contract Staffing Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates, if any; and,
   b. If the **first named insured** or the **Company** cancels any coverage provided under any Insuring Agreement other than the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement, but not the entire policy, earned premium for the coverage canceled will be computed pro rata.
   c. If the **first named insured** cancels the entire policy, earned premium shall be the greater of:
      (1) The short rate amount of the Total Annual Premium computed in accordance with the standard short rate tables and procedure; or,
      (2) the sum of:
         a) the **total locum premium base**, if any;
         b) the **provider premium** up to the date of cancellation as determined by Contract Staffing Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates, if any; and,
         c) any other premium accrued up to the date of cancellation, such premium computed pro rata, for coverage provided under Insuring Agreements other than the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement.
   d. If the **Company** cancels the entire policy, earned premium shall be the greater of:
      (1) The pro rata amount of the Total Annual Premium;
      (2) the sum of:
         a) the **total locum premium base**, if any;

        b)    the **provider premium** up to the date of cancellation as determined by Contract Staffing Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates, if any; and,

        c)    any other premium accrued up to the date of cancellation, such premium computed pro rata, for coverage provided under Insuring Agreements other than the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement

    (3)   a minimum earned premium of 0% of the Total Annual Premium set forth in the Declarations, but only when the **first named insured** (not the **Company**) cancels the entire policy.

2.   If a policy does not have an attached Schedule of Contract Staffing and Locum Tenens Rates, the following cancellation provisions apply:

   a.   If the **first named insured** cancels this policy, or terminates any coverage contained therein, earned premium shall be the greater of:

    (1)   the premium computed in accordance with the standard short rate tables and procedure;

    (2)   the Annual Minimum Premium as set forth in the Declarations; or,

    (3)   a minimum earned premium of $50,000 of the Total Annual Premium set forth in the Declarations.

   b.   If the **Company** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed pro rata.

3.   Premium adjustments shall be made within a reasonable period of time after cancellation. However, payment or tender of unearned premium shall not be a condition of cancellation.

4.   Any premium calculations made in accordance with the above provisions with respect to a policy which has an attached Schedule of Contract Staffing and Locum Tenens Rates remain subject to audit pursuant to any audit provision set forth in the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement.

*Calculation of Premium – Expiration at the End of the Policy Term.*

1.   If a policy has an attached Schedule of Contract Staffing and Locum Tenens Rates, the following provisions apply regarding the calculation of premium at the expiration of the policy at the end of the full term of the policy as originally specified in the Declarations:

   a.   *Locum Tenens Rates* - If the premium is calculated based upon Locum Tenens Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates:

    (1)   Upon expiration of this policy, the **contract staffing organization** shall furnish to the **Company** a statement of the **contract staffing organization's** actual **locum premium base** for the **policy period** for each Provider Classification and Description set forth in the Schedule of Contract Staffing and Locum Tenens Rates, as well as a **total locum premium base**;

    (2)   If the Deposit Premium set forth in the Declarations is less than the **total locum premium base** by 10% or more, the **contract staffing organization** shall pay the difference to the **Company**. Alternatively, if the **total locum premium base** is less than the Deposit Premium, the **Company** shall refund the difference to the **contract staffing organization**, except to the extent that the **Company** is entitled to the Annual Minimum Premium as set forth in the Declarations;

   b.   *Contract Staffing Rates* - If the premium is calculated based upon Contract Staffing Rates set forth in the Schedule of Contract Staffing and Locum Tenens Rates:

    (1)   Upon expiration of this policy, the **contract staffing organization** shall furnish to the **Company** a statement, for the **policy period**, of the **contract staffing organization's** actual number of **provider premium elements** listed in the Contract Staffing Rates provision of the Schedule for Contract Staffing and Locum Tenens Rates;

    (2)   The Deposit Premium set forth in the Declarations is less than the **provider premium** charged by 10% or more, the **contract staffing organization** shall pay the difference to the **Company**. Alternatively, if the **provider premium** charged is less than the Deposit Premium, the **Company** shall refund the difference to the **contract staffing organization**, except to the extent that the **Company** is entitled to the Annual Minimum Premium as set forth in the Declarations

2.   If a policy does not have an attached Schedule of Contract Staffing and Locum Tenens Rates, the Total Annual Premium set forth in the Declarations applies.

3.  Any premium calculations made in accordance with the above provisions with respect to a policy which has an attached Schedule of Contract Staffing and Locum Tenens Rates remain subject to audit pursuant to any audit provision set forth in the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement.

All other terms and conditions of the policy remain unchanged.

# National Fire & Marine Insurance Company
## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No. | Forming Part of Policy No. | First Named Insured |
|---|---|---|
| 8 | ES013814 | Windy City Anesthesia, PC |
| Effective Date of Endorsement | | |
| 04/21/2023 | | |

### RESTRICTED PRACTICE ENDORSEMENT (EXEMPTED PROCEDURES)
### CONTRACT STAFFING & LOCUM TENENS PROFESSIONAL LIABILITY INSURING AGREEMENT
### (CLAIMS-MADE)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **Insureds**, the **Company** and the **Insureds** agree to amend the Contract Staffing and Locum Tenens Professional Liability Insuring Agreement as follows:

| MODIFIED COVERAGES |
|---|

The following definitions are added to *DEFINITIONS*:

**Exempted procedure insured** means any **Insured** listed as an Exempted Procedure Insured on the Schedule of Exempted Procedures below.

**Exempted procedure** means any specific **treatment** listed as an Exempted Procedure for the **exempted procedure insured** on the Schedule of Exempted Procedures below.

The following exclusion is added to *GENERAL EXCLUSIONS*:

any **claim** or **potential claim** arising from **exempted procedures** rendered, or which should have been rendered, by an **exempted procedure insured** on or after the Exempted Procedures Retroactive Date listed on the Schedule of Exempted Procedures below and prior to the Exempted Procedures Termination Date listed on the Schedule of Exempted Procedures below.

All other terms and conditions of the policy remain unchanged.

| SCHEDULE OF EXEMPTED PROCEDURES | | | | |
|---|---|---|---|---|
| EXEMPTED PROCEDURE INSURED | ID NUMBER | EXEMPTED PROCEDURES RETROACTIVE DATE | EXEMPTED PROCEDURES TERMINATION DATE | EXEMPTED PROCEDURES |
| Windy City Anesthesia, PC | 1170265 | 04/21/2021 | | Correctional Medicine; Department of Defense Staffing; U.S. Immigration and Customs Enforcement Staffing; Indian Health Services Staffing |

# National Fire & Marine Insurance Company
## Omaha, Nebraska

*All effective dates are 12:01 a.m. Standard Time at the address of the First Named Insured.*

| Endorsement No.  9 | Forming Part of Policy No.  ES013814 | First Named Insured  Windy City Anesthesia, PC |
|---|---|---|
| Effective Date of Endorsement  04/21/2023 | | |

### THIS ENDORSEMENT CHANGES THE POLICY - PLEASE READ IT CAREFULLY

### SERVICE OF SUIT CLAUSE ENDORSEMENT

Service of process in any lawsuit, or mandated alternative dispute resolution (ADR) proceeding instituted against the **Company** shall be made upon:

**General Counsel**
**National Fire & Marine Insurance Company**
**1314 Douglas Street**
**Omaha, Nebraska 68102-1944**

The General Counsel is authorized and directed to accept service of process on behalf of the **Company** in any suit or ADR proceeding and, upon the request of the **Insured**, agrees to give a written acknowledgement to the **Insured** that the **Company** will retain counsel to enter an appearance upon the **Company's** behalf should a lawsuit or ADR proceeding be instituted.

Further, pursuant to any law of any state, the District of Columbia, territory, or protectorate of the United States which makes provision therefore, the **Company** hereby designates the Superintendent, Commissioner, Director of Insurance, deputy, or department employee specified as attorney or agent for receipt of lawful service of process or ADR proceeding, in the law, instituted by or on behalf of the **Insured** or any beneficiary within this contract, the General Counsel is hereby authorized as the **Company's** designee upon whom the service of process may be served.

Nothing contained herein shall limit or abridge the right to serve any process, notice or demand upon the **Company** in any other manner permitted or required by law.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

All other terms and conditions of this policy remain unchanged.

# EXHIBIT C

RLN/PJO 2011-1933

FILED
5/26/2020 1:28 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

2020L002002

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| MICHAEL KEATING, JR., Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, Deceased, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No.: 20 L 002002 |
| | ) |
| AYOUB SAYED, M.D., SURGICAL ASSISTANT LUIS, CERTIFIED SURGICAL TECHNOLOGIST LISA, CERTIFIED REGISTERED NURSE ANESTHETIST MIKE, 63RD MEDICAL & SURGICAL CENTER, LLC, 63RD LASER & SKIN CLINIC, LLC, ANTI-AGING & COSMETIC INSTITUTE OF CHICAGO, LTD, FERNANDO ORELLANA, M.D., ANGELL JONES, M.D., THERESA MAZUR, R.N., CARMEN CAVNER, R.N., NURSE NASSAR, R.N., and HOLY CROSS HOSPITAL, | ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## NOTICE OF FILING

**TO:** Zane D. Smith, Esq.     **CC:**  See Attached Service List
   Boris G. Samovalov, Esq.
   Zane D. Smith & Associates, ltd.
   221 N. LaSalle St., Suite 1320
   Chicago, IL 60601
   T:  (312) 245-0031
   zane@zanesmith.com
   boris@zanesmith.com

  **PLEASE TAKE NOTICE** that on **May 26, 2020**, *Defendants,* **AYOUB SAYED, M.D., 63RD MEDICAL & SURGICAL CENTER, LLC, 63RD LASER & SKIN CLINIC, LLC, ANTI-AGING & COSMETIC INSTITUTE OF CHICAGO, LTD., LUIS ZARAGOZA (incorrectly sued as "Surgical Assistant Luis"), and MICHAEL TURNER, CRNA (incorrectly sued as "Certified Registered Nurse Anesthetist Mike"),** filed with the Clerk of the Circuit Court of Cook County their *Appearance and Jury Demand*, a copy of which is attached hereto and served upon you.

Name:  Nora & Partners, LLP
     Robert L. Nora (rnora@noralaw.com)
     Patrick J. O'Connor (poconnor@noralaw.com)
Attorneys for:  Defendants, Ayoub Sayed, M.D., 63rd Medical
        & Surgical Center, LLC, 63rd Laser & Skin

FILED DATE: 5/26/2020 1:28 PM  2020L002002

FILED DATE: 5/26/2020 1:28 PM  2020L002002

Clinic, LLC, Anti-Aging & Cosmetic Institute of Chicago, LTD.,
Luis Zaragoza and Michael Turner, CRNA

Address:    10 South LaSalle Street, Suite 2500
City:    Chicago, Illinois 60603
Telephone:    (312) 650-7900
Facsimile:    (312) 650-7910
E-mail:    service@noralaw.com
Firm No.:    59068

## **PROOF OF SERVICE**

The undersigned, a non-attorney, on oath states she caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system on May 26, 2020, which will send notification of such filing to all counsel of record in this case.

/s/ *Julie Corbett*

[X]    Under penalties as provided by law pursuant to Section 5/1-109 of the Illinois Code of Civil Procedure (750 ILCS 5/1-109), I certify that the statements set forth herein are true and correct.

FILED DATE: 5/26/2020 1:28 PM    2020L002002

## <u>SERVICE LIST</u>

***MICHAEL KEATING, JR., Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, deceased v. AYOUB SAYED, M.D., et al.***
Court No.:  20 L 2002
Our File No:  2011-1933

**<u>Plaintiff's Attorney</u>**
Zane D. Smith, Esq.
Boris G. Samovalov, Esq.
Zane D. Smith & Associates, ltd.
221 N. LaSalle St., Suite 1320
Chicago, IL 60601
T:  (312) 245-0031
zane@zanesmith.com
boris@zanesmith.com
(Assistant:  Anne Zallis – anne@zanesmith.com)

**<u>Attorneys for Defendant, Angell Jones, M.D.</u>**
Erin S. Davis
Alexandra E. Zimm
Kominiarek Bresler Harvick & Gudmundson, LLC
33 N. Dearborn Street
Suite 1310
Chicago, IL 60602
(P)  312-322-1111
(F)  312-782-1432
edavis@kbhglaw.com
azimm@kbhglaw.com
(Assistant to Erin Davis – Megan Cook – mcook@kbhglaw.com)
(Assistant to Alexandra Zimm – Linda Paton – lpaton @kbhglaw.com)

**Attorneys for Holy Cross Hospital, Theresa Mazur, R.N. Carmen Cavner, R.N. and Nacer Musleh, R.N. (incorrectly sued as Nurse Nasser, R.N.**
Robert H. Summers, Jr.
Daniel J. Broderick, Jr.
Susan J. Dewey
Cassiday Schade
222 W. Adams Street
Suite 2900
Chicago, IL 60606
312-641-3100
jsummers@cassiday.com
dbroderick@cassiday.com
sdewey@cassiday.com

FILED DATE: 5/26/2020 1:28 PM   2020L002002

(Assistant:  Betty Rauen – brauen@cassiday.com)

**<u>Attorneys for Defendant, Fernando Orellano, M.D.</u>**
Robert S. Burtker, Esq.
Brennan Burtker, LLC
20 N. Clark St.
Suite 1800
Chicago, IL 60602
312-676-1900
rburtker@brennanburtker.com
gnoble@brennanburtker.com

# EXHIBIT D

FILED
6/9/2020 10:30 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L002002

FILED DATE: 6/9/2020 10:30 AM   2020L002002

**#37398**

**File No.  4828**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| MICHAEL KEATING, JR., administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: 2020 L 002002 |
| v. | ) ) | |
| AYOUB SAYEG, M.D.; LUIS ZARAGOZA; LISA FLEITAS; MICHAEL TURNER; 63RD MEDICAL & SURGICAL CENTER, LLC; 63RD LASER & SKIN CLINIC, LLC; ANTI-AGING & COSMETIC INSTITUTE OF CHICAGO, LTD.; FERNANDO ORELLANA, MD; ANGELL JONES, MD; THERESA MAZUR, RN; CARMEN CAVNER, RN; NACER MUSLEH, RN; HOLY CROSS HOSPITAL; DENNYS OMAR VERA DANER, MD; SUYEUN BAN, MD; and MOUNT SINAI COMMUNITY FOUNDATION d/b/a SINAI MEDICAL GROUP; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>FIRST AMENDED COMPLAINT</u>

NOW COMES the Plaintiff, MICHAEL KEATING, JR. ("Plaintiff"), administrator of the

Estate of CRYSTAL LORAINE WALKER KEATING, deceased ("Walker") and complaining of

the Defendants, AYOUB SAYEG, M.D. ("Sayeg"); LUIS ZARAGOZA ("Luis"); LISA FLEITAS

("Lisa"); MICHAEL TURNER ("Mike"); 63RD MEDICAL & SURGICAL CENTER, LLC

("Medical Center"); 63RD LASER & SKIN CLINIC, LLC ("Medical Clinic"); ANTI-AGING &

COSMETIC INSITUTE OF CHICAGO, LTD (the "Institute"); FERNANDO ORELLANA, MD

("Orellana"); ANGELL JONES, MD ("Jones"); THERESA MAZUR, RN ("Mazur"); CARMEN

CAVNER, RN ("Cavner"); NACER MUSLEH, RN ("Nacer"); HOLY CROSS HOSPITAL

FILED DATE: 6/9/2020 10:30 AM    2020L002002

("Holy Cross"); DENNYS OMAR VERA DANER , MD ("Vera"); SUYEUN BAN, MD ("Ban"); and  MOUNT SINAI COMMUNITY FOUNDATION d/b/a SINAI MEDICAL GROUP ("Sinai") and states as follows:

## **PARTIES**

1.      Plaintiff is the heir and independent administrator of the estate of Walker.

2.      Walker was, at all relevant times, a resident of Iowa and a patient of Sayeg.

3.      Defendant, Sayeg is an individual residing in the State of Michigan and practicing medicine in the State of Illinois, County of Cook.

4.      Defendant, Luis was at all relevant times a surgical assistant who practiced in the State of Illinois, County of Cook.

5.      Defendant, Lisa, was at all relevant times a certified surgical technologist who practiced in the State of Illinois, County of Cook.

6.      Defendant, Mike, was at all relevant times a Certified Registered Nurse Anesthetist, who practiced in the State of Illinois, County of Cook.

7.      Defendant, Medical Center, was at all relevant times an Illinois LLC, with offices in the State of Illinois, County of Cook.

8.      Defendant, Medical Clinic, was at all relevant times an Illinois LLC, with offices in the State of Illinois, County of Cook.

9.      Defendant, Institute, was at all relevant times an Illinois corporation, with offices in the State of Illinois, County of Cook.

10.     Defendant, Orellana, was at all relevant times an emergency room doctor and an agent, employee, or apparent agent of Holy Cross and Sinai, who practiced medicine in the County of Cook, State of Illinois.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

11.     Defendant, Jones, was at all relevant times a surgeon and an agent, employee, or apparent agent of Holy Cross and Sinai, who practiced medicine in the County of Cook, State of Illinois.

12.     Defendant, Mazur, was at all relevant times an emergency room head charge nurse and an agent, employee, or apparent agent of Holy Cross, who practiced as a nurse in the County of Cook, State of Illinois.

13.     Defendant, Cavner, was at all relevant times an emergency room nurse and an agent, employee, or apparent agent of Holy Cross, who practiced as a nurse in the County of Cook, State of Illinois.

14.     Defendant, Nacer, was at all relevant times a nurse and an agent, employee, or apparent agent of Holy Cross, who practiced as a nurse in the County of Cook, State of Illinois.

15.     Holy Cross was at all relevant times an Illinois Not-For-Profit Corporation and a hospital, located in the County of Cook State of Illinois.

16.     Defendant, Vera, was at all relevant times an emergency room doctor and an agent, employee, or apparent agent of Holy Cross and Sinai, who practiced medicine in the County of Cook, State of Illinois.

17.     Defendant, Ban, was at all relevant times an emergency room resident doctor and an agent, employee, or apparent agent of Holy Cross and Sinai, who practiced medicine in the County of Cook, State of Illinois.

18.     Defendant, Sinai, was at all relevant times a physician-led provider of primary care and specialty medicine and employer of Orellana, Jones, Vera, and Ban.

## JURISDICTION AND VENUE

FILED DATE: 6/9/2020 10:30 AM    2020L002002

19.     This Court has subject matter jurisdiction over this action, pursuant to Section 2-209(a)(2) of the Illinois Code of Civil Procedure, because it arises from the commission of a tortious act within this State.

20.     Venue is proper in the Circuit Court of Cook County, Illinois, pursuant to Section 2-101 of the Illinois Code of Civil Procedure, because the tortious conduct at issue in this Case occurred entirely within the County of Cook, State of Illinois.

## FACTS COMMON TO ALL COUNTS

21.     On or about November 1, 2018, Sayeg performed multiple surgical procedures on Walker, which include, abdominoplasty, liposuction, and fat grafting of the buttocks (collectively, the "Procedures").

22.     The Procedures were performed at the facilities located at 3918 W. 63rd Street, Chicago, Illinois 60629 that were, at all relevant times, upon information and belief, owned and maintained by the Medical Center, Medical Clinic, and the Institute.

23.     Sayeg was assisted by Luis, Lisa, and Mike, in the performance of the Procedures.

24.     After, the Procedures were completed, it was noted that the Plaintiff was experiencing symptoms consistent with severe blood loss; however, emergency responders were not notified for over 40 minutes, as the Plaintiff was actively losing blood in the operating room.

25.     When the emergency personnel finally arrived at the Medical Center, Medical Clinic facility, and the Institute, where the Procedures were performed, they proceeded with taking the Plaintiff to the nearest emergency room, at Holy Cross.

26.     Upon arrival at Holy Cross, it was noted that the Plaintiff was bleeding heavily and was suffering from severe blood loss.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

27.    Nacer admitted Walker into the hospital at Holy Cross, despite the fact that there was no available trauma center at Holy Cross at that time.

28.    While at Holy Cross, Walker was examined by the Defendants, Vera, Orellana, Jones, Ban, Mazur, and Cavner; however, inexplicably, no action was taken to find the source of bleeding for over eight hours after the Plaintiff's arrival at Holy Cross.

29.    Late in the evening, an exploratory surgery was finally performed by Jones and the source of bleeding was discovered and addressed.

30.    Unfortunately, at this late juncture, the exploratory surgery was too little, too late, and Walker was pronounced dead late at night on November 1, 2018.

31.    At least on one occasion prior to her death, Walker became conscious and suffered extreme excruciating pain, grief, and horror.

32.    An affidavit pursuant to 735 ILCS 5/2-622 is being filed herewith.

## **COUNT I – Wrongful Death (Directed at Sayeg)**

33.    Plaintiff repeats and realleges Paragraphs 1 through 32, as if fully set forth herein in this Paragraph 33.

34.    After assuming the care of Walker, Sayeg owed a duty to use, in his care of Walker, that degree of skill customarily required of like-kind doctors in the area, but in violation of said duty, Sayeg was then and there guilty of one or more of the following wrongful acts or omissions:

a.    Failed to properly inform Walker of true risks associated with the Procedures;

b.    Failed to recognize that Walker was unfit to undergo the Procedures in light of the history of her health conditions;

c.    Failed to inform Walker that she was unfit for the Procedures;

d.    Failed to recommend a more conservative form of treatment to Walker;

e.    Improperly performed all of the Procedures at once instead of performing them separately and giving Walker time to heal and recover after each procedure;

f.    Failed to address Walker's heavy bleeding while performing the Procedures;

g.    Failed to perform the Procedures properly;

h.    Prior to completing the Procedures, failed to check to make sure that all sources of bleeding were under control;

i.    Unreasonably delayed calling the paramedics when he knew, or should have known, that Walker required emergency care; and/or

j.    Failed to tell the paramedics that Walker had to be taken to a hospital equipped with Level 1 Trauma Center.

35.    As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Sayeg, Walker died on the day the Procedures were performed due to a significant loss of blood.

36.    As a direct and a proximate result of the death of Sayeg, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the defendant Sayeg to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant AYOUB SAYEG, MD, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT II – Survival Action (Directed at Sayeg)

6

FILED DATE: 6/9/2020 10:30 AM    2020L002002

FILED DATE: 6/9/2020 10:30 AM    2020L002002

37.     Plaintiff repeats and realleges Paragraphs 1 through 36, as if fully set forth herein in this Paragraph 37.

38.     As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Sayeg, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Sayeg to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant AYOUB SAYEG, MD, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT III – Wrongful Death (Directed at Lisa)

39. Plaintiff repeats and realleges Paragraphs 1 through 32, as if fully set forth herein in this Paragraph 39.

40.     After assuming the care of Walker, Lisa owed a duty to use, in her care of Walker, that degree of skill customarily required of like-kind certified surgical technologists in the area, but in violation of said duty, Lisa was then and there guilty of one or more of the following wrongful acts or omissions:

a.      Failed to recognize the signs of extensive blood loss and tachycardia during and following the Procedures;

b.      Failed to call emergency responders in a timely manner when Lisa knew or should have known that Walker required emergency care;

c.      Failed to properly monitor Walker and follow up after the Procedures were completed; and/or

d.      Disregarded signs of active bleeding during and/or after the Procedures.

7

FILED DATE: 6/9/2020 10:30 AM   2020L002002

41.     As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Lisa, Walker died on the day the Procedures were performed due to a significant loss of blood.

42.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the defendant Lisa to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant LISA FLEITAS, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

### COUNT IV – Survival Action (Directed at Lisa)

43.     Plaintiff repeats and realleges Paragraphs 1 through 32 and 39 through 42, as if fully set forth herein in this Paragraph 43.

44.     As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Lisa, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Lisa to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant LISA FLEITAS, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

## COUNT V – Wrongful Death (Directed at Mike)

45.     Plaintiff repeats and realleges Paragraphs 1 through 32, as if fully set forth herein in this Paragraph 45.

46.     After assuming the care of Walker, Mike owed a duty to use, in his care of Walker, that degree of skill customarily required of like-kind certified nurse anesthesists in the area, but in violation of said duty, Mike was then and there guilty of one or more of the following wrongful acts or omissions:

a.      Failed to recognize the signs of extensive blood loss and tachycardia during and following the Procedures;

b.      Failed to call emergency responders in a timely manner when Mike knew or should have known that Walker required emergency care;

c.      Failed to properly monitor Walker and follow up after the Procedures were completed; and/or

d.      Disregarded signs of active bleeding during and/or after the Procedures.

47.     As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Mike, Walker died on the day the Procedures were performed, due to a significant loss of blood.

48.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the Defendant, Mike, to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, MICHAEL TURNER, in an amount in excess of Fifty Thousand Dollars,

FILED DATE: 6/9/2020 10:30 AM    2020L002002

plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT VI – Survival Action (Directed at Mike)

49.     Plaintiff repeats and realleges Paragraphs 1 through 32 and 45 through 48, as if fully set forth herein in this Paragraph 49.

50.     As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Mike, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Mike to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, MICHAEL TURNER, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT VII – Wrongful Death (Directed at Luis)

51.     Plaintiff repeats and realleges Paragraphs 1 through 32, as if fully set forth herein in this Paragraph 51.

52.     After assuming the care of Walker, Luis owed a duty to use, in his care of Walker, that degree of skill customarily required of like-kind surgical assistants in the area, but in violation of said duty, Luis was then and there guilty of one or more of the following wrongful acts or omissions:

    a.     Failed to recognize the signs of extensive blood loss and tachycardia during and following the Procedures;

b.      Failed to call emergency responders in a timely manner when Luis knew or should have known that Walker required emergency care;

c.      Failed to properly monitor Walker and follow up after the Procedures were completed; and/or

d.      Disregarded signs of active bleeding during and/or after the Procedures.

53.     As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Luis, Walker died on the day the Procedures were performed, due to a significant loss of blood.

54.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the defendant Luis to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, LUIS ZARAGOZA, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT VIII – Survival Action (Directed at Luis)

55.     Plaintiff repeats and realleges Paragraphs 1 through 32 and 51 through 54, as if fully set forth herein in this Paragraph 55.

56.     As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Luis, prior to her death, Walker did suffer serious injuries of a personal and

FILED DATE: 6/9/2020 10:30 AM   2020L002002

FILED DATE: 6/9/2020 10:30 AM   2020L002002

pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Luis to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, LUIS ZARAGOZA, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

### COUNT IX – Wrongful Death and *Respondeat Superior* (Directed at Medical Clinic, Medical Center, and the Institute)

57.     Plaintiff repeats and realleges Paragraphs 1 through 32, as if fully set forth herein in this Paragraph 57.

58.     At all relevant times, Sayeg was employee, agent, owner, president, and/or manager of the Medical Clinic, Medical Center, and the Institute.

59.     At all relevant times, Medical Clinic, Medical Center, and the Institute operated from the same location (3918 W. 63rd Street, Chicago, Illinois 60629) and provided the same services to its patients.

60.     Upon information and belief, Medical Clinic, Medical Center, and the Institute had the same employees and agents.

61.     Upon information and belief, Medical Clinic, Medical Center, and the Institute shared assets and bank accounts.

62.     Based on the foregoing, Medical Clinic, Medical Center, and the Institute (collectively, the "Practice") constitute the same entity and are all alter egos of each other.

63.     At all relevant times to this Complaint, Defendant, Sayeg, was a duly authorized employee, apparent employee, servant, apparent servant, agent, or apparent agent of the Practice,

FILED DATE: 6/9/2020 10:30 AM  2020L002002

and he practiced his profession at the Practice's offices where he performed the Procedures on the Plaintiff.

64.     Indeed, all of the Procedures at issue in this Complaint were rendered by Sayeg, to the Plaintiff, on behalf of the Practice.

65.     At all relevant times to this Complaint, Defendant, Sayeg, was acting within the scope of his employment, apparent employment, agency, and/or apparent agency relationship with the Practice.

66.     Sayeg, as the employee, apparent employee, agent, or apparent agent of the Practice had a duty to use, in his care of the Plaintiff, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Sayeg was then and there guilty of one or more of the following wrongful acts or omissions:

   a.     Failed to properly inform Walker of true risks associated with the Procedures;

   b.     Failed to recognize that Walker was unfit to undergo the Procedures in light of the history of her health conditions;

   c.     Failed to inform Walker that she was unfit for the Procedures;

   d.     Failed to recommend a more conservative form of treatment to Walker;

   e.     Improperly performed all of the Procedures at once instead of performing them separately and giving Walker time to heal and recover after each procedure;

   f.     Failed to address Walker's heavy bleeding while performing the Procedures;

   g.     Failed to perform the Procedures properly;

   h.     Prior to completing the Procedures, failed to check to make sure that all sources of bleeding were under control;

   i.     Unreasonably delayed calling the paramedics when he knew, or should have known, that Walker required emergency care after the Procedures; and

FILED DATE: 6/9/2020 10:30 AM    2020L002002

j.      Failed to tell the paramedics that Walker had to be taken to a hospital equipped with Level 1 Trauma Center.

67.     As his employer, apparent employer, principal, and/or apparent principal, the Practice is vicariously liable for the negligent acts and/or omissions of the Defendant, Sayeg.

68.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Practice, as employer, apparent employer, principal, and/or apparent principal, of Sayeg, Walker died on or about November 1, 2018.

69.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the Practice to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

70.     At all relevant times to this Complaint, Defendants, Lisa, Mike, and Luis, were duly authorized employees, apparent employees, servants, apparent servants, agents, or apparent agents of the Practice, and they practiced their professions at the Practice's offices where they assisted with the performance the Procedures on the Plaintiff.

71.     Indeed, all of the work performed by Lisa, Mike, and Luis was rendered to the Plaintiff, on behalf of the Practice.

72.     At all relevant times to this Complaint, Defendants, Lisa, Mike, and Luis, were acting within the scope of their employment, apparent employment, agency, and/or apparent agency relationship with the Practice.

73.     Lisa, Mike, and Luis, as the employees, apparent employees, agents, or apparent agents of the Practice had a duty to use, in their care of the Plaintiff, that degree of skill customarily

FILED DATE: 6/9/2020 10:30 AM    2020L002002

required of like-kind medical professionals in the area, but in violation of said duty, Lisa, Mike, and Luis, were then and there guilty of one or more of the following wrongful acts or omissions:

    a.    Failed to recognize the signs of extensive blood loss and tachycardia during and following the Procedures;

    b.    Failed to call emergency responders in a timely manner when they knew or should have known that Walker required emergency care;

    c.    Failed to properly monitor Walker and follow up after the Procedures were completed; and/or

    d.    Disregarded signs of active bleeding during and/or after the Procedures.

74.    As their employer, apparent employer, principal, and/or apparent principal, the Practice is vicariously liable for the negligent acts and/or omissions of the Defendants Lisa, Mike, and Luis.

75.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Practice, as employer, apparent employer, principal, and/or apparent principal, of Lisa, Mike, and Luis, Walker died on or about November 1, 2018.

76.    As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the Practice to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant 63RD MEDICAL & SURGICAL CENTER, LLC; 63RD LASER & SKIN CLINIC, LLC; and ANTI-AGING & COSMETIC INSITUTE OF CHICAGO, LTD; in an amount

FILED DATE: 6/9/2020 10:30 AM   2020L002002

in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT X – Survival Action and *Respondeat Superior* (Directed at Medical Clinic, Medical Center, and the Institute)

77.     Plaintiff restarts and realleges Paragraphs 1 through 32 and 57 through 76 as and for this Paragraph 77, as if fully set forth herein.

78.     As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of the defendants, collectively referred to as the Practice, acting by their agents and/or employees, prior to her death Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting the Practice to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant 63RD MEDICAL & SURGICAL CENTER, LLC; 63RD LASER & SKIN CLINIC, LLC; and ANTI-AGING & COSMETIC INSITUTE OF CHICAGO, LTD; in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XI – Wrongful Death (Directed at Nacer)

79.     Plaintiff restarts and realleges Paragraphs 1 through 32 as and for this Paragraph 79, as if fully set forth herein.

80.     As the nurse charged with making decisions on whether to admit patients to Holy Cross, Nacer owed Walker a duty to use, in her care of Walker, that degree of skill customarily required of like-kind nurses in the area, but in violation of said duty, Nacer was then and there guilty of one or more of the following wrongful acts or omissions:

FILED DATE: 6/9/2020 10:30 AM    2020L002002

a.    Failed to recognize the signs of extensive blood loss and gravity of Walker's condition at the time Walker arrived at Holy Cross;

b.    Improperly admitted Walker into Holy Cross;

c.    Failed to inform the paramedics that Walker should be immediately taken to a hospital with a Level 1 Trauma Center; and/or

d.    Failed to ensure that there were doctors at Holy Cross that could render appropriate care to Walker.

81.    As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Nacer, Walker died on the day Walker was brought to Holy Cross due to a significant loss of blood.

82.    As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the Defendant, Nacer, to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, NACER MUSLEH, RN, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XII – Survival Action (Directed at Nacer)

83.    Plaintiff repeats and realleges Paragraphs 1 through 32 and 79 through 82, as if fully set forth herein in this Paragraph 83.

84.    As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Nacer, prior to her death, Walker did suffer serious injuries of a personal and

FILED DATE: 6/9/2020 10:30 AM   2020L002002

pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Nacer to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, NACER MUSLEH, RN, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XIII – Wrongful Death (Directed at Cavner)

85.     Plaintiff restarts and realleges Paragraphs 1 through 32 as and for this Paragraph 85, as if fully set forth herein.

86.     After assuming the care of Walker, Cavner owed a duty to use, in her care of Walker, that degree of skill customarily required of like-kind nurses in the area, but in violation of said duty, Cavner was then and there guilty of one or more of the following wrongful acts or omissions:

    a.     Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

    b.     Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would get appropriate care that she needed; and/or

    c.     Failed to timely inform a qualified medical professional, including but not limited a doctor, of the gravity of Walker's condition.

87.     As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Cavner, Walker died on the day Walker was brought to Holy Cross, due to a significant loss of blood.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

88.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the defendant Cavner to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, CARMEN CAVNER, RN, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XIV – Survival Action (Directed at Cavner)

89.     Plaintiff repeats and realleges Paragraphs 1 through 32 and 85 through 88, as if fully set forth herein in this Paragraph 89.

90.     As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Cavner, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Cavner to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, CARMEN CAVNER, RN, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XV – Wrongful Death (Directed at Mazur)

91.     Plaintiff restarts and realleges Paragraphs 1 through 32 as and for this Paragraph 91, as if fully set forth herein.

92.     After assuming the care of Walker, Mazur owed a duty to use, in her care of Walker, that degree of skill customarily required of like-kind nurses in the area, but in violation of said duty, Mazur was then and there guilty of one or more of the following wrongful acts or omissions:

a.     Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.     Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would get appropriate care that she needed; and/or

c.     Failed to timely inform a qualified medical professional, including but not limited to a doctor, of the gravity of Walker's condition.

93.     As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Mazur, Walker died on the day Walker was brought to Holy Cross, due to a significant loss of blood.

94.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the Defendant, Mazur, to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, THERESA MAZUR, RN, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

FILED DATE: 6/9/2020 10:30 AM     2020L002002

FILED DATE: 6/9/2020 10:30 AM   2020L002002

### COUNT XVI – Survival Action (Directed at Mazur)

95.    Plaintiff repeats and realleges Paragraphs 1 through 32 and 91 through 94, as if fully set forth herein in this Paragraph 95.

96.    As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Mazur, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Mazur to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, THERESA MAZUR, RN, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

### COUNT XVII – Wrongful Death (Directed at Orellana)

97.    Plaintiff restarts and realleges Paragraphs 1 through 32 as and for this Paragraph 97, as if fully set forth herein.

98.    After assuming the care of Walker, Orellana owed a duty to use, in his care of Walker, that degree of skill customarily required of like-kind emergency room doctors in the area, but in violation of said duty, Orellana was then and there guilty of one or more of the following wrongful acts or omissions:

a.    Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.    Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would get appropriate care that she needed;

FILED DATE: 6/9/2020 10:30 AM    2020L002002

c.      Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention;

d.      Ignored notification from Nurse Cavner regarding Walker's grave condition;

e.      Unreasonably delayed Walker's transfer to surgery, despite obvious signs of extreme blood loss; and/or

f.      Neglected Walker as a patient and failed to provide the care that she needed.

99.      As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Orellana, Walker died on the day Walker was brought to Holy Cross, due to a significant loss of blood.

100.      As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the defendant, Orellana, to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, FRENANDO ORELLANA, M.D., in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## **COUNT XVIII – Survival Action (Directed at Orellana)**

101.      Plaintiff repeats and realleges Paragraphs 1 through 32 and 97 through 100, as if fully set forth herein in this Paragraph 101.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

102.    As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Orellana, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Orellana to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, DR. FERNANDO ORELLANA, MD, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XIX – Wrongful Death (Directed at Jones)

103.    Plaintiff restates and realleges Paragraphs 1 through 32 as and for this Paragraph 103, as if fully set forth herein.

104.    After assuming the care of Walker, Jones owed a duty to use, in his care of Walker, that degree of skill customarily required of like-kind emergency room doctors in the area, but in violation of said duty, Jones was then and there guilty of one or more of the following wrongful acts or omissions:

a.    Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.    Failed to ensure that Walker was promptly transferred to a hospital with a Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

c.    Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention;

d.    Ignored notification from Nurse Cavner regarding Walker's grave condition;

FILED DATE: 6/9/2020 10:30 AM    2020L002002

e.  Unreasonably delayed Walker's transfer to surgery despite obvious signs of extreme blood loss; and/or

f.  Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

105.  As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Jones, Walker died on the day Walker was brought to Holy Cross, due to a significant loss of blood.

106.  As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the defendant, Jones, to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, ANGELL JONES, M.D., in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XX – Survival Action (Directed at Jones)

107.  Plaintiff repeats and realleges Paragraphs 1 through 32 and 103 through 106, as if fully set forth herein in this Paragraph 107.

108.  As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Jones, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Jones to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, ANGELL JONES, M.D., in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XXI – Wrongful Death (Directed at Vera)

109.    Plaintiff restates and realleges Paragraphs 1 through 32 as and for this Paragraph 109, as if fully set forth herein.

110.    After assuming the care of Walker, Vera owed a duty to use, in his care of Walker, that degree of skill customarily required of like-kind emergency room doctors in the area, but in violation of said duty, Vera was then and there guilty of one or more of the following wrongful acts or omissions:

a.    Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.    Failed to ensure that Walker was promptly transferred to a hospital with a Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

c.    Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention; and/or

d.    Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

111.    As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Vera, Walker died on the day Walker was brought to Holy Cross, due to a significant loss of blood.

FILED DATE: 6/9/2020 10:30 AM   2020L002002

112. As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the defendant, Vera, to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, DENNYS OMAR VERA DANER, M.D., in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XXII – Survival Action (Directed at Vera)

113. Plaintiff repeats and realleges Paragraphs 1 through 32 and 109 through 112, as if fully set forth herein in this Paragraph 113.

114. As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Vera, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Vera to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, DENNYS OMAR VERA DANER, M.D., in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XXIII – Wrongful Death (Directed at Ban)

115. Plaintiff restates and realleges Paragraphs 1 through 32 as and for this Paragraph 115, as if fully set forth herein.

116. After assuming the care of Walker, Ban owed a duty to use, in her care of Walker, that degree of skill customarily required of like-kind emergency room doctors in the area, but in violation of said duty, Ban was then and there guilty of one or more of the following wrongful acts or omissions:

    a. Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

    b. Failed to ensure that Walker was promptly transferred to a hospital with a Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

    c. Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention; and/or

    d. Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

117. As a direct and proximate result of one or more of the foregoing negligent and reckless actions and/or omissions of Ban, Walker died on the day Walker was brought to Holy Cross, due to a significant loss of blood.

118. As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting the defendant, Ban, to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and

FILED DATE: 6/9/2020 10:30 AM 2020L002002

FILED DATE: 6/9/2020 10:30 AM   2020L002002

against the defendant, SUYEUN BAN, M.D., in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

### COUNT XXIV – Survival Action (Directed at Ban)

119.    Plaintiff repeats and realleges Paragraphs 1 through 32 and 115 through 118, as if fully set forth herein in this Paragraph 119.

120.    As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions of Ban, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Ban to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the defendant, SUYEUN BAN, M.D., in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

### COUNT XXV – Wrongful Death and *Respondeat Superior* (Directed at Holy Cross)

121.    Plaintiff repeats and realleges Paragraphs 1 through 32, as if fully set forth herein in this Paragraph 121.

122.    At all relevant times to this Complaint, Defendant, Nacer, was a duly authorized employee, apparent employee, servant, apparent servant, agent, or apparent agent of Holy Cross, and she practiced her profession at the Holy Cross location where Walker was taken on emergency basis.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

123.    At all relevant times to this Complaint, Defendant, Nacer, was acting within the scope of her employment, apparent employment, agency, and/or apparent agency relationship with Holy Cross.

124.    Nacer, as the employee, apparent employee, agent, or apparent agent of Holy Cross had a duty to use, in her care of the Plaintiff, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Nacer was then and there guilty of one or more of the following wrongful acts or omissions:

   a.    Failed to recognize the signs of extensive blood loss and gravity of Walker's condition at the time Walker arrived at Holy Cross;

   b.    Improperly admitted Walker into Holy Cross;

   c.    Failed to inform the paramedics that Walker should be immediately taken to a hospital with a Level 1 Trauma Center; and/or

   d.    Failed to ensure that there were doctors at Holy Cross that could render appropriate care to Walker.

125.    As her employer, apparent employer, principal, and/or apparent principal, Holy Cross is vicariously liable for the negligent acts and/or omissions of the Defendant, Nacer.

126.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Holy Cross, as employer, apparent employer, principal, and/or apparent principal, of Nacer, Walker died on or about November 1, 2018.

127.    As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Holy Cross to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

128.     At all relevant times to this Complaint, Defendant, Cavner, was duly authorized employees, apparent employees, servants, apparent servants, agents, or apparent agents of Holy Cross, and she practiced her profession at the Holy Cross hospital location where she assisted with treatment of Walker.

129.     Indeed, all of the work performed by Cavner to Walker was rendered on behalf of Holy Cross.

130.     At all relevant times to this Complaint, Cavner was acting within the scope of her employment, apparent employment, agency, and/or apparent agency relationship with Holy Cross.

131.     Cavner as an employee, apparent employee, agent, or apparent agent of Holy Cross had a duty to use, in her care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Cavner, was then and there guilty of one or more of the following wrongful acts or omissions:

a.     Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.     Failed to ensure that Walker was promptly transferred to a hospital with a Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed; and/or

c.     Failed to timely inform a qualified medical professional, including but not limited a doctor, of the gravity of Walker's condition.

132.     As her employer, apparent employer, principal, and/or apparent principal, Holy Cross is vicariously liable for the negligent acts and/or omissions of the Defendant, Cavner.

133.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Holy Cross, as employer, apparent employer, principal, and/or apparent principal, of Cavner, Walker died on or about November 1, 2018.

FILED DATE: 6/9/2020 10:30 AM   2020L002002

FILED DATE: 6/9/2020 10:30 AM   2020L002002

134.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Holy Cross to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

135.     At all relevant times to this Complaint, Defendant, Mazur, was duly authorized employee, apparent employee, servant, apparent servant, agent, or apparent agent of Holy Cross, and she practiced her profession at the Holy Cross hospital location where she assisted with treatment of Walker.

136.     Indeed, all of the treatment rendered by Mazur to Walker was rendered on behalf of Holy Cross.

137.     At all relevant times to this Complaint, Mazur was acting within the scope of her employment, apparent employment, agency, and/or apparent agency relationship with Holy Cross.

138.     Mazur as an employee, apparent employee, agent, or apparent agent of Holy Cross had a duty to use, in her care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Mazur, was then and there guilty of one or more of the following wrongful acts or omissions:

a.       Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.       Failed to ensure that Walker was promptly transferred to a hospital with a Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed; and/or

c.       Failed to timely inform a qualified medical professional, including but not limited to a doctor, of the gravity of Walker's condition.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

139.    As her employer, apparent employer, principal, and/or apparent principal, Holy Cross is vicariously liable for the negligent acts and/or omissions of Mazur.

140.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Holy Cross, as employer, apparent employer, principal, and/or apparent principal, of Mazur, Walker died on or about November 1, 2018.

141.    As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Holy Cross to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

142.    At all relevant times to this Complaint, Defendant, Orellana, was a duly authorized employee, apparent employee, servant, apparent servant, agent, or apparent agent of Holy Cross, and he practiced his profession at the Holy Cross hospital location where she assisted with treatment of Walker.

143.    Indeed, all of the treatment rendered by Orellana to Walker was rendered on behalf of Holy Cross.

144.    At all relevant times to this Complaint, Orellana was acting within the scope of his employment, apparent employment, agency, and/or apparent agency relationship with Holy Cross.

145.    Orellana as an employee, apparent employee, agent, or apparent agent of Holy Cross had a duty to use, in his care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Orellana, was then and there guilty of one or more of the following wrongful acts or omissions:

    a.    Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.      Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

c.      Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention;

d.      Ignored notification from Nurse Cavner regarding Walker's grave condition;

e.      Unreasonably delayed Walker's transfer to surgery despite obvious signs of extreme blood loss; and/or

f.      Neglected Walker as a patient and failed to provide the care that she needed.

146.    As their employer, apparent employer, principal, and/or apparent principal, Holy Cross is vicariously liable for the negligent acts and/or omissions of Orellana.

147.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Holy Cross, as employer, apparent employer, principal, and/or apparent principal, of Orellana, Walker died on or about November 1, 2018.

148.    As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Holy Cross to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

149.    At all relevant times to this Complaint, Defendant, Jones, was a duly authorized employee, apparent employee, servant, apparent servant, agent, or apparent agent of Holy Cross, and she practiced her profession at the Holy Cross hospital location where she assisted with treatment of Walker.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

150. Indeed, all of the treatment rendered by Jones to Walker was rendered on behalf of Holy Cross.

151. At all relevant times to this Complaint, Jones was acting within the scope of her employment, apparent employment, agency, and/or apparent agency relationship with Holy Cross.

152. Jones as an employee, apparent employee, agent, or apparent agent of Holy Cross had a duty to use, in her care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Jones, was then and there guilty of one or more of the following wrongful acts or omissions:

a. Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b. Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

c. Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention;

d. Ignored notification from Nurse Cavner regarding Walker's grave condition;

e. Unreasonably delayed Walker's transfer to surgery despite obvious signs of extreme blood loss; and/or

f. Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

153. As their employer, apparent employer, principal, and/or apparent principal, Holy Cross is vicariously liable for the negligent acts and/or omissions of Jones.

154. As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Holy Cross, as employer, apparent employer, principal, and/or apparent principal, of Defendant, Jones, Walker died on or about November 1, 2018.

34

FILED DATE: 6/9/2020 10:30 AM   2020L002002

FILED DATE: 6/9/2020 10:30 AM    2020L002002

155.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Holy Cross to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

156.     At all relevant times to this Complaint, Defendant, Vera, was a duly authorized employee, apparent employee, servant, apparent servant, agent, or apparent agent of Holy Cross, and she practiced her profession at the Holy Cross hospital location where she assisted with treatment of Walker.

157.     Indeed, all of the treatment rendered by Vera to Walker was rendered on behalf of Holy Cross.

158.     At all relevant times to this Complaint, Vera was acting within the scope of his employment, apparent employment, agency, and/or apparent agency relationship with Holy Cross.

159.     Vera, as an employee, apparent employee, agent, or apparent agent of Holy Cross had a duty to use, in his care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Vera, was then and there guilty of one or more of the following wrongful acts or omissions:

a.     Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.     Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

c.     Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention; and/or

FILED DATE: 6/9/2020 10:30 AM    2020L002002

    d.    Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

160.    As his employer, apparent employer, principal, and/or apparent principal, Holy Cross is vicariously liable for the negligent acts and/or omissions of Vera.

161.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Holy Cross, as employer, apparent employer, principal, and/or apparent principal, of Defendant, Vera, Walker died on or about November 1, 2018.

162.    As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Holy Cross to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

163.    At all relevant times to this Complaint, Defendant, Ban, was a duly authorized employee, apparent employee, servant, apparent servant, agent, or apparent agent of Holy Cross, and she practiced her profession at the Holy Cross hospital location where she assisted with treatment of Walker.

164.    Indeed, all of the treatment rendered by Ban to Walker was rendered on behalf of Holy Cross.

165.    At all relevant times to this Complaint, Ban was acting within the scope of her employment, apparent employment, agency, and/or apparent agency relationship with Holy Cross.

166.    Ban as an employee, apparent employee, agent, or apparent agent of Holy Cross had a duty to use, in her care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Ban, was then and there guilty of one or more of the following wrongful acts or omissions:

FILED DATE: 6/9/2020 10:30 AM   2020L002002

a.      Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.      Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

c.      Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention; and/or

d.      Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

167.    As her employer, apparent employer, principal, and/or apparent principal, Holy Cross is vicariously liable for the negligent acts and/or omissions of Ban.

168.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Holy Cross, as employer, apparent employer, principal, and/or apparent principal, of Defendant, Ban, Walker died on or about November 1, 2018.

169.    As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Holy Cross to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, HOLY CROSS HOSPITAL, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

## COUNT XXVI – Survival Action and *Respondeat Superior* (Directed at Holy Cross)

FILED DATE: 6/9/2020 10:30 AM    2020L002002

170.    Plaintiff restarts and realleges Paragraphs 1 through 32 and 121 through 169 as and for this Paragraph 170, as if fully set forth herein.

171.    As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions Holy Cross, acting by its agents and/or employees, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Holy Cross to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, HOLY CROSS HOSPITAL, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

### COUNT XXVII – Wrongful Death and *Respondeat Superior* (Directed at Sinai)

172.    Plaintiff repeats and realleges Paragraphs 1 through 32, as if fully set forth herein in this Paragraph 172.

173.    At all relevant times to this Complaint, Defendant, Orellana, was an employee of Sinai.

174.    Indeed, all of the treatment rendered by Orellana to Walker was rendered on behalf of Sinai and within the scope of his employment for Sinai.

175.    At all relevant times to this Complaint, Orellana was acting within the scope of his employment for Sinai.

176.    Orellana as an employee of Sinai had a duty to use, in his care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation

FILED DATE: 6/9/2020 10:30 AM   2020L002002

of said duty, Orellana, was then and there guilty of one or more of the following wrongful acts or omissions:

      a.     Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

      b.     Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

      c.     Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention;

      d.     Ignored notification from Nurse Cavner regarding Walker's grave condition;

      e.     Unreasonably delayed Walker's transfer to surgery despite obvious signs of extreme blood loss; and/or

      f.     Neglected Walker as a patient and failed to provide the care that she needed.

177.    As his employer, Sinai is vicariously liable for the negligent acts and/or omissions of Orellana.

178.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Siani, as employer of Orellana, Walker died on or about November 1, 2018.

179.    As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Sinia to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

180.    At all relevant times to this Complaint, Defendant, Jones, was a duly authorized employee of Sinai.

FILED DATE: 6/9/2020 10:30 AM   2020L002002

181.    Indeed, all of the treatment rendered by Jones to Walker was rendered on behalf of Sinai and within the scope of her employment for Sinai.

182.    At all relevant times to this Complaint, Jones was acting within the scope of her employment relationship with Sinai.

183.    Jones, as an employee of Sinai, had a duty to use, in her care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Jones, was then and there guilty of one or more of the following wrongful acts or omissions:

a.    Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.    Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

c.    Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention;

d.    Ignored notification from Nurse Cavner regarding Walker's grave condition;

e.    Unreasonably delayed Walker's transfer to surgery despite obvious signs of extreme blood loss; and/or

f.    Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

184.    As her employer, Sinai is vicariously liable for the negligent acts and/or omissions of Jones.

185.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Jones, as employer of Defendant, Jones, Walker died on or about November 1, 2018.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

186.     As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Holy Cross to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

187.     At all relevant times to this Complaint, Defendant, Vera, was a duly authorized employee of Sinai who acted within the scope his employment by Sinai.

188.     Indeed, all of the treatment rendered by Vera to Walker was rendered on behalf of Sinai and within the scope of Vera's employment with Sinai.

189.     At all relevant times to this Complaint, Vera was acting within the scope of his employment at Sinai.

190.     Vera, as an employee of Sinai, had a duty to use, in his care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Vera, was then and there guilty of one or more of the following wrongful acts or omissions:

a.     Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

b.     Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

c.     Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention; and/or

d.     Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

191.     As his employer Sinai is vicariously liable for the negligent acts and/or omissions of Vera.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

192. As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Sinai, as of Defendant, Vera, Walker died on or about November 1, 2018.

193. As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Sinai to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

194. At all relevant times to this Complaint, Defendant, Ban, was a duly authorized employee of Sinai.

195. Indeed, all of the treatment rendered by Ban to Walker was rendered on behalf of Sinai and within the scope of her employment by Sinai.

196. At all relevant times to this Complaint, Ban was acting within the scope of her employment with Sinai.

197. Ban as an employee of Sinai had a duty to use, in her care of Walker, that degree of skill customarily required of like-kind medical professionals in the area, but in violation of said duty, Ban, was then and there guilty of one or more of the following wrongful acts or omissions:

    a.    Failed to recognize the signs of extensive blood loss and gravity of Walker's condition after she was admitted to Holy Cross;

    b.    Failed to ensure that Walker was promptly transferred to a hospital with Level 1 Trauma Center, where Walker would have gotten appropriate care that she needed;

    c.    Failed to timely inform a qualified medical professional, including but not limited to a surgeon, of the gravity of Walker's condition and the need for immediate surgical intervention; and/or

    d.    Neglected Walker as a patient and failed to perform the necessary exploratory surgery to address the source of Walker's bleeding until it was too late.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

198. As her employer, Sinai is vicariously liable for the negligent acts and/or omissions of Ban.

199. As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of Sinai, as employer, of Defendant, Ban, Walker died on or about November 1, 2018.

200. As a direct and a proximate result of the death of Walker, as her next of kin, the Plaintiff has suffered great and grievous losses of a personal and a pecuniary nature, and has been deprived of the society, companionship, friendship, comfort, guidance, love, support and affection of Walker, subjecting Sinai to liability pursuant to the Illinois Wrongful Death Act 740 ILCS 180/1, *et seq.*

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, MOUNT SINAI COMMUNITY FOUNDATION d/b/a SINAI MEDICAL GROUP, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.

### COUNT XXVIII – Survival Action and *Respondeat Superior* (Directed at Sinai)

201. Plaintiff restarts and realleges Paragraphs 1 through 32 and 172 through 200 as and for this Paragraph 201, as if fully set forth herein.

202. As a further direct and proximate result of one or more of the above-mentioned acts and/or omissions Sinai, acting by its employees, prior to her death, Walker did suffer serious injuries of a personal and pecuniary nature, including but not limited to great pain and suffering prior to her death, subjecting Sinai to liability pursuant to the Illinois Survival Act, 755 ILCS 5/27-6.

FILED DATE: 6/9/2020 10:30 AM    2020L002002

WHEREFORE, Plaintiff, MICHAEL KEATING, JR., as the Administrator of the Estate of CRYSTAL LORAINE WALKER KEATING, prays that this Court enter judgment as and against the Defendant, MOUNT SINAI COMMUNITY FOUNDATION d/b/a SINAI MEDICAL GROUP, in an amount in excess of Fifty Thousand Dollars, plus the Plaintiff's costs of this action, and further, for that relief deemed proper by this Honorable Court.


Respectfully Submitted,

_____
Boris G. Samovalov

ZANE D. SMITH & ASSOCIATES, LTD.
111 W. Washington St., Suite 1750
Chicago, Illinois 60602
(312) 245-0031
Boris@zanesmith.com


## AFFIDAVIT IN COMPLIANCE WITH SUPREME COURT RULE 222

You are hereby put on notice that the amount being sought by this action does exceed the sum of fifty thousand dollars ($50,000), and that this action shall not be governed by Illinois Supreme Court Rule 222 with respect to Limited and Simplified Discovery. Under penalties provided by law, pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in the Affidavit of Compliance with Supreme Court Rule 222 are true and correct, except for matters stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Boris G. Samovalov

FILED DATE: 6/9/2020 10:30 AM   2020L002002

## AN AFFIDAVIT PURSUANT TO 735 ILCS 5/2-622 IS INCORPORATED HEREIN AND

## IS BEING ELECTRONICALLY FILED SIMULTANEOUSLY HEREWITH

### CERTIFICATE OF SERVICE

    I, Boris Samovalov, an attorney, on oath state that I served the foregoing document to the attorney(s) of record by sending a true and correct copy of same via email on June 9, 2020. Under the penalties of perjury, I certify that the above statements set forth herein are true and correct.